# EXHIBIT A

# IN THE CHANCERY COURT FOR GILES COUNTY, TENNESSEE

MATTHEW MOORE, and )
KIMBERLY MOORE VANN, )
in their individual capacities and )
in their capacities as co-trustees )
for the ROBERT W. MOORE TRUST )
originally dated November 4, 2014, )
)
     Plaintiffs, )
v. )     CASE NO. 8673
)
NANCY SUZANNE MOORE, )
)
     Defendant. )

## COMPLAINT

Plaintiffs, Matthew Moore and Kimberly Moore Vann, in their individual capacities and in their capacities as co-trustees of the Robert W. Moore Trust dated November 4, 2014, by and through undersigned counsel, sue Defendant, Nancy Suzanne Moore, and state as follows:

## PARTIES

1.     Plaintiffs are residents of the State of Florida and have an interest in the real property located in Giles County, Tennessee, that is the subject of this action.

2.     Nancy Suzanne Moore ("Suzanne" or "Defendant") is a resident of Giles County, Tennessee, and maintains a claimed interest in the real property located in Giles County, Tennessee, that is the subject of this action.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to Tenn. Code Ann. § 16-11-101, because this action seeks equitable relief including rescission, cancellation of an instrument, quiet title, and the imposition of a constructive trust.

1

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 2 of 144 PageID #: 7

4.     Venue is proper in Giles County pursuant to Tenn. Code Ann. § 16-11-114, because the real property at issue is located in Giles County, Tennessee.

## FACTUAL BACKGROUND

5.     Robert W. Moore ("Bud") was a successful football coach and businessman. He played for and coached under Paul "Bear" Bryant at the University of Alabama and eventually became the head football coach at the University of Kansas.

6.     At age forty, Bud retired from coaching and purchased a beer distributorship based in Pensacola, Florida. He successfully operated the distributorship for more than twenty years before selling the business at a substantial profit.

7.     After selling the business, Bud focused on his long-standing passion for Tennessee Walking Horses and purchased a horse farm consisting of approximately sixty-one acres located at 1200 Blue Creek Road, Lynnville, Tennessee (the "Horse Farm"). (*See* Deed, attached hereto as **Exhibit 1**). Bud thereafter transferred title to the Horse Farm to the Robert W. Moore Trust, originally dated November 4, 2014. (*See* Deed, attached hereto as **Exhibit 2**). Also made exhibits 3, 4, 5, & 6 hereto are the Revocable Trust Agreement dated November 4, 2014 **(Exhibit 3)**, the First Amendment to Revocable Trust Agreement of Robert W. Moore dated October 18, 2017 **(Exhibit 4),** the Second Amendment to Revocable Trust Agreement of Robert W. Moore dated October 24, 2019 **(Exhibit 5),** and the Third Amendment to Revocable Trust Agreement of Robert W. Moore dated April 28, 2022 **(Exhibit 6)**. The Horse Farm was Bud's most prized possession and has great financial and emotional value to his family. (*See* Aerial Photograph of the Horse Farm, attached hereto as **Exhibit 7)**.

8.     Bud consistently expressed his desire that the Horse Farm remain in his family for generations.

2

9. Bud had two children with his first wife: Matthew Moore ("Matt") and Kimberly Moore Vann ("Kim"). He also had three grandchildren.

10. In 2008, Bud married his fourth wife, Suzanne. Suzanne is approximately twenty-four years younger than Bud.

11. Before the fourth marriage and for several years thereafter, Matt regularly assisted Bud with his investments because Bud trusted him to manage and grow the family finances. In the last years of Bud's life, Suzanne's son-in-law, who is a financial advisor, also became actively involved in the management of Bud's financial affairs.

12. Bud was not technologically savvy. As Bud aged, Suzanne and her son-in-law increasingly managed his financial accounts and personal affairs.

13. Bud maintained a sophisticated estate plan which included a will **(Attached hereto as Exhibit 8)**, the revocable trust and amendments thereto, (hereinafter "the Trust" or the "Robert W. Moore Trust"), and pre-marital agreement with Suzanne. **(Attached hereto as Exhibit 9).** He updated that plan over the years to make changes as life circumstances evolved; however, one thing remained consistent in all his estate planning: his intention that Suzanne would receive lifetime use and enjoyment in the Horse Farm with the property ultimately passing for the benefit of his children and grandchildren. The pre-marital agreement is a contract between Robert W. Moore and Nancy Suzanne Moore and is binding and enforceable by plaintiffs herein.

14. In the final year of his life, Bud suffered from terminal bladder cancer, severe physical decline, and significant mental frailty. He was prescribed and regularly taking Dilaudid or something like that, a powerful opioid/narcotic medication used to treat severe pain.

15. Bud died on February 2, 2026, at the age of 86.

3

16.     Nearly a month after Bud's death, Plaintiffs discovered that on January 5, 2026—just twenty-five days before Bud's death—a quitclaim deed was executed by Bud, as Trustee of the Trust, purportedly transferring the Horse Farm from the Trust to Suzanne outright. (*See* Deed, attached hereto as **Exhibit 10**).

17.     Plaintiffs, who are the successor trustees of Bud's Trust which previously owned the Horse Farm and who were instructed to carefully manage the Horse Farm for Suzanne as a life estate beneficiary and then Bud's lineal descendants, first learned that the Horse Farm was the subject of the quitclaim deed nearly a month after Bud's death. Suzanne actively concealed the existence of the quitclaim deed until some time after his death such that Bud's children were unaware of the existence of a quitclaim deed until that time.

18.     The deed was prepared by a title company which, upon information and belief, never previously handled Bud's estate planning and was not among the lawyers who had prepared Bud's longstanding trust-based estate plan.

19.     Upon information and belief, Suzanne arranged the title company appointment, selected the drafter, directed the form of the deed, transported Bud to the meeting, was actively involved in procuring the execution of the deed, and paid for the service.

20.     The Horse Farm was conveyed to Suzanne for no consideration and dramatically altered Bud's longstanding estate plan at a time when Bud was physically weakened, medicated with powerful opioids/narcotics, and heavily dependent upon Suzanne.

21.     The circumstances surrounding the transaction—including without limitation Bud's advanced age and medical condition, the secrecy of the transaction, the exclusion of Bud's longtime estate lawyers, the absence of independent legal advice, the lack of consideration, and the drastic change to Bud's estate plan—constitute suspicious circumstances.

4

## COUNT I – UNDUE INFLUENCE

22.     Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

23.     Suzanne stood in a confidential relationship with Bud and exercised substantial influence over his finances and personal affairs.

24.     Suzanne actively participated in procuring the quitclaim deed of the Horse Farm to herself, including selecting the drafting title company, arranging the appointment, transporting Bud to execute the deed, and paying for the same.

25.     Because a confidential relationship existed and the transaction occurred under suspicious circumstances, the transaction was the product of undue influence.

26.     Suzanne abused her confidential relationship with Bud and procured the quitclaim deed transferring the Horse Farm to herself at a time when Bud was elderly, terminally ill, medicated with powerful opioids, and highly vulnerable.

27.     As a direct result of Suzanne's undue influence, Plaintiffs have been deprived of their rightful expectancy in the Horse Farm.

## COUNT II – TORTIOUS INTERFERENCE WITH EXPECTANCY & CONTRACT

28.     Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

29.     Plaintiffs had a valid expectancy that the Horse Farm would ultimately pass to them through the Robert W. Moore Trust after Suzanne's lifetime use and enjoyment as life estate beneficiary and by enforcement of the pre-marital agreement as Exhibit 9 herein.

30.     Suzanne knew that the Horse Farm would be held for her lifetime use and enjoyment through the Robert W. Moore Trust, and ultimately pass to Bud's children after her death.

5

31. Suzanne intentionally interfered with that expectancy by procuring the quitclaim deed of the Horse Farm to herself through undue influence, fraud, and abuse of a confidential relationship.

32. But for Suzanne's tortious conduct, the Horse Farm would have remained part of Bud's estate plan and ultimately passed to Plaintiffs through the Trust.

33. As a result, Plaintiffs have suffered damages, including without limitation the loss of the use, enjoyment, and value of the Horse Farm.

## COUNT III – CANCELLATION AND RESCISSION OF DEED

34. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

35. The quitclaim deed of the Horse Farm to Suzanne injured the Plaintiffs' legal and/or equitable interests in that Bud's long-standing estate plan established his intention that Suzanne would only receive lifetime use and enjoyment in the Horse Farm, and that the Horse Farm would ultimately pass through the Robert W. Moore Trust for the benefit of his children and grandchildren.

36. Suzanne had notice of the Plaintiffs' interests by virtue of her expectation of lifetime use and enjoyment of the Horse Farm after Bud's passing.

37. Additionally, the quitclaim deed of the Horse Farm to Suzanne was procured through undue influence, fraud, lack of capacity and/or mental debility, and without consideration.

38. Equity therefore requires that the quitclaim deed of the Horse Farm to Suzanne be rescinded and cancelled, and that title to the Horse Farm be restored consistent with Bud's estate plan into the successor trustees of the Robert W. Moore Trust.

## COUNT IV – QUIET TITLE

39. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

6

40. The quitclaim deed of the Horse Farm to Suzanne constitutes a cloud on title to the Horse Farm.

41. Plaintiffs seek a declaration that the quitclaim deed of the Horse Farm to Suzanne is void and that title to the Horse Farm is properly held by the successor trustees of the Robert W. Moore Trust.

## COUNT V – CONSTRUCTIVE TRUST

42. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

43. Suzanne obtained the Horse Farm through abuse of a confidential relationship, fraud, duress, and with notice that the successor trustees of the Robert W. Moore Trust which was the intended recipient of the Horse Farm following the death of Robert W. Moore.

44. Equity requires the imposition of a constructive trust over the Horse Farm for the benefit of the Plaintiffs and the Robert W. Moore Trust.

## COUNT VI – LACK OF CAPACITY

45. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

46. At the time the quitclaim deed of the Horse Farm to Suzanne was executed, Bud lacked the mental capacity to understand the nature, extent, character, and consequences of the transaction due to terminal illness, advanced age, and powerful opioid medication.

## COUNT VII – FRAUD

47. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

48. Suzanne concealed the transaction, misused her influence over Bud, and procured the deed through fraudulent conduct designed to deprive Plaintiffs of their rightful inheritance.

## COUNT VIII – BREACH OF FIDUCIARY DUTY

49. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

7

50. Suzanne was Bud's wife and owed Bud the highest degree of loyalty and good faith in her dealings with him.

51. Additionally, Suzanne exercised control over Bud's finances and affairs and owed fiduciary duties of loyalty and good faith in her exercise of control over these affairs.

52. Suzanne breached her duties of loyalty and good faith by failing to act for the benefit of Bud, and instead engaged in conduct adverse to Bud's interests by procuring the quitclaim deed of the Horse Farm from Bud by undue influence, fraud, or other inequitable means.

53. As a result of Suzanne's breach of her fiduciary duties, she received the benefit of the Horse Farm by quitclaim deed without providing any consideration and in contravention to Bud's long-standing estate plan, when instead, she was only intended to receive lifetime use and enjoyment in the Horse Farm.

## COUNT IX – UNJUST ENRICHMENT

54. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

55. Suzanne received the Horse Farm from the Robert W. Moore Trust via quitclaim deed.

56. Suzanne appreciated the benefit of receiving the Horse Farm via quitclaim deed for no consideration.

57. Suzanne procured the quitclaim deed transferring the Horse Farm to herself at a time when Bud was elderly, terminally ill, medicated with powerful opioids, highly vulnerable, and highly dependent on her to manage his financial and personal affairs.

58. The Horse Farm is highly valuable, estimated to be worth millions of dollars.

59. Thus, Suzanne accepted the multi-million-dollar Horse Farm without providing consideration and under circumstances that make retention of the benefit inequitable.

8

## COUNT X – DECLARATORY JUDGMENT

60. Plaintiffs reallege and incorporate paragraphs 1 through 21 herein.

61. The Tennessee Declaratory Judgment Act grants courts of record the power to declare rights, status, and other legal relations. Tenn. Code Aim. § 29-14-102. The Act also conveys the power to construe or determine the validity of any written instrument, statute, ordinance, contract, or franchise, provided that the case is within the court's jurisdiction. Tenn. Code Ann. § 29-14-103.

62. The Tennessee Declaratory Judgment Act provides that "further relief based on a declaratory judgment or decree may be granted whenever necessary or proper." Tenn. Code. Ann. § 29-14-110. Pursuant to this statutory provision, the Court is empowered to grant any appropriate relief related to its declarations.

63. Plaintiffs request a declaration determining the rights of the parties and confirming that the Horse Farm should be held consistent with Bud's longstanding estate plan in the name of the trustees of the Robert W. Moore Trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for the following relief and that the Court enter judgment as necessary:

    a. Setting aside the quitclaim deed of the Horse Farm to Suzanne as *void ab initio* based on the undue influence of Nancy Suzanne Moore;

    b. Adjudging and decreeing that Nancy Suzanne Moore engaged in acts that intentionally interfered with Plaintiffs' expectancy in the Horse Farm by procuring the quitclaim deed of the Horse Farm to Suzanne through undue influence, fraud, and/or abuse of a confidential relationship and awarding damages for the same;

9

c. Cancelling and rescinding the quitclaim deed of the Horse Farm to Suzanne as *void ab initio* based on the undue influence of Nancy Suzanne Moore;

d. Quieting title to the Horse Farm in the Trust;

e. Declaring that Nancy Suzanne Moore holds legal title to the real property located at 1200 Blue Creek Road, Lynnville, Tennessee, referred to herein as the Horse Farm, as a constructive trustee for the benefit of Plaintiffs; imposing a constructive trust upon the Horse Farm, together with all improvements, fixtures, revenues, and proceeds derived therefrom, in favor of Plaintiffs; ordering Nancy Suzanne Moore to convey legal title to the Horse Farm to Plaintiffs, or in the alternative to hold the Horse Farm in trust for Plaintiffs subject to such further orders of the Court; entering any such injunctive or declaratory relief as necessary to prevent further transfer, encumbrance, or dissipation of the property located at 1200 Blue Creek Road, Lynnville, Tennessee, during the pendency of this action; and awarding Plaintiffs the costs of this action;

f. Adjudging and decreeing that, as a matter of law, Robert W. Moore, individually and as trustee of the Trust at the time of the conveyance of the Horse Farm to Suzanne, lacked the requisite capacity to convey title to the Horse Farm from the Trust to Nancy Suzanne Moore;

g. Adjudging and decreeing that Nancy Suzanne Moore engaged in fraudulent conduct that caused Plaintiffs' damages and awarding the same damages to Plaintiffs;

10

h. Adjudging and decreeing that Nancy Suzanne Moore breached her fiduciary duties of loyalty and good faith that caused Plaintiffs' damages and awarding the same damages to Plaintiffs;

i. Adjudging and decreeing that Nancy Suzanne Moore accepted the multi-million-dollar Horse Farm without providing consideration and under circumstances that make retention of the benefit of receiving the Horse Farm inequitable, and thus, was unjustly enriched and awarding damages to Plaintiffs;

j. Adjudging and decreeing that the quitclaim deed purporting to convey the Horse Farm to Nancy Suzanne Moore outright is void and rescinded as a result of undue influence, fraud, and/or procured while Bud lacked capacity to contract; that the Horse Farm is legally titled in the name of Robert W. Moore Trust, to be used and enjoyed for Nancy Suzanne Moore's lifetime and then shall ultimately pass to Bud's lineal descendants through the Robert W. Moore Trust, as provided under the Trust;

k. The Clerk and Master issue an abstract lien *lis pendens* on the subject property;

l. Awarding Plaintiffs the costs of this action, and where appropriate, reasonable attorney's fees as allowed by law; and the Court grant such other, further, and general relief as equity requires.

Respectfully submitted,

Ben Boston (BPR# 11800)
Cameron Hoffmeyer (BPR# 32173)
Wyatt Boston (BPR# 36708)
Boston, Holt & Hoffmeyer, PLLC

11

235 Waterloo Street
Post Office Box 357
Lawrenceburg, TN 38464
(931) 762-7167
ben@thebostonfirm.com
cam@thebostonfirm.com
wyatt@thebostonfirm.com

&

Sallie Papajohn Neese (BPR# 038748)
Clark Partington
125 East Intendencia St.
Pensacola, Florida 32502
(850) 434-9200
Primary email: sneese@clarkpartington.com
Secondary email addresses:
ldunlap@clarkpartington.com
pbrennan@clarkpartington.com
*Attorneys for the Plaintiffs*

## COST BOND

Pursuant to Tenn. Code Ann. § 20-12-120, we acknowledge ourselves sureties for the successful prosecution of the plaintiffs cause of action, and, in case of failure, for the payment of court costs and taxes which may be awarded against the plaintiffs, except in cases and instances specially excepted.

Principals

Boston, Holt and Hoffmeyer, PLLC, surety

By:

12

## VERIFICATION

I, MATTHEW. MOORE, pursuant to Rule 72 of the Tennessee Rules of Civil Procedure, declare and verify under penalty of perjury that the statements contained in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

MATTHEW W. MOORE

Date: 3-11-26

## (Remainder of the Page Intentionally Left Blank)

13

# VERIFICATION

I, KIMBERLY MOORE VANN, pursuant to Rule 72 of the Tennessee Rules of Civil Procedure, declare and verify under penalty of perjury that the statements contained in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

_____
KIMBERLY MOORE VANN

Date: ___3/17/2026___

**(Remainder of the Page Intentionally Left Blank)**

14

# Exhibit 1

**WARRANTY DEED**

STATE OF TENNESSEE
COUNTY OF WILLIAMSON
THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER IS
GREATER FOR THIS TRANSFER IS $395,000.00

_J. B. Bell, Agent_
APPIANT

SUBSCRIBED AND SWORN TO ME ON THE 27TH DAY OF
SEPTEMBER, 2013.

_Brenda Farris_
NOTARY PUBLIC

MY COMMISSION EXPIRES July 1, 2015

[Notary seal: BRENDA FARRIS NOTARY PUBLIC AT LARGE COFFEE COUNTY TENNESSEE]

THIS INSTRUMENT PREPARED BY
Jim R. Vanderpool, P.C., 256 Seaboard Lane, G-104, Franklin, TN 37067
File # 13-P5714 MOORE JV

| ADDRESS OF NEW OWNER | SEND TAX BILLS TO: If left blank please use the address of the new owner | MAP-PARCEL |
| --- | --- | --- |
| Robert W. Moore | 311 Spence Creek Rd | 30-5.03 |
| Blue Creek Road | Franklin, TN 37069 | |
| Lynnville, TN 38472 | | |

FOR AND CONSIDERATION OF THE SUM OF TEN DOLLARS, CASH IN HAND PAID BY THE HEREINAFTER NAMED GRANTEES, AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, WE,

**ALEX F. WADE AND MARY WADE**

HEREINAFTER CALLED THE GRANTORS, HAVE BARGAINED AND SOLD, AND BY THESE PRESENTS DO TRANSFER AND CONVEY UNTO:

**ROBERT W. MOORE**

HEREINAFTER CALLED THE GRANTEES, THEIR HEIRS AND ASSIGNS, A CERTAIN TRACT OR PARCEL OF LAND IN GILES COUNTY, TENNESSEE, DESCRIBED AS FOLLOWS TO-WIT:

**SEE EXHIBIT "A"**

This is improved property known as Blue Creek Road, Lynnville, TN 38472

TO HAVE AND TO HOLD the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEE(S), their heirs and/or assigns forever and we do covenant with the said GRANTEE(S) that we are lawfully seized and possessed of said land in fee simple, have a good right to convey it and the same is unencumbered, unless otherwise herein set out; and we do further covenant and bind ourselves, our heirs and representatives, to warrant and forever defend the title to the said land to the said GRANTEE(S), their heirs and/or assigns, against the lawful claims of all persons whomsoever. Wherever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

Witness my hand on the 27th day of September, 2013.

_Alex F. Wade_
Alex F. Wade

_Mary Wade_
Mary Wade

STATE OF TENNESSEE
COUNTY OF WILLIAMSON

Personally appeared before me, the undersigned, a Notary Public, in and for said County and State, the within named, ALEX F. WADE AND MARY WADE, the bargainor(s), with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence) and who acknowledged that he executed the within instrument for the purposes therein contained.

Witness my hand and official seal at Franklin, Tennessee, this 27th day of September, 2013.

Notary Public _____

My Commission Expires _____

[Notary seal: VANDERPOOL STATE OF TENNESSEE NOTARY PUBLIC WILLIAMSON COUNTY My Commission Expires 03-27-2015]

13095941

COPELAND & BELL PLC
PO BOX 176 -ENV
TULLAHOMA, TN 37388

BK/PG:D356/875-876
**13095941**

| | |
| --- | --- |
| DEED 2 PG | BA:44011 |
| 10/11/2013 | 10:30 AM |
| VALUE | 395000.00 |
| MTG TAX | 0.00 |
| TRN TAX | 1461.50 |
| REC FEE | 10.00 |
| DP FEE | 2.00 |
| REG FEE | 1.00 |
| TOTAL | 1474.50 |
| RECORDED BY: KAY | |

KAY GIBBONS, REGISTER
GILES COUNTY, TENNESSEE

Book D356 Page 875

EX. 1 (6 PAGES)

## EXHIBIT A - LEGAL DESCRIPTION

The following described tract is bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the East margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the Northwest corner of this tract; thence with Stephen K. Heard (remaining portion of the tract) the following 2 calls: South 87 degrees 42'22" East, 825.09 feet to an iron rod set, South 00 degrees 04'51" East, 883.26 feet (passing an iron rod set at 813.26') to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20'42" West, 137.79 feet to a point, South 02 degrees 34'52" East, 59.31 feet to a point, South 30 degrees 57'34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19'15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79 degrees 01'21" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56'12" East, 104.30 feet to an existing iron rod, North 00 degrees 06'08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

Being the same property conveyed to Alex F. Wade by General Waranty Deed from Stephen K. Heard, recorded on the 27th day of August, 1997 in Deed Book 283, Page 903, in the Register's Office of Giles County, Tennessee.

This Conveyance is subject to the matters set forth below, if any, as well as (1) all applicable zoning ordinances (2) utility, sewer, drainage, and other easements of record, (3) all subdivision/condominium assessments, covenants, bylaws, restrictions, declarations and easements of record (as may be amended or supplemented), (4) building restrictions, and (5) all other matters of public record.

a.   County of Giles taxes for the year 2013 and thereafter, not yet due and payable.

b.   Liability as to taxes resulting from supplemental, revised or correction assessments pursuant to the provisions of Tennessee Code Ann 67-5-603, et seq.

c.   Covenants, conditions, restrictions, easements or servitudes, if any, appearing in the public records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

d.   Easement for right of way, recorded in Book D339, Page 16.

e.   NOTE: THE AMOUNT OF ACREAGE STATED IN THE LEGAL DESCRIPTION IS NOT INSURED.

Marshall County Title & Escrow
118 Second Avenue South
Lewisburg, TN 37091

THIS INSTRUMENT WAS PREPARED BY:
MICHAEL M. BOYD
ATTORNEY AT LAW
P.O. BOX 2666
LEWISBURG, TENNESSEE 37091

+ 81.52

- 20.14

FOR IDENTIFICATION ONLY:
MAP 030 PARCEL 005.02
PROPERTY ADDRESS: BLUE CREEK ROAD, LYNNVILLE, TN 38472
GILES COUNTY ASSESSOR'S OFFICE

WARRANTY DEED FROM: JAMES BARROW BROWN, III, AND WIFE, CARLANA G. BROWN, AND SUSAN BREWER BROWN McMILLIAN AND JAMES BARROW BROWN, III, CO-TRUSTEES OF THE SUSAN BREWER BROWN REVOCABLE TRUST

TO: ROBERT W. MOORE

For and in consideration of the sum of One Dollar ($1.00), cash in hand paid, the receipt of which herewith acknowledged, and for other good and valuable considerations, WE , the undersigned, JAMES BARROW BROWN, III, AND WIFE, CARLANA G. BROWN, AND SUSAN BREWER BROWN McMILLIAN (FORMERLY KNOWN AS SUSAN BREWER BROWN) AND JAMES BARROW BROWN, III, CO-TRUSTEES OF THE SUSAN BREWER BROWN REVOCABLE TRUST, have this day bargained and sold and do hereby sell, transfer and convey all our right, title, interest and estate in and to the tract of realty hereinafter described unto ROBERT W. MOORE, his heirs and assigns, in fee simple forever.

To have and to hold unto the said grantee, his heirs and assigns, in fee simple.

The grantors covenant that they are lawfully seized and possessed of the granted realty and that they have a good and lawful right to sell and convey the same; that the property is not encumbered except as herein stated; and that the grantors will forever warrant and defend the title thereto unto the said grantee, his heirs and assigns, against the lawful claims and demands of all persons whomsoever.

The realty conveyed is lying and situated in the SIXTEENTH (16TH) Civil District of GILES County, Tennessee, and is more particularly described as follows, to-wit:

Located in the Sixteenth (16th) Civil District of Giles County, Tennessee, and being more particularly described as follows, to-wit: The following described tract is bounded on the South by Danny Hanson and Albert Menefee, on the East by Albert Menefee, on the West and North by Blue Creek Road. Beginning at an iron rod set in the Southeast corner of the intersection of Blue Creek Road and Trade Branch Road, said point being 25 feet from the center of Blue Creek Road, said point being the Northwest corner of this tract; THENCE with the South margin of Blue Creek Road the following 8 calls: South 83 degrees 58' 19" East, 464.66 feet to an iron pin set, South 77 degrees 13' 12" East, 133.52 feet to an iron pin set, South 67 degrees 35' 28" East, 335.11 feet to an iron pin set, South 75 degrees 58' 19" East, 126.72 feet to an iron pin set, South 87 degrees 30' 13" East, 394.63 feet to an iron pin set, North 77 degrees 34' 16" East, 294.72 feet to an iron pin set, North 84 degrees 51' 55" (Erroneously referred to in a previous deed as minutes) East 117.62 feet to an iron pin set, South 82 degrees 51' 31" East, 7.07 feet to an iron pin set; Thence with Albert Menefee the following 2 calls: South 02 degrees 24' 58" East, 428.26 feet to an iron pin set, South 02 degrees 29' 36" East, 562.32 feet to an iron pin set; thence continuing with Menefee South 02 degrees (erroneously referred to in a previous deed as feet) 25' 44" East, 412.07 feet (passing an iron pin at 382.05 feet) to a point in the center of Blue Creek; Thence continuing with Menefee and generally along the center of the creek South 62 degrees 42' 42" West, 135.78 feet to a point in the center of Blue Creek; thence with Danny Hanson and generally along the center of the creek the following 12 calls: South 59 degrees 15' 32" West, 295.33 feet to a point, South 79 degrees 01' 25" West, 58.49 feet to a point, North 88 degrees 53' 42" West, 36.75 feet to a point, North 59 degrees 32' 58" West, 83.17 feet to a point, South 41 degrees 34' 26" West, 77.29 feet to a point, South 26 degrees 52' 29" West, 78.58 feet to a point, South 68 degrees 31' 53" West, 272.73 feet to a point, South 50 degrees 21' 37" West 190.76 feet to a point, South 38 degrees 47' 22" West, 61.04 feet to a point, South 10 degrees 20' 42" West, 137.79 feet to a point, South 02 degrees 34' 52" East,

14097784

MARSHALL COUNTY TITLE
118 SECOND AVE SOUTH -ENV
LEWISBURG, TN 37091

59.31 feet to a point, South 30 degrees 57' 34" West, 55.40 feet to a point; thence continuing with Hanson and leaving said creek North 78 degrees 19' 15" West, 526.19 feet (passing an iron pin set at 36.78 feet) to a 36" Hackberry; thence continuing with Hanson North 79 degrees 01' 21" West, 275.41 feet to an iron pin set in the East margin of Blue Creek Road (25 feet from the center): thence with said margin the following 4 calls: North 04 degrees 56' 12" East, 104.30 feet to an iron pin set, North 00 degrees 06' 08" East, 1187.96 feet to an iron pin set, North 00 degrees 39' 29" East, 551.96 feet to an iron pin set, North 00 degrees 54' 24" West, 400.38 feet to the point of beginning, containing 81.52 acres, more or less, as per survey of James H. Bingham, Jr., TN RLS No. 1251, dated July 21, 1997.

> INCLUDED WITHIN THE BOUNDARIES OF THE ABOVE DESCRIBED REAL ESTATE BUT EXPRESSLY EXCLUDED FROM THIS CONVEYANCE IS THE FOLLOWING DESCRIBED TRACT OF LAND WHICH WAS PREVIOUSLY CONVEYED TO ALEX F. WADE:
>
> Bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the East margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the Northwest corner of this tract; THENCE with Stephen K. Heard (remaining portion of the tract) the following 2 calls: South 87 degrees 42' 22" East, 825.09 feet to an iron rod set, South 00 degrees 04' 51" East 883.26 feet (passing an iron rod set at 813.26') to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20' 42" West, 137.79 feet to a point, South 02 degrees 34' 52" East, 59.31 feet to a point, South 30 degrees 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79 degrees 01' 21" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56' 12" East, 104.30 feet to an existing iron rod, North 00 degrees 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

The undersigned also conveys unto the grantee, his heirs and assigns, such water rights as were acquired by them in the deed of record in Book D328, page 75, Register's Office of Giles County, Tennessee, described therein as follows:

> "Also hereby intended to be conveyed is certain water rights reserved by the Grantor in Deed Book 283, Page 903, for the right to use of one-half of the water produced from a well located thereon for agricultural/residential purposes along with the right to enter the premises for the purpose of installing water and pumping equipment for the use and benefit of the Grantee herein. These water rights shall be perpetual and shall run with the land."

The property herein conveyed is the same property conveyed to James Barrow Brown, III and wife, Carlana G. Brown (as tenants by the entireties in a one-half undivided interest) , and to the Susan Brewer Brown Revocable Trust, by deed from GERALD ROBESON, dated December 18, 2006 and recorded December 20, 2006 in Book D328, Page 75, Register's Office of Giles County, Tennessee.

The realty is conveyed subject to the following:

1. Any existing easement whether recorded or unrecorded for highway, road, or utility purposes which may affect the realty.

2. Subject to water rights as shown by the instruments of record in Book 283, page 903, and Book 327, page 700, Register's Office of Giles County, Tennessee.

3. Subject to a right of way easement granted to The Fairview Utility District of Giles County, Tennessee, as shown by the instrument of record in Book D339, page 14, Register's Office of Giles County, Tennessee.

4. The realty is currently assessed under the Greenbelt Law and may be subject to the assessment of rollback taxes if not re-certified.

5. All matters expressed or implied noted on the plat of survey prepared by James H. Bingham, Jr., TRLS 1251, dated July 21, 1997.

Possession of the realty will be given to grantee with delivery of this instrument.

The 2014 realty taxes will be prorated between the parties as of the date of this instrument.

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 20 of 144 PageID #: 25

The undersigned, **SUSAN BREWER BROWN McMILLIAN (WHO WAS FORMERLY KNOWN AS SUSAN BREWER BROWN) AND JAMES BARROW BROWN, III, CO-TRUSTEES OF THE SUSAN BREWER BROWN REVOCABLE TRUST**, specifically state that they are the duly authorized Co-Trustees of said Trust and are authorized to execute this instrument on behalf of the SUSAN BREWER BROWN REVOCABLE TRUST.

This 14th day of ____March____, 2014.

_____          _____
JAMES BARROW BROWN, III,                        CARLANA G. BROWN
INDIVIDUALLY


SUSAN BREWER BROWN REVOCABLE TRUST


BY _____ BY _____
SUSAN BREWER BROWN McMILLIAN                JAMES BARROW BROWN, III
(FORMERLY KNOWN AS SUSAN
BREWER BROWN)
CO-TRUSTEES OF THE SUSAN BREWER BROWN REVOCABLE TRUST


STATE OF TENNESSEE
COUNTY OF MARSHALL

    Personally appeared before me, _____, a Notary Public in and for the County and State aforesaid, JAMES BARROW BROWN, III AND WIFE, CARLANA G. BROWN , with whom I am personally acquainted (OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCED), and who acknowledged that THEY executed the within instrument for the purposes therein contained.
    My commission expires:_____
    Witness my hand, at office, this ____ day of _____, 2014.

_____
NOTARY PUBLIC

STATE OF TENNESSEE
COUNTY OF MARSHALL

    Personally appeared before me, _____, a Notary Public in and for the County and State aforesaid, SUSAN BREWER BROWN McMILLIAN (FORMERLY KNOWN AS SUSAN BREWER BROWN),  with whom I am personally acquainted (OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE), and who, upon oath,  acknowledged herself to be a CO-TRUSTEE of THE SUSAN BREWER BROWN REVOCABLE TRUST , the within named bargainor, and that she as such Co-Trustee executed the within instrument for the purposes therein contained.
    My commission expires: 1-31-2017
    Witness my hand, at office, this ____ day of _____, 2014.

_____          SEAL:
NOTARY PUBLIC

STATE OF TENNESSEE
COUNTY OF MARSHALL

    Personally appeared before me, _____, a Notary Public in and for the County and State aforesaid, JAMES BARROW BROWN, III, with whom I am personally acquainted (OR PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE), and who, upon oath,  acknowledged himself to be a CO-TRUSTEE of THE SUSAN BREWER BROWN REVOCABLE TRUST , the within named bargainor, and that he as such Co-Trustee executed the within instrument for the purposes therein contained.
    My commission expires:_____
    Witness my hand, at office, this ____ day of ____March____, 2014.

_____
NOTARY PUBLIC

STATE OF TENNESSEE
COUNTY OF MARSHALL

The undersigned makes oath that the actual value or consideration of this transfer is
$ 385,000.00 .

*Adora G Brown*

Sworn to and subscribed before me this 14th day of March, 2014.

*Vicki Hay*
NOTARY PUBLIC
My Commission Expires: 1.31-2017

SEAL:

NAME AND ADDRESS OF PROPERTY OWNER &
RESPONSIBLE FOR TAXES:
ROBERT W. MOORE
ADDRESS: 1200 Blue Creek Rd
Sunnville TN 38475
Mailing Taxes & Deed to:
311 Spencer Creek Rd
Franklin TN 37069

BK/PG:D358/460-463

14097784

| DEED | 4 | PG | BA:46535 |
|---|---|---|---|
| 03/17/2014 | | | 10:50 AM |
| VALUE | | | 385000.00 |
| MTG TAX | | | 0.00 |
| TRN TAX | | | 1424.50 |
| REC FEE | | | 20.00 |
| DP FEE | | | 2.00 |
| REG FEE | | | 1.00 |
| TOTAL | | | 1447.50 |
| RECORDED BY: | | | TAMMY |

KAY GIBBONS, REGISTER
GILES COUNTY, TENNESSEE

# Exhibit 2

D362/37

BK: D362/375-378  BN: 48681
#:15101836 02/18/15 10:37 AM
MTG TAX          0.00
TRH TAX          0.00
REC FEE         20.00
DP FEE           2.00
REG FEE          0.00
TOTAL           22.00
RECORDED BY: KAY
        KAY GIBBONS, REGISTER
        GILES, TENNESSEE

+ 81.52 ac

− 20.14 ac

*This Instrument Prepared by, and*
*After Recording to be Returned to:*
Ray D. Gibbons, Esq.
Gibbons Graham LLC
100 Corporate Parkway, Suite 125
Birmingham, Alabama 35242

### QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the _30th_ day of ~~November~~ *January*, 2015, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4TH DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this _30th_ day of _January_, 2015.

_____
ROBERT W. MOORE

STATE OF TENNESSEE                    §
COUNTY OF ___Giles___                 §

Before me, the undersigned Notary Public in and for the County and State aforesaid, personally appeared Robert W. Moore, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged to be the person(s) within named and that he executed the foregoing instrument for the purpose therein contained.

Witness my hand and seal this _30th_ day of _January_, 20_15_.

_____
Notary Public
My Commission Expires: _9/21/2015_

                    15101836
GIBBONS GRAHAM LLC
ATTN JANIE DILLINGHAM -ENV
100 CORPORATE PKWY STE 125
BIRMINGHAM, AL 35242-8903

{00055858.DOCX; 1}

Book D362  Page 375

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 24 of 144  PageID #: 29

EX. 2 (TYMHOES)

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $ 0⁰

_____
Affiant

STATE OF ~~TENNESSEE~~ *Alabama*  §

COUNTY OF *Shelby*  §

Subscribed and sworn before me this the *5th* day of *February*, 20 *15*.

Notary Public

My Commission Expires: *10/17/2018*

L. JANE DILLINGHAM
My Commission Expires
October 17, 2018

The following information is not a part of this Deed:

Property Address: 1200 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name:  Robert W. Moore
and Address:  311 Spencer Creek Road
Franklin, Tennessee 37069

Parcel ID Number:  MAP 030, PARCEL 005.02

Mail Tax Bills to:  Robert W. Moore, Trustee of the
Robert W. Moore Revocable Trust
5487 Academy Way
Bessemer, Alabama 35022

{00055858.DOCX; 1}

2

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 25 of 144 PageID #: 30

# EXHIBIT "A"

## LEGAL DESCRIPTION

Located in the Sixteenth (16th) Civil District of Giles County, Tennessee, and being more particularly described as follows, to-wit: The following described tract is bounded on the South by Danny Hanson and Albert Menefee, on the East by Albert Menefee, on the West and North by Blue Creek Road. Beginning at an iron rod set in the southeast corner of the intersection of Blue Creek Road and Trade Branch Road, said point being 25 feet from the center of Blue Creek Road, said point being the northwest corner of this tract; THENCE with the south margin of Blue Creek Road the following 8 calls: South 83 degrees 58' 19" East, 464.66 feet to an iron pin set; South 77 degrees 13' 12" East, 133.52 feet to an iron pin set; South 67 degrees 35' 28" East, 335.11 feet to an iron pin set; South 75 degrees 58' 19" East, 126.72 feet to an iron pin set; South 87 degrees 30' 13" East, 394.63 feet to an iron pin set; North 77 degrees 34' 16" East, 294.72 feet to an iron pin set; North 84 degrees 51' 55" (erroneously referred to in a previous deed as minutes) East, 117.62 feet to an iron pin set; South 82 degrees 51' 31" East, 7.07 feet to an iron pin set; thence with Albert Menefee the following 2 calls: South 02 degrees 24' 58" East, 428.26 feet to an iron pin set; South 02 degrees 29' 36" East, 562.32 feet to an iron pin set; thence continuing with Menefee, South 02 degrees (erroneously referred to in a previous deed as feet) 25' 44" East, 412.07 feet (passing an iron pin at 382.05 feet) to a point in the center of Blue Creek; thence continuing with Menefee and generally along the center of the creek, South 62 degrees 42' 42" West, 135.78 feet to a point in the center of Blue Creek; thence with Danny Hanson and generally along the center of the creek the following 12 calls: South 59 degrees 15' 32" West, 295.33 feet to a point; South 79 degrees 01' 25" West, 58.49 feet to a point; North 88 degrees 53' 42" West, 36.75 feet to a point; North 59 degrees 32' 58" West, 83.17 feet to a point; South 41 degrees 34' 26" West, 77.29 feet to a point; South 26 degrees 52' 29" West, 78.58 feet to a point; South 68 degrees 31' 53" West, 272.73 feet to a point; South 50 degrees 21' 37" West 190.76 feet to a point; South 38 degrees 47' 22" West, 61.04 feet to a point; South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence continuing with Hanson and leaving said creek, North 78 degrees 19' 15" West, 526.19 feet (passing an iron pin set at 36.78 feet) to a 36" Hackberry; thence continuing with Hanson, North 79 degrees 01' 21" West, 275.41 feet to an iron pin set in the east margin of Blue Creek Road (25 feet from the center); thence with said margin the following 4 calls: North 04 degrees 56' 12" East, 104.30 feet to an iron pin set; North 00 degrees 06' 08" East, 1187.96 feet to an iron pin set; North 00 degrees 39' 29" East, 551.96 feet to an iron pin set; North 00 degrees 54' 24" West, 400.38 feet to the point of beginning, containing 81.52 acres, more or less, as per survey of James H. Bingham, Jr., TN RLS No. 1251, dated July 21, 1997.

INCLUDED WITHIN THE BOUNDARIES OF THE ABOVE DESCRIBED REAL ESTATE BUT EXPRESSLY EXCLUDED FROM THIS CONVEYANCE IS THE FOLLOWING DESCRIBED TRACT OF LAND WHICH WAS PREVIOUSLY CONVEYED TO ALEX F. WADE:

Bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road

{00055858.DOCX; 1}                                    3

and Trade Branch Road, said point being the northwest corner of this tract; THENCE with Stephen K. Heard (remaining portion of the tract), the following 2 calls: South 87 degrees 42' 22" East, 825.09 feet to an iron rod set; South 00 degrees 04' 51" East 883.26 feet (passing an iron rod set at 813.26'), to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79 degrees 01' 21" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56' 12" East, 104.30 feet to an existing iron rod; North 00 degrees 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

The undersigned also conveys unto the grantee, its heirs and assigns, such water rights as were acquired by deed of record in Book D328, page 75, Register's Office of Giles County, Tennessee, described therein as follows:

"Also hereby intended to be conveyed is certain water rights reserved by the Grantor in Deed Book 283, Page 903, for the right to use of one-half of the water produced from a well located thereon for agricultural/residential purposes along with the right to enter the premises for the purpose of installing water and pumping equipment for the use and benefit of the Grantee herein. These water rights shall be perpetual and shall run with the land."

The property herein conveyed is the same property conveyed to Robert W. Moore by deed from James Barrow Brown, III, and wife, Carlana G. Brown, and Susan Brewer Brown McMillian (formerly known as Susan Brewer Brown) and James Barrow Brown, III, Co-Trustees of the Susan Brewer Brown Revocable Trust, said deed dated March 14, 2014 and recorded March 17, 2014 in Book D358, pages 460-463, Register's Office of Giles County, Tennessee.

The realty is conveyed subject to the following:

Any existing easement, whether recorded or unrecorded, for highway, road, or utility purposes which may affect the realty.

Subject to water rights as shown by the instruments of record in Book 283, page 903, and Book 327, page 700, Register's Office of Giles County, Tennessee.

Subject to a right of way easement granted to The Fairview Utility District of Giles County, Tennessee, as shown by the instrument of record in Book D339, page 14, Register's Office of Giles County, Tennessee.

The realty is currently assessed under the Greenbelt Law and may be subject to the assessment of rollback taxes if not re-certified.

All matters expressed or implied noted on the plat of survey prepared by James H. Bingham, Jr., TRLS 1251, dated July 21, 1997.

{00055858.DOCX; 1}                                          · 4

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 27 of 144 PageID #: 32

+ 20.14 ac

BK/PG:D380/23-25

19120940

| | |
|---|---|
| QD 3 PG BA:63991 | |
| 03/19/2019 | 09:59 AM |
| VALUE | 0.00 |
| MTG TAX | 0.00 |
| TRN TAX | 0.00 |
| REC FEE | 15.00 |
| DP FEE | 2.00 |
| REG FEE | 0.00 |
| TOTAL | 17.00 |
| RECORDED BY: TAMMY J | |

TAMMY HELTON, REGISTER
GILES COUNTY, TENNESSEE

This instrument prepared by and
after recording returned to:

Ray D. Gibbons, Esq.
Gibbons Law LLC
1200 Corporate Drive, Suite 150
Birmingham, Alabama 35242

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the 8 day of March, 2019, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4th DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this 8 day of March, 2019.

_____
ROBERT W. MOORE

STATE OF ~~TENNESSEE~~ Alabama )
COUNTY OF Jefferson )

I, the undersigned Notary Public in and for said County in said State, hereby certify that Robert W. Moore, whose name is signed to the forgoing Quitclaim Deed and who is personally known to me (or proved to me on the basis of satisfactory evidence), acknowledged before me on this day that, being informed of the contents of said instrument, he voluntarily executed the same for the purposes contained therein.

Given under my hand and seal this 8 day of March, 2019.

_____
Notary Public
My Commission Expires: 12/11/21

CHRISTINE MARINO — MY COMMISSION EXPIRES DECEMBER 11, 2021 — NOTARY PUBLIC — STATE OF ALABAMA

{00055858.DOCX; 1}

19120940
GIBBONS LAW LLC
1200 CORPORATE DR -ENV
STE 150
BIRMINGHAM, AL 35242-5429

Book D380 Page 23

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 28 of 144 PageID #: 33

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $_____0.00____

_____
Affiant

STATE OF ~~TENNESSEE~~ Alabama )
COUNTY OF Jefferson )

Subscribed and sworn before me this the _8_ day of _March_, 20 _19_.

_____
Notary Public
My Commission Expires: _12|11|21_

The following information is not a part of this Deed:

Property Address: 1200 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name: Robert W. Moore
and Address: 311 Spencer Creek Road
Franklin, Tennessee 37069

Parcel ID Number: MAP 030, PARCEL 005.03

**Mail Tax Bills to:** **Robert W. Moore, Trustee of the**
**Robert W. Moore Revocable Trust**
**5487 Academy Way**
**Bessemer, Alabama 35022**

{00055858.DOCX; 1}

2

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 29 of 144 PageID #: 34

## EXHIBIT "A"

## LEGAL DESCRIPTION

The following described tract is bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the northwest corner of this tract; thence with Stephen K. Heard (remaining portion of the tract) the following 2 calls: South 87° 42' 22" East, 825.09 feet to an iron rod set;  South 00° 04' 51" East, 883.26 feet (passing an iron rod set at 813.26') to a point in the center of Blue Creek;  thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10° 20' 42" West, 137.79 feet to a point;  South 02° 34' 52" East, 59.31 feet to a point;  South 30° 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence, the following 2 calls: North 78° 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry;  North 79° 01' 21" West, 275.41 feet to an existing iron rod (approximately 25 feet from the center of Blue Creek Road); thence with said margin, the following 2 calls:  North 04° 56' 12" East, 104.30 feet to an existing iron rod;  North 00° 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

Being the same property conveyed to Robert W. Moore by Deed from Alex F. Wade and Mary Wade, recorded October 11, 2013 in Book D356, page 875, in the Register's Office for Giles County, Tennessee.

This conveyance is subject to the matters set forth below, if any, as well as: (1) all applicable zoning ordinances; (2) utility, sewer, drainage, and other easements of record; (3) all subdivision / condominium assessments, covenants, bylaws, restrictions, declarations and easements of record (as may be amended or supplemented); (4) building restrictions; and (5) all other matters of public record.

1.  Giles County taxes for the year 2019 and thereafter, not yet due and payable;

2.  Liability as to taxes resulting from supplemental, revised or correction assessments pursuant to provisions of Tennessee Code Ann 65-6-503, et seq.;

3.  Covenants, conditions, restrictions, easements or servitudes, if any, appearing in the public records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, conditions or restrictions violate 42 USA 3604(c);

4.  Easement for right of way recorded in Book D339, page 16, in the Register's Office of Giles County, Tennessee.

{00055858.DOCX; 1}

3

# Exhibit 3

## REVOCABLE TRUST AGREEMENT

THIS TRUST AGREEMENT is made on the date hereinafter set forth, between ROBERT W. MOORE, of Walton County, Florida, hereinafter the "Grantor," and ROBERT W. MOORE, hereinafter the "Trustee," for the following uses and purposes:

1. This trust shall be known as the "Revocable Trust Agreement of ROBERT W. MOORE, dated the _4th_ day of _November_, 2014" which date shall be the date this trust was executed by the Grantor.

2. The Grantor has transferred and delivered to the Trustee all of the right, title, and interest of the Grantor in that property described in Schedule "A" attached hereto. The assets herein transferred, and any assets added by the Grantor or passing to the Trustee under the provisions of the Last Will and Testament of the Grantor, shall be held by the Trustee IN TRUST, and shall be managed and distributed under the terms and conditions hereinafter set forth; provided, however, that the Trustee, in the Trustee's discretion, may require, as a prerequisite to accepting property, that the Grantor provide evidence satisfactory to the Trustee that (i) the property is not contaminated by any hazardous or toxic materials or substances; and (ii) the property is not being used and has never been used for any activities directly or indirectly involving the generation, use, treatment, storage, disposal, release, or discharge of any hazardous or toxic materials or substances.

3. The Grantor reserves the right, at any time and from time to time, by instrument in writing delivered to the Trustee, to amend, modify, or revoke this trust in whole or in part. Only the Grantor, or an attorney in fact to whom the power to exercise the right described in the preceding sentence has been expressly granted in the power of attorney which appointed the attorney in fact, may exercise such right. Neither a guardian, an attorney in fact, a conservator, nor any other person (other than the Grantor) may exercise such reserved right of the Grantor, except for an attorney in fact to whom such power has been expressly granted in the power of attorney which appointed the attorney in fact. This trust shall become irrevocable upon the death of the Grantor.

EX 3 (71 PAGES)

4.  (a)  During the life of the Grantor, the Trustee shall manage the assets of the trust for the benefit of the Grantor, and shall pay to the Grantor so much of the income and principal of the trust as the Grantor shall request of the Trustee.  Income not requested by the Grantor shall be accumulated by the Trustee and added to principal.

(b)  In the event the Grantor becomes, in the opinion of the Co-Trustee or successor Trustee, as the case may be, incapable of managing his own affairs (as determined under the provisions of Paragraph 5 below), then during the life of the Grantor, the successor Trustee shall have the right to distribute as much of the income and principal to or for the benefit of the Grantor and, so long as the Grantor's spouse is living with the Grantor, for the benefit of the Grantor's spouse as the successor Trustee in the successor Trustee's discretion determines necessary or appropriate for the health, maintenance, and support of the Grantor and his spouse.

(c)  If any transfer from the trust during the Grantor's lifetime is made to a person other than the Grantor, such transfer shall be treated as a withdrawal by the Grantor and a subsequent transfer by the Grantor to the recipient.

5.  Incapacity of the Grantor to manage his own affairs shall be determined by one of the following means:

(a)  Receipt by the successor Trustee of the Grantor's signed statement requesting and directing that the successor Trustee assume the duties of Trustee and specifically indicating that the Grantor believes that he is incapable of managing his own affairs;

(b)  Receipt by the successor Trustee of a certificate in writing executed by the Grantor's attending physician, certifying that the Grantor has become incapable of the management of his business and personal affairs by reason of physical or mental disability; or

(c)  The successor Trustee's determination, upon such investigation and/or receipt of such evidence as the successor Trustee, in the successor Trustee's reasonable discretion, shall deem necessary or advisable, that the Grantor has become incapable of the management of his business and personal affairs by reason of physical or mental disability.

2

The successor Trustee shall cease to be Trustee upon receipt of the Grantor's signed statement reassuming the duties of Trustee, at any time after the receipt of a statement referred to in subparagraph (a) above and after the successor Trustee, upon investigation, determines that the Grantor is capable of managing his affairs. Further, at any time after the successor Trustee's receipt of a certification referred to in subparagraph (b) above, or after the successor Trustee makes the determination referred to in subparagraph (c) above, the Grantor may make a written request to the successor Trustee to reassume the duties of Trustee. In such event, the successor Trustee shall be required to make such investigation as the successor Trustee deems necessary or desirable, in the successor Trustee's reasonable discretion, and if the successor Trustee concludes as a result of such investigation that the Grantor is no longer incapable of managing his affairs, then the successor Trustee shall cease to perform the duties of Trustee. After the successor Trustee ceases to perform the duties of Trustee, the Grantor shall resume the duties of Trustee.

6. After the death of the Grantor, the Trustee may pay as much of the debts and funeral expenses, estate or inheritance taxes, and reasonable expenses of administration of the estate of the Grantor as the Personal Representative of the Grantor's estate shall request of the Trustee. The Trustee may rely on written requests from the Personal Representative of the Grantor's estate, if any, as to the payment of such amounts, and shall not be required to inquire further as to the accuracy or reasonableness of the amounts so paid. However, it is not the Grantor's intent that the authority of the Trustee to pay debts upon request of the Personal Representative of the Grantor's estate will waive any protection afforded by any statute pursuant to the laws of the State of Florida that would cause any asset of this trust to be exempt from payment of obligations of the Grantor or the Grantor's estate. This authority to pay such debts, expenses, and taxes shall not postpone the disposition of the remaining principal of this trust as herein provided, but the Trustee shall have the right to withhold such an amount as the Trustee may consider necessary for the purposes described herein. The Trustee's selection of assets to be withheld to pay such amount, and the income tax effect

3

thereof, and the Trustee's determination of the amount necessary to withhold, shall not be subject to question by any beneficiary. After the tax liability described above has been finally determined and provided for, the Trustee shall distribute any remaining trust assets as provided for below. Anything herein to the contrary notwithstanding, the Trustee shall not use funds received from the Grantor's individual retirement accounts or other qualified retirement plans to pay any claims or expenses of the Grantor's estate.

7. Upon the death of the Grantor, if his spouse, NANCY SUZANNE LITTEL MOORE (hereinafter "Suzanne"), survives the Grantor by at least one hundred twenty (120) days, and at the time of the Grantor's death, neither the Grantor nor Suzanne has filed any petition for dissolution of marriage or petition for separate maintenance (or the equivalent of separate maintenance), then the Trustee shall distribute outright to Suzanne the sum of FOUR HUNDRED THOUSAND AND NO/100 ($400,000.00) DOLLARS in cash. If Suzanne does not survive the Grantor by at least one hundred twenty (120) days or either Suzanne or the Grantor has filed a petition for dissolution of marriage or a petition for separate maintenance, then the distribution to Suzanne provided in this Paragraph 7 shall not be made.

8. After providing for the distribution described in Paragraph 7 above (if such distribution under Paragraph 7 is to be made), the Trustee shall allocate trust assets with a value equal to TWO HUNDRED THOUSAND AND NO/100 ($200,000.00) DOLLARS to a separate subtrust share (to be referred to as "the Grandchildren's Trust") to be held, managed and distributed as provided in this Paragraph 8. If, after the funding of the distribution described in Paragraph 7 above, there is less than TWO HUNDRED THOUSAND AND NO/100 ($200,000.00) DOLLARS in trust assets remaining, then all of such remaining trust assets shall be allocated to the Grandchildren's Trust.

(a) The Trustee shall divide the assets of the Grandchildren's Trust into separate subtrust shares, one subtrust share for each grandchild of the Grantor who survives the Grantor and one subtrust share for each grandchild of the Grantor who predeceases the Grantor with lineal descendants surviving.

4

(                                    (

(b)    The share for the benefit of a living grandchild of the Grantor who is over the age of thirty-five (35) years shall be distributed to that grandchild, free of any trust. The share for the benefit of a living grandchild of the Grantor who is under the age of thirty-five (35) years shall be held, managed and distributed as follows:

The Trustee of the trust share for the benefit of a grandchild of the Grantor shall pay to or for the benefit of such grandchild for whom the separate trust share is established as much of the income and principal of the separate trust share for the benefit of such grandchild, as the Trustee, in the Trustee's discretion, considers necessary or appropriate for the health, maintenance and education of such grandchild after considering all other sources available to such grandchild.

The authority to make discretionary distributions of income and principal of the share for the benefit of that grandchild shall continue so long as the grandchild is a beneficiary of the trust share. After the grandchild reaches the age of twenty-one (21) years, the Trustee shall distribute to such grandchild, on written request of such grandchild, an aggregate amount equal to up to one-fourth (1/4th) of the value of the assets of such grandchild's separate trust share on the date of the twenty-first (21st) birthday of the grandchild. The grandchild may make multiple requests for distributions under the preceding sentence so long as the aggregate amount of such distributions authorized by the preceding sentence does not exceed the limitation described in the preceding sentence. After the grandchild reaches the age of thirty (30) years, the Trustee shall distribute, on written request of the grandchild, in addition to the amounts which the grandchild may request after the grandchild attains the age of twenty-one (21) years, an aggregate amount equal to up to one-fourth (1/4th) of the value of the assets of the grandchild's separate trust share on the date of the thirtieth (30th) birthday of the grandchild. The grandchild may make multiple requests for distributions under the preceding sentence so long as the aggregate amount of such distributions authorized by the preceding sentence does not exceed the limitation described in the preceding sentence. Upon the grandchild reaching the age of thirty-five (35) years, the

5

Trustee shall distribute on written request of the grandchild, all of the remaining assets of the grandchild's separate trust share to the grandchild, free of any trust. If a grandchild is at least twenty-one (21) years of age but under thirty (30) years of age at the time a separate trust share is established for the grandchild's benefit, the grandchild shall be entitled to request distribution of an amount equal to up to one-fourth (1/4th) of the value of the assets of the grandchild's separate trust share on the date the grandchild's share is established; and a grandchild who is over thirty (30) years of age, but under thirty-five (35) years of age at the date the separate trust share is established for the grandchild's benefit, shall be entitled to request distribution of an amount equal to up to one-half (1/2) of the value of the assets of the grandchild's separate trust share on the date the grandchild's share is established.

If a grandchild of the Grantor dies after a separate trust has been established for the grandchild's benefit, but before all assets of such separate trust share have been distributed to such grandchild, then the remaining assets of the deceased grandchild's separate trust share shall pass (subject to subparagraph (c) below) to the deceased grandchild's lineal descendants, per stirpes, and if none, then to the deceased grandchild's siblings, per stirpes, and if none, to the Grantor's lineal descendants, per stirpes; provided, however, if any of the Grantor's lineal descendants who would otherwise receive a distribution under this subparagraph is not a lineal descendant of the deceased grandchild and is then a beneficiary of a separate trust share created under this trust, then the portion of the share being distributed to such descendant of the Grantor pursuant to this subparagraph shall be added to such descendant's separate trust share for distribution as provided for such separate trust share, and any distribution of a deceased grandchild's interest to the descendants of such deceased grandchild shall be made as provided in Subparagraph (c) below.

(c) The assets of any trust share initially established for the lineal descendants of a grandchild of the Grantor who dies before the separate trust shares are established for the Grantor's grandchildren pursuant to this Paragraph 8 or of any trust share or portion of a trust share held for the lineal descendants of a deceased grandchild of the Grantor

6

who is alive when the separate shares are established for the Grantor's grandchildren, but dies, leaving lineal descendants, before all assets have been distributed from such grandchild's trust share, shall be distributed, per stirpes, to the deceased grandchild's lineal descendants in accordance with this Subparagraph (c). If any assets of this trust are to be distributed to a lineal descendant of a deceased grandchild of the Grantor pursuant to the provisions of this Subparagraph (c), then the Trustee shall have authority either to (i) continue to hold the trust assets for the benefit of such descendant until the descendant attains the age of twenty-five (25) years, at which time the assets of the share shall be distributed, per stirpes, to the descendant, or (ii) immediately distribute the trust assets to the lineal descendant with the share of a lineal descendant who is under the age of twenty-one (21) years being distributed to a custodian chosen by the Trustee under the Florida Uniform Transfers to Minors Act, to be held for the benefit of such descendant pursuant to such Act.

If the Trustee continues to hold trust assets for the benefit of a descendant of a deceased grandchild of the Grantor as provided in clause (i) of the preceding subparagraph, then during the time the assets are held for the benefit of such descendant, the Trustee shall have discretion to distribute as much of the income and principal of the trust share for the benefit of such descendant as in the discretion of the Trustee shall be determined necessary or appropriate for the health, maintenance and education of the descendant, and if the descendant dies before receiving all assets of his or her trust share, then the assets of such deceased descendant's trust share shall be distributed to such descendant's estate.

9. After the distributions described in Paragraphs 7 and 8, and subject to the provisions of Paragraph 6, the Trustee shall distribute the remainder of the trust assets, real and personal, in equal shares, to the Grantor's children, MATTHEW W. MOORE (hereinafter "Matt") and KIMBERLY M. VANN (hereinafter "Kim"). However, if Matt survives the Grantor but disclaims, in whole or in part, his entitlement under this Paragraph 9, then such disclaimed portion of Matt's share under this Paragraph 9 shall pass to the trust described in Paragraph 10 below (hereinafter the "Matt Disclaimer Trust") to be held, managed and distributed as provided

7

in Paragraph 10 below. If Kim survives the Grantor but disclaims, in whole or in part, her entitlement under this Paragraph 9, then such disclaimed portion of Kim's share under this Paragraph 9 shall pass to the trust described in Paragraph 11 below (hereinafter the "Kim Disclaimer Trust") to be held, managed and distributed as provided in Paragraph 11 below. If either of Grantor's children predeceases the Grantor, then such deceased child's share under this Paragraph 9 shall be distributed to such deceased child's lineal descendants, per stirpes, and if a deceased child of the Grantor has no lineal descendants, then such deceased child's share shall be distributed to the Grantor's other lineal descendants, per stirpes; provided, however, if a descendant to whom a distribution would be made pursuant to this sentence is a beneficiary of a separate trust share established for such descendant under this trust, then the distribution that would otherwise be made to such descendant shall be added to such descendant's separate trust share to be held and distributed in accordance with the terms applicable to such separate trust share.

10.     If Matt disclaims any portion of his entitlement under Paragraph 9 above, then such disclaimed portion of Matt's share shall be allocated to a separate subtrust share (named the Matt Disclaimer Trust) which shall be held, managed and distributed as provided in this Paragraph 10. If the Grantor's wife, NANCY SUZANNE LITTEL MOORE (Suzanne) is living, then the Matt Disclaimer Trust will be funded only with property that will qualify for the estate tax marital deduction under the federal estate tax laws (assuming that a timely election had been made to treat the Matt Disclaimer Trust and all assets of such trust as qualified terminable interest property).

As long as Suzanne is living, the Trustee shall hold, manage and distribute the assets of the Matt Disclaimer Trust solely for the benefit of Suzanne in the manner provided in this Paragraph 10. The Trustee shall pay all of the income from the Matt Disclaimer Trust to Suzanne in convenient installments no less frequently than quarter-annually. Any income of the Matt Disclaimer Trust that is accrued but undistributed on the date of Suzanne's death shall be distributed to Suzanne's estate. While Suzanne is living, the Trustee shall not distribute the

8

principal of the Matt Disclaimer Trust to anyone other than Suzanne, and the Trustee shall distribute principal of the Matt Disclaimer Trust to or for the benefit of Suzanne only in the case of a health emergency or life threatening medical condition of Suzanne for which other sources of payment are not available.

If the Matt Disclaimer Trust contains any property which is unproductive, then Suzanne or her representative shall have the power to require the Trustee either to make such property productive or to convert it to productive property within a reasonable time after a written demand by Suzanne or her representative made in writing and delivered to the Trustee. The Trustee shall not mortgage, pledge, hypothecate, or create any lien against the assets of the Matt Disclaimer Trust without the consent of Suzanne or her representative.

Upon the death of Suzanne or at the Grantor's death if Suzanne predeceases the Grantor and the Matt Disclaimer Trust is nevertheless funded, then any assets remaining in the Matt Disclaimer Trust shall be distributed, per stirpes, to the lineal descendants of the Grantor's son, MATTHEW W. MOORE ("Matt") and if Matt has no surviving lineal descendants, the assets of the Matt Disclaimer Trust shall be distributed to the Grantor's other grandchildren, per stirpes. Anything herein to the contrary notwithstanding, if a descendant of the Grantor, including Matt's descendants, to whom a distribution would be made pursuant to this paragraph is a beneficiary of a separate trust share established under this trust, then the distribution that would otherwise be made to such descendant shall be added to such descendant's separate trust share to be held and distributed in accordance with the terms applicable to such separate trust share.

11. If Kim disclaims any portion of her entitlement under Paragraph 9 above, then such disclaimed portion of Kim's share shall be allocated to a separate subtrust share (named the Kim Disclaimer Trust). If the Grantor's wife, NANCY SUZANNE LITTEL MOORE (Suzanne), is living, then the Kim Disclaimer Trust will be funded only with property that will qualify for the estate tax marital deduction under the federal estate tax laws (assuming that a timely election

9

had been made to treat the Kim Disclaimer Trust and all assets of such trust as qualified terminable interest property).

As long as Suzanne is living, the Trustee shall hold, manage and distribute the assets of the Kim Disclaimer Trust solely for the benefit of Suzanne in the manner provided in this Item Seven of this Paragraph 11. The Trustee shall pay all of the income from the Kim Disclaimer Trust to Suzanne in convenient installments no less frequently than quarter-annually. Any income of the Kim Disclaimer Trust that is accrued but undistributed on the date of Suzanne's death shall be distributed to Suzanne's estate. While Suzanne is living, the Trustee shall not distribute the principal of the Kim Disclaimer Trust to anyone other than Suzanne, and the Trustee shall distribute principal of the Kim Disclaimer Trust to or for the benefit of Suzanne only in the case of a health emergency or life threatening medical condition of Suzanne for which other sources of payment are not available.

If the Kim Disclaimer Trust contains any property which is unproductive, then Suzanne or her representative shall have the power to require the Trustee either to make such property productive or to convert it to productive property within a reasonable time after a written demand by Suzanne or her representative made in writing and delivered to the Trustee. The Trustee shall not mortgage, pledge, hypothecate, or create any lien against the assets of the Kim Disclaimer Trust without the consent of Suzanne or her representative.

Upon the death of Suzanne or at the Grantor's death if Suzanne predeceases the Grantor and the Kim Disclaimer Trust is nevertheless funded, any assets remaining in the Kim Disclaimer Trust shall be distributed, per stirpes, to the lineal descendants of the Grantor's daughter, KIMBERLY M. VANN ("Kim"), and if Kim has no surviving lineal descendants, the assets of the Kim Disclaimer Trust shall be distributed to the Grantor's other grandchildren, per stirpes. Anything herein to the contrary notwithstanding, if a descendant of the Grantor, including Kim's descendants, to whom a distribution would be made pursuant to this paragraph is a beneficiary of a separate trust share established under this trust, then the distribution that would otherwise be made to such descendant shall be added to such descendant's separate

10

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 41 of 144 PageID #: 46

trust share to be held and distributed in accordance with the terms applicable to such separate trust share.

12. (a) The interest of any beneficiary hereunder (including a remainderman) in income or principal of this trust or a share or subshare of this trust shall not be subject to voluntary or involuntary assignment, alienation, encumbrance, legal process, claims of creditors, or claims of any spouse of any beneficiary for alimony or support until after payment has actually been made to the beneficiary by the Trustee as hereinbefore provided. This provision is intended to establish this trust as a spendthrift trust to the maximum extent allowable under the law of the State of Florida. The limitation of this Subparagraph 12(a) shall not limit the exercise of any testamentary power of appointment granted to a child of the Grantor under the provisions of this trust.

(b) When, and if, the Trustee shall have notice or shall believe that the rights or interests of any beneficiary in and to any part of the income or principal, or both, of this trust have been or may be diverted from the purpose of this trust, whether by voluntary act or legal process, the Trustee shall not exercise the Trustee's discretion to pay or distribute income or principal to such beneficiary as provided above. Instead, the Trustee may thereafter, in the Trustee's sole discretion, distribute income or principal for the benefit of such beneficiary at such time or times as the Trustee may determine appropriate for the beneficiary's health, maintenance, education and support. The foregoing provisions of this subparagraph (b) shall not apply to required/mandatory distributions of income or principal from any trust or trust share created hereunder, particularly including the mandatory income distributions from the Matt Disclaimer Trust and the Kim Disclaimer Trust.

13. (a) In addition to any power given the Trustee under this instrument for investment or receipt of trust assets, the Trustee shall have all of the powers and authority conferred upon trustees by the laws of the State of Florida and the laws of any other state in which the property of the trust may be located; provided, however, that during the lifetime of the Grantor, the Trustee will not sell or otherwise dispose of any trust asset without first

11

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 42 of 144 PageID #: 47

obtaining the approval of the Grantor if he is available and able to act. Additionally, the Grantor-Trustee, but no other Trustee, shall observe the standard in dealing with the trust assets that he would observe if he were dealing with his individually owned, nontrust property, without accounting for his actions to any other beneficiary of this trust.

(b) If the Trustee is directed to distribute trust assets to a minor, the Trustee is authorized to distribute the assets instead to a custodian, chosen by the Trustee under the Florida Uniform Transfers to Minors Act, to be held for the benefit of the minor pursuant to such Act.

(c) In making any distributions to or for the benefit of a grandchild of the Grantor or a member of a lower generation, the Grantor desires that the Trustee take advantage of any applicable exemptions or exclusions from the generation-skipping transfer tax in order to minimize the amount of transfer taxes which may be payable as a result of such distributions.

(d) The Trustee's powers specifically include the power and authority to buy, sell, wholly or partly for cash or on credit, contract to buy, sell, transfer, exchange or lease any real property; and the power to buy, sell, and trade in securities of any nature, including short sales, on margin, and for such purpose to maintain and operate margin accounts with brokers, and the power to pledge any security held or purchased by the Trustee with such brokers as security for loans and advances made to the Trustee. This provision shall not in any way limit the Trustee's powers under authority of Chapter 736, Florida Statutes, as such chapter now exists or may hereafter be amended.

14. The Trustee shall administer this trust without the necessity of filing or reporting to any court; but the Trustee shall in any event render annual reports to the income beneficiaries hereof, which reports shall include the income earned for the preceding year and the current value of the assets held in trust for the benefit of that beneficiary. After the death of the Grantor, the Trustee shall render such reports and accountings as required by the laws of the State of Florida. The Trustee may have duties and responsibilities in addition to those

12

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 43 of 144 PageID #: 48

described in this instrument. The Trustee is specifically authorized to engage, at the expense of the trust, counsel to advise the Trustee regarding the Trustee's duties and responsibilities.

15. (a) In the event of the removal, resignation, death or incapacity of the initial Trustee, then the Grantor's children, KIMBERLY MOORE VANN and MATTHEW W. MOORE, shall serve as Co-Trustees of this trust. If one of the appointed Co-Trustees cannot or will not serve as Co-Trustee, then the Grantor's other child shall serve as sole Trustee of this trust. If neither of the Grantor's children can serve as Trustee of this trust, then ServisFirst Bank (or its corporate successor or assignee by merger, purchase, consolidation or otherwise) shall serve as successor Trustee. The term "Trustee" referred to in this trust agreement shall be considered to include successor Co-Trustees and successor sole Trustee.

(b) The last individual serving as Trustee of this trust or of any separate trust share or separate trust subshare established under this agreement shall have the power to designate a successor Trustee to replace such Trustee if such Trustee should cease to serve for any reason, and if such designation is made, such designated successor Trustee shall serve before any institutional successor Trustee named herein. Such designation shall be made by written instrument signed by the person making the designation and delivered to the successor Trustee, and may be revoked by similar written instrument at any time before the Trustee making the designation ceases to serve as Trustee.

(c) If at any time there is no Trustee in office and no designated successor, then a majority in interest of the current beneficiaries of the trust who are competent adults and the legal or natural guardian of any other current beneficiaries of the trust shall designate and appoint a successor institutional Trustee to serve as successor Trustee hereunder.

(d) Any Trustee may resign at any time by giving prior written notice to the income beneficiaries.

(e) If any institutional Trustee at any time acting hereunder is merged with or transfers substantially all of its assets to another institution, or is in any other manner

13

reorganized or reincorporated, the resulting or transferee institution shall become Trustee in place of its institutional predecessor.

(f) Any Trustee may be paid compensation for services rendered under this trust agreement.

(g) All fees, compensation, and expenses, including fees and expenses of the Trustee, shall be charged and paid as provided by applicable law.

(h) No successor Trustee shall be personally liable for any act or omission of any predecessor Trustee. Any successor Trustee may accept, without examination or review, the accounts rendered and the property delivered by or for a predecessor Trustee without incurring any liability or responsibility. Any successor Trustee shall have all the title, powers and discretion of the Trustee succeeded, without the necessity of any conveyance or transfer.

(i) At any time that an institution is serving as trustee (hereinafter "an institutional trustee"), a majority in interest of the current beneficiaries who are competent adults and the legal or natural guardian of any other current beneficiaries may remove such institutional trustee and appoint in the place of such removed institutional trustee another institutional trustee.

15. No Trustee appointed hereunder shall be required to furnish any bond or other security in any jurisdiction, the same being expressly waived hereby.

16. If this trust or a share of this trust cannot be finally distributed as provided for above because of the sooner death of all beneficiaries provided for above, whether by name or otherwise, then the Trustee shall distribute the assets of the trust or share remaining at the death of the last surviving beneficiary of the trust or share to those persons who would then be the Grantor's heirs at law as provided in the Florida law of intestate descent and distribution as it then exists and as if the Grantor had died simultaneously with the last surviving beneficiary.

17. (a) Notwithstanding any other provision of this trust agreement:

(i) If this trust or a separate share of this trust would otherwise be partially exempt from generation-skipping transfer tax due to the intended allocation of a GST

14

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 45 of 144 PageID #: 50

exemption to it, then before such allocation and as of the relevant valuation date with respect to such allocation under Section 2642 of the Internal Revenue Code of 1986, as amended, the Trustee may (but need not) divide the trust or share (the "original trust") into two separate trusts of equal or unequal value which shall be identical in all other respects to the original trust or share, so that the allocation of GST exemption can be made to one trust which will be entirely exempt from the federal generation-skipping transfer tax. The two trusts created under this subparagraph shall have the same name as the original trust or share except that the trust to which the GST exemption is allocated shall have the phrase "GST Exempt" added to its name. The two trusts are sometimes referred to herein as "related."

(ii)     If property which is held in, or is to be added or allocated to, this trust is subject to different treatment for any reason for purposes of the federal generation-skipping transfer tax than other property being added or allocated to, or also held in, this trust, then the Trustee may (but need not) hold such property instead as a separate trust that is appropriately designated to distinguish it from the trust to which the property otherwise would have been allocated, but that is identical in all other respects to that trust. The identical trusts resulting from application of this subparagraph are also sometimes referred to herein as "related."

(iii)     If property of this trust or a share of this trust is to be added to or consolidated with another trust or another share of this trust and each of the two trusts or shares is entirely exempt from generation-skipping transfer tax but the addition or consolidation would cause the trust or share which was to receive the addition or survive the consolidation thereafter to be only partially exempt from such tax, then the Trustee may (but need not) continue to hold such trusts or shares as separate trusts or shares. Each trust or share shall retain its individual name, but the separate trusts or shares shall thereafter be held, managed, and distributed under the terms provided for that trust or share which was to receive assets from the other trust or share. The identical trusts or shares resulting from application of this subparagraph are also sometimes referred to herein as "related."

15

(iv)     It is the Grantor's intent that the Trustee shall not be required to administer a trust or share hereunder that is only partially exempt from generation-skipping transfer tax, or to commingle property subject to different treatment for generation-skipping transfer tax purposes whether because the transferors with respect to the property are assigned to different generations or otherwise. The provisions of this subparagraph (a) are intended to enable the Trustee to avoid such situations by empowering the Trustee to segregate trust property (1) that is entirely exempt from generation-skipping transfer tax from trust property that is not exempt; or (2) that is otherwise treated differently from other trust property for purposes of the generation-skipping transfer tax; or (3) that, although entirely exempt from generation-skipping transfer tax, if added to or consolidated with another trust or share would cause the receiving trust or share to be only partially exempt from such tax. The provisions of this subparagraph (a) should be applied in a manner consistent with this intention.

(b)     To the extent it is consistent with the Trustee's fiduciary obligations, the Trustee, in making discretionary distributions of net income and principal from the related trusts referred to in subparagraph (a) above, shall take advantage of the opportunities provided by the creation of such related trusts to avoid or delay generation-skipping transfer tax when making discretionary distributions, and to maximize the amount of trust property that eventually may be distributed to the Grantor's grandchildren or more remote descendants without transfer tax of any kind at the termination of all trusts created under this trust agreement.

18.     If the trust assets include any real property upon which the Grantor resides and makes his permanent residence (or the permanent residence of another or others legally or naturally dependent upon the Grantor), the Grantor shall have a beneficial interest for life in such property and shall have the right to reside there and to have the full and exclusive use of the property for his lifetime. At the time of signing this instrument, the Grantor's residence is located at _65 Jasmine Circle, Santa Rosa Road, Fla_, and is more particularly described on Schedule B attached hereto.

16

Anything herein to the contrary, notwithstanding, the Grantor hereby retains the right to use, possess, and occupy, as the Grantor's personal residence during the Grantor's lifetime, the real property held under this trust agreement when such real property is used as the homestead of the Grantor within the meaning given to the term "homestead" by the State of Florida Constitution and applicable Florida statutes pertaining thereto.

The Grantor's interest in such real property shall be construed as an "equitable title to real estate" as stated in Section 196.041 (2), Florida Statutes, or successor statutes.

19. This trust agreement shall be construed under and regulated by the laws of the State of Florida.

IN WITNESS WHEREOF, this Revocable Trust Agreement is executed on the date hereinafter set forth.

GRANTOR/TRUSTEE:

_____
ROBERT W. MOORE

DATE: 11/4/14 _____, 2014

The foregoing instrument was on the 4th day of NOVEMBER, 2014, signed, sealed, published and declared by ROBERT W. MOORE, in our presence, as and for his Revocable Trust Agreement, and we and each of us, in his presence, and at his special request, and in the presence of each other, hereunto subscribe our names as witnesses to the same.

_____ of Pensacola, Florida.

_____ of Pensacola, Florida.

17

STATE OF FLORIDA )
         : ss.
COUNTY OF ESCAMBIA )

  I, ROBERT W. MOORE, declare to the officer taking my acknowledgement of this instrument and to the subscribing witnesses, that I signed this instrument as my Revocable Trust Agreement.

               _Robert W Moore_
               ROBERT W. MOORE

  We, _Suzanne C. Cooke_ and _Mikele Nunnelee_, have been sworn by the officer signing below, and declare to that officer on our oaths that the Grantor declared the instrument to be the Grantor's Revocable Trust Agreement and signed it in our presence and that we each signed the instrument as a witness in the presence of the Grantor and of each other.

             _Suzanne C. Cooke_
                Witness

             _Mikele Nunnelee_
                Witness

  Acknowledged and subscribed before me by the Grantor and Initial Trustee, ROBERT W. MOORE, who is personally known to me or who has produced _____ _____ as identification, and sworn to and subscribed before me by the witnesses, _Suzanne C. Cooke_____, who is personally known to me or who has produced _____ as identification, and by _Mikele Nunnelee_____, who is personally known to me or who has

18

produced _____ as identification, and subscribed by me in the presence of the Grantor and the subscribing witnesses, all on the ___4th___ day of _Novenber_____, 2014.

HARRY B. STACKHOUSE
COMMISSION # EE46640
EXPIRES: February 23, 2015

[Signature of Notary Public]

_____
[Print, Type, or Stamp Name of Notary Public]
State of Florida at Large

[NOTARIAL SEAL]
A1629114.DOC

Commission Number:_____
My Commission Expires:_____

19

ATTACHMENT TO
REVOCABLE TRUST AGREEMENT OF
<u>ROBERT W. MOORE</u>

**SCHEDULE "A"**

(                                          (

ATTACHMENT TO
REVOCABLE TRUST AGREEMENT OF
ROBERT W. MOORE

**SCHEDULE "B"**

Legal Description of Grantor's Homestead

# Exhibit 4



## FIRST AMENDMENT TO
## REVOCABLE TRUST AGREEMENT OF
## ROBERT W. MOORE

This First Amendment to the Revocable Trust Agreement of ROBERT W. MOORE is executed on the date hereinafter set forth, by ROBERT W. MOORE, of Walton County, Florida, both as Grantor and as Trustee, for the following uses and purposes:

I.   The Revocable Trust Agreement established by ROBERT W. MOORE, as Grantor and as Trustee, on November 4, 2014, is hereby modified and amended as follows:

1.   Paragraph 7 is amended and restated in its entirety to read as follows:

7.   If the Grantor is survived by his spouse Nancy Suzanne Littel Moore (hereinafter "Suzanne"), then the Trustee shall allocate to a separate subtrust to be referred to herein as "the Suzanne Trust" (i) the real property and improvements located in Williamson, County, Tennessee, and more particularly described on Schedule 1 to this Trust, as amended (hereinafter "The Franklin Residential Property"), together with all furniture, fixtures, appliances and electronics located in the Franklin Residential Property and (ii) cash in the amount of Six Hundred Thousand ($600,000.00) Dollars. If the Franklin Residential Property is subject to a mortgage or other lien or encumbrance, then the Franklin Residential Property shall be allocated to the Suzanne Trust, subject to such mortgage, lien or encumbrance. The assets of the Suzanne Trust shall be held, administered and distributed as provided in the following subparagraphs of this Paragraph 7.

(a) So long as Suzanne does not remarry or co-habitat (as described herein) with an adult male who is not a lineal descendant of Suzanne's parents, the Trustee shall hold, manage and distribute the assets of the Suzanne Trust for the benefit of Suzanne as provided in subparagraphs (i) through (v) of this subparagraph 7(a).

i.   So long as the Suzanne Trust owns the Franklin Residential Property, the Trustee shall allow Suzanne to use the Franklin Residential Property as her principal place of residence and shall also allow Suzanne to use all of the contents of the Franklin

Residential Property that are owned by the Suzanne Trust (if Suzanne wants to use the Franklin Residential Property as her principal place of residence), provided, however, as a condition for Suzanne to use the Franklin Residential Property as her principal place of residence, the Trustee may require Suzanne to pay some or all of the expenses related to the Franklin Residential Property, including regularly scheduled principal and interest payments on any debt secured by a mortgage on the Franklin Residential Property, taxes, insurance, utilities and maintenance and upkeep, if the Suzanne Trust does not have liquid assets sufficient to pay such expenses.

ii. If the Suzanne Trust holds liquid assets sufficient to pay the expenses related to the Franklin Residential Property, the Trustee shall pay such expenses related to the Franklin Residential Property from such liquid assets of the Suzanne Trust. However, the Trustee shall not be required to borrow funds to pay the expenses related to the Franklin Residential Property. So long as the Suzanne Trust holds assets in addition to the Franklin Residential Property and its contents, the Trustee shall maintain those other assets as liquid assets to be used to pay the expenses related to the Franklin Residential Property.

iii. During each of the first five (5) years following the funding of the Suzanne Trust (hereinafter "the Five Year Distribution Period"), the Trustee shall distribute to Suzanne, from the assets of the Suzanne Trust, cash in an amount equal to $100,000 less any amounts paid by the Trustee during such year (from the liquid assets of the Suzanne Trust) for the expenses related to the Franklin Residential Property, including regularly scheduled

2

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 55 of 144 PageID #: 60

principal and interest payments on any debt secured by a mortgage on the Franklin Residential Property, and for legal and accounting expenses incurred by the Suzanne Trust during such year. The aggregate distributions to Suzanne pursuant to this subparagraph iii of this subparagraph 7(a) shall not exceed $500,000 less the amounts paid by the Suzanne Trust during the Five Year Distribution Period for expenses related to the Franklin Residential Property and the legal and accounting expenses incurred by the Suzanne Trust during the Five Year Distribution Period.

iv. The Trustee shall not sell or otherwise dispose of the Franklin Residential Property or the contents of the Franklin Residential Property without the consent of Suzanne so long as Suzanne is entitled to use the Franklin Residential Property as her principal place of residence (so long as Suzanne satisfies all conditions to use the Franklin Residential Property as her principal place of residence). However, the Trustee shall sell the Franklin Residential Property and its contents if (a) Suzanne demands that the Trustee sell the Franklin Residential Property and its contents or (b) the Suzanne Trust does not have sufficient liquid assets to pay the expenses of the Franklin Residential Property, together with the legal and accounting expenses of the Suzanne Trust, and Suzanne is unwilling or unable to pay the expenses of the Franklin Residential Property and the legal and accounting expenses of the Suzanne Trust. After the sale of the Franklin Residential Property and its contents, the net proceeds from the sale of the Franklin Residential Property and its contents (hereinafter "the Sales Proceeds") shall continue to be held, along

3

with any other assets of the Suzanne Trust, in the Suzanne Trust (so long as Suzanne does not remarry or co-habitate with an adult male who is not a lineal descendant of Suzanne's parents) for Suzanne's benefit. In addition to the distributions described in subparagraph iii above, after a sale of the Franklin Residential Property, the Trustee shall begin distributing to Suzanne all of the income earned by the assets of the Suzanne Trust, and such income distributions shall be made to Suzanne or for Suzanne's benefit no less frequently than quarterly. In addition, the Trustee, in the Trustee's sole discretion, may distribute from the principal of the Suzanne Trust such amounts as the Trustee determines to be appropriate to pay the expenses of a health emergency of Suzanne or a life threatening medical condition of Suzanne for which other sources of payment are not available.

v. In addition to the distributions described in subparagraphs iii and iv of this subparagraph 7(a), after a sale of the Franklin Residential Property and so long as Suzanne does not remarry or cohabitate with an adult male who is not a lineal descendant of Suzanne's parents, Suzanne shall have the right to demand that the Trustee apply the principal of the trust to provide for a principal place of residence for Suzanne's use, which principal place of residence shall be reasonably acceptable to Suzanne. In the event of such a demand by Suzanne, the Trustee may elect to provide a principal place of residence for Suzanne's use by making principal distributions from the trust to Suzanne so that Suzanne may pay rent for, or make monthly payments on a mortgage on, a reasonable facility to use as Suzanne's principal place of residence, or the Trustee may use (no more than half of)

4

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 57 of 144 PageID #: 62

the trust principal to acquire, as an asset of the Trust, residential property to be used by Suzanne as her principal place of residence. If the Trustee acquires, as an asset of the Trust, property to be used by Suzanne as her principal place of residence, then the Trustee may require Suzanne to pay the expenses (other than mortgage payments) related to such residential property if the trust does not have sufficient other assets to pay such expenses.

(b) In the event that Suzanne does not survive the Grantor, then the Suzanne Trust shall not be funded. If Suzanne survives the Grantor and the Suzanne Trust is funded, but Suzanne remarries or co-habitates with adult male who is not a lineal descendant of Suzanne's parents, then upon Suzanne's remarriage or co-habitation, Suzanne shall immediately cease to be a beneficiary of the Suzanne Trust and all assets then remaining in the Suzanne Trust shall be distributed as provided in Paragraph 9 of the Trust, without regard to any disclaimers that might have been previously filed by Matthew W. Moore or Kimberly M. Vann (prior to Suzanne's remarriage or co-habitation). For purposes of this Paragraph 7, Suzanne shall be considered to co-habitate with a person if Suzanne lives/stays with such person in the same residential property for more than two (2) consecutive days or for more than four (4) days in any period of six (6) consecutive months.

(c) If Suzanne survives the Grantor and does not remarry or co-habitate, then upon Suzanne's death, all assets, if any, then remaining in the Suzanne Trust at the time of Suzanne's death shall be distributed as provided in paragraph 9 of the Trust.

If the Suzanne Trust is funded, then such funding shall be considered as a nonresiduary interest/distribution for purposes of Section 733.817, Florida Statutes, and the apportionment of estate tax.

II. The Revocable Trust Agreement of ROBERT W. MOORE, dated November 4, 2014, is hereby ratified and confirmed as hereby amended.

5

IN WITNESS WHEREOF, this First Amendment to Revocable Trust Agreement of ROBERT W. MOORE is executed on the date hereinafter set forth.

**GRANTOR/TRUSTEE:**

_Robert W Moore_
ROBERT W. MOORE
DATE: _10/18/17_ , 2017

The foregoing Instrument was on the _18th_ day of _October_, 2017, signed, sealed, published and declared by ROBERT W. MOORE, in our presence, as and for the First Amendment to his Revocable Trust Agreement, and we and each of us, in his presence, and at his special request, and in the presence of each other, hereunto subscribe our names as witnesses to the same.

_[signature]_
WITNESS                                          of _Franklin, TN_ .

_[signature] K. Hagan_
WITNESS                                          of _Franklin, TN_ .

STATE OF _Tennessee_ )
                                                          : ss.
COUNTY OF _Williamson_ )

I, ROBERT W. MOORE, declare to the officer taking my acknowledgement of this instrument and to the subscribing witnesses, that I signed this instrument as the First Amendment to my Revocable Trust Agreement.

_Robert W Moore_
ROBERT W. MOORE

6

We, _Olga D'angelo_ and _Nancy K. Hagan_,
have been sworn by the officer signing below, and declare to that officer on our oaths that the
Grantor declared the instrument to be the First Amendment to the Grantor's Revocable Trust
Agreement and signed it in our presence and that we each signed the instrument as a witness
in the presence of the Grantor and of each other.

_(signature)_
Witness

_(signature)_
Witness

Acknowledged and subscribed before me by the Grantor and initial Trustee, ROBERT W.
MOORE, who is personally known to me or who has produced
_his drivers license_ as identification, and sworn to and subscribed before
me by the witnesses, _Olga D'angelo_ (first witness), who is
personally known to me or who has produced _her drivers license_ as
identification, and by _Nancy K. Hagan_ (second witness), who is
personally known to me or who has produced _her drivers license_ as
identification, and subscribed by me in the presence of the Grantor and the subscribing
witnesses, all on the _18th_ day of _October_, 2017.

_(signature)_
[Signature of Notary Public]

JACKIE E DAWSON
[Print, Type, or Stamp Name of Notary Public]

Commission Number: _N/A_
My Commission Expires: _5/8/18_

[NOTARIAL SEAL]
A2469116.DOC

7

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 60 of 144 PageID #: 65

**FIRST AMENDMENT TO
REVOCABLE TRUST AGREEMENT OF
ROBERT W. MOORE**

**Schedule 1**

**The Franklin Residential Property**

(See attached deed.)

8

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 61 of 144 PageID #: 66

Prepared by:                                    Tax Responsibility:

Boho, Hunt, White & Neece                       Robert W. Moore-Owner
111 W. Side Square                              (illegible)
Shelbyville, TN 37160                           (illegible)

Information contained in                        Map 53-C, Group A, Parcel 2
this Deed was furnished
by the parties.

## *WARRANTY DEED*

For and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt of all of which is hereby acknowledged, I, PAUL W. BRYAN, JR., a married person, have this day bargained and sold and do hereby sell, transfer and convey unto ROBERT W. MOORE, his heirs and assigns, certain real estate lying and being in the Eighth (8th) Civil District of Williamson County, Tennessee, and being more particularly described as follows:

> Land in Williamson County, Tennessee, being Lot No. 441 and Lot No. 442 on the Final Plat of Dunwoody Commons, Section One, as of record in Plat Book 21, page 62, Register's Office of Williamson County, Tennessee, to which said plan reference is hereby made for a more complete and accurate legal description thereof.

> Being the same property conveyed to Paul W. Bryan, Jr., a married person, by Deed from Anthony F. Ushneck and wife, Ann Marie Ushneck, dated July 27, 2006, of record in Book 3997, page 462, Register's Office of Williamson County, Tennessee.

> This conveyance is subject to any and all existing easements and restrictions of record.

> This is improved property known as 311 Spencer Creek Road, Franklin, TN 37069, and also unimproved property known as 305 Spencer Creek Road, Franklin, TN 37069.

To have and to hold said tract or parcel of real estate, together with all improvements thereon and all appurtenances thereunto belonging, unto the said ROBERT W. MOORE, his

9

# Exhibit 5

**SECOND AMENDMENT TO**
**REVOCABLE TRUST AGREEMENT OF**
**ROBERT W. MOORE**

This Second Amendment to the Revocable Trust Agreement of ROBERT W. MOORE is executed on the date hereinafter set forth, by ROBERT W. MOORE, of Walton County, Florida, both as Grantor and as Trustee, for the following uses and purposes:

I.      The Revocable Trust Agreement established by ROBERT W. MOORE, as Grantor and as Trustee, on November 4, 2014, as modified and amended by the First Amendment, dated October 18, 2017, is hereby further modified and amended as follows:

1.      Paragraph 7 is amended and restated in its entirety to read as follows:

7.      If the Grantor is survived by his spouse Nancy Suzanne Littel Moore (hereinafter "Suzanne"), then the Trustee shall allocate to a separate subtrust to be referred to herein as "the Suzanne Trust" (i) all of the interest of the trust and the Grantor in any and all real property and improvements located in Giles County, Tennessee, which property, as of September 1, 2019, includes the real property described on Schedule 1 to this Trust (hereinafter referred to as "the Lynnville Real Property"), together with all interest of the trust and the Grantor in the furniture, fixtures, appliances, electronics and other tangible personal property located in or on the Lynnville Real Property as of the date of the Grantor's death, other than the tangible personal property that is specifically identified on the list referred to in Item Two of the Grantor's Last Will and Testament (the tangible personal property to be allocated to the Suzanne Trust is hereinafter referred to as the "Lynnville Personal Property"), and (ii) cash in the amount of Six Hundred Thousand ($600,000.00) Dollars. The Lynnville Real Property consists of at least two separate parcels that are described on Schedule 1 and includes all improvements located on the Lynnville Real Property, including, but not limited to, the house/residence, barns and any other outbuildings, as well as

the pastures and fields that are part of the Lynnville Real Property. If the Lynnville Real Property is subject to a mortgage or other lien or encumbrance, then the Lynnville Real Property shall be allocated to the Suzanne Trust, subject to such mortgage, lien or encumbrance. The assets of the Suzanne Trust shall be held, administered and distributed as provided in the following subparagraphs of this Paragraph 7.

(a) Subject to the other provisions of this Subparagraph (a), particularly Subparagraph (a)(ix), so long as Suzanne is living, the Trustee shall hold, manage and distribute the assets of the Suzanne Trust for the benefit of Suzanne in the manner provided in Subparagraphs (i) through (viii) of this Subparagraph 7(a).

(i) Except as otherwise provided herein, so long as the Suzanne Trust owns the Lynnville Real Property, the Trustee shall allow Suzanne to use the entirety of the Lynnville Real Property rent free, as her principal place of residence and/or for any other purpose, including the operation of a business, such as the operation of a horse boarding business on a portion of the Lynnville Real Property. The Trustee shall also allow Suzanne rent-free use of all of the Lynnville Personal Property. However, a condition of Suzanne's rent-free use of the Lynnville Real Property and the Lynnville Personal Property is that Suzanne pay the recurring expenses related to the Lynnville Real Property, such as regularly scheduled principal and interest payments on debt, if any, secured by a mortgage on the Lynnville Real Property, ad valorem taxes, insurance (both hazard and liability), utilities and routine maintenance and upkeep, in the event, and only in the event, that the Suzanne Trust does not have assets, in addition to the Lynnville Real Property and the Lynnville Personal Property, including income earned by the Suzanne Trust, sufficient to pay such recurring expenses.

2

(ii)     Since the Lynnville Real Property owned by the Suzanne Trust includes real property in addition to the real property immediately surrounding the home/residence located on the Lynnville Real Property, as well as tangible personal property in addition to the furniture, fixtures and appliances located in the home/residence located on the Lynnville Real Property, then unless Suzanne is using such other real property or other personal property (such as using such other real property or other personal property in a business operated by Suzanne), the Trustee shall make reasonable efforts to make such other Lynnville Real Property and other Lynnville Personal Property productive. By way of example, and not by way of limitation, to the extent consistent with Suzanne's use of the Lynnville Real Property, the Trustee may arrange for cultivation of portions of the Lynnville Real Property (other than the portion on which the home/residence is located) and sell the crops harvested to produce income for the Suzanne Trust that can be used to pay expenses of the Suzanne Trust, including the recurring expenses of the Lynnville Real Property, or to make distributions provided in this Subparagraph 7(a).

(iii).    If the Suzanne Trust holds assets other than the Lynnville Real Property and Lynnville Personal Property (hereinafter "excess trust assets") sufficient to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property, then the Trustee shall pay such expenses related to the Lynnville Real Property and the Lynnville Personal Property from such excess trust assets, and the Trustee shall not look to Suzanne to pay all or any part of such expenses if excess trust assets are available to pay such expenses. If the Suzanne Trust does not have sufficient excess trust assets to pay all of the expenses related to the Lynnville Real Property and the Lynnville Personal Property, but the Trustee has determined that the Lynnville Real Property should not be sold as

3

permitted by Subparagraph (vi) below, then the Trustee is authorized, but not required, to cause the Suzanne Trust to borrow funds to provide excess trust assets to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property. So long as the Suzanne Trust holds excess trust assets, the Trustee shall maintain those excess trust assets as liquid assets to be used to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property.

(iv) During each of the first five (5) calendar years following the funding of the Suzanne Trust (hereinafter "the Five Year Distribution Period"), the Trustee shall distribute to Suzanne, from the assets of the Suzanne Trust, cash in an amount equal to $100,000 less any amounts paid by the Trustee during such year (from the excess trust assets) for the expenses related to the Lynnville Real Property and the Lynnville Personal Property, including regularly scheduled principal and interest payments on debt, if any, secured by a mortgage on the Lynnville Real Property, ad valorem taxes, insurance (hazard and liability), utilities and routine maintenance and upkeep, and for legal and accounting expenses incurred by the Suzanne Trust during such year. The aggregate distributions to Suzanne pursuant to this Subparagraph (iv) of this Subparagraph 7(a) shall not exceed $500,000 less the amounts paid by the Suzanne Trust during the Five Year Distribution Period for expenses related to the Lynnville Real Property and the Lynnville Personal Property and the legal and accounting expenses incurred by the Suzanne Trust during the Five Year Distribution Period.

(v) In addition to the distributions to Suzanne described in Subparagraph (iv) above, the Trustee shall have discretion to distribute the income (if the Suzanne Trust is not distributing income on a mandatory basis pursuant to Subparagraph (vii) below) or principal of the Suzanne Trust to pay for legitimate and significant medical and health care

4

expenses for Suzanne, and such expenses may include premiums for reasonable amounts of health, medical and hospitalization insurance for Suzanne.

(vi)     Except as specifically provided herein, so long as Suzanne is a beneficiary of the Suzanne Trust, the Trustee shall not sell or otherwise dispose of the Lynnville Real Property or the Lynnville Personal Property without Suzanne's consent.  However, the Trustee may sell all or part of the Lynnville Real Property and Lynnville Personal Property if Suzanne requests that the Trustee sell all or part of the Lynnville Real Property or Lynnville Personal Property and the Trustee determines that the sale of all or part of the Lynnville Real Property or Lynnville Personal Property is a prudent action considering all factors, such as the potential appreciation of the Lynnville Real Property.  If a portion, but not all, of the Lynnville Real Property or the Lynnville Personal Property is sold as provided herein, then the proceeds from such sale shall be considered excess trust assets available to pay expenses of the remaining Lynnville Real Property and the remaining Lynnville Personal Property and to make distributions as described herein. Anything herein to the contrary notwithstanding, the Trustee shall sell the entire Lynnville Real Property and all Lynnville Personal Property if –

a.     the Suzanne Trust (1) does not have sufficient excess trust assets to pay the expenses of the Lynnville Real Property and the Lynnville Personal Property, together with the legal and accounting expenses of the Suzanne Trust, (2) Suzanne is unwilling or unable to pay the remaining expenses of the Lynnville Real Property and the Lynnville Personal Property and the remaining legal and accounting expenses of the Suzanne Trust and (3) the Trustee, in the Trustee's discretion, determines that it is not appropriate for the Suzanne Trust to borrow funds to pay such expenses.

5

b.     Suzanne notifies the Trustee that she will no longer use the Lynnville Real Property as a place of residence and Suzanne demands that the Trustee sell the entire Lynnville Real Property and all of the Lynnville Personal Property.

In the case of any proposed sale of all or any portion of the Lynnville Real Property or the Lynnville Personal Property, upon receipt of a bona fide offer to purchase all or any portion of the Lynnville Real Property or Lynnville Personal Property that the Trustee intends to accept (hereinafter "a Third Party Offer"), the Trustee, before final acceptance of a Third Party Offer, shall give the Grantor's children the opportunity (a Right of First Refusal) to purchase the Lynnville Real Property or the Lynnville Personal Property that is the subject of such Third Party Offer upon the same terms and conditions as the Third Party Offer (if the Third Party Offer involves consideration from the buyer in a form other than cash, such as exchange property, then the Grantor's children may substitute cash of equivalent value for such exchange property).   The Right of First Refusal shall be extended by the Trustee providing to the Grantor's children the price and all terms and conditions of the Third Party Offer and allowing the Grantor's children forty-five (45) days to notify the Trustee in writing that they will match the Third Party Offer (hereinafter "the ROFR Acceptance Notice").  The closing pursuant to a Right of First Refusal Acceptance Notice must occur within thirty (30) days after the timely delivery of the Right of First Refusal Acceptance Notice.  The Right of First Refusal shall expire if (i) a Right of First Refusal Acceptance Notice is not delivered within the forty-five (45) day period, (ii) the closing pursuant to a timely Right of First Refusal Acceptance Notice does not occur within the applicable thirty (30) day period or (iii) the Grantor's children cannot agree between themselves regarding whether one or both of them will exercise the Right of First Refusal.

6

(vii)    After the sale of the entire Lynnville Real Property, and so long as Suzanne is still a beneficiary of the Suzanne Trust, the net proceeds from the sale of the entire Lynnville Real Property and all of the Lynnville Personal Property (hereinafter "the Sales Proceeds") shall continue to be held in trust and managed and distributed, along with any other assets of the Suzanne Trust, for Suzanne's benefit in accordance with the provisions of this Subparagraph 7(a).    After the sale of the entire Lynnville Real Property and while Suzanne is still a beneficiary of the Suzanne Trust, in addition to the distributions to Suzanne described in Subparagraphs (iv) and (v) above, the Trustee shall begin distributing to Suzanne all of the net income earned by all of the assets of the Suzanne Trust, and such mandatory income distributions shall be made to Suzanne or for Suzanne's benefit no less frequently than quarterly.

(viii)    In addition to the distributions described in Subparagraphs (iv), (v) and (vii) of this Subparagraph 7(a), after a sale of the home/residence located on the Lynnville Real Property and so long as Suzanne is still a beneficiary of the Suzanne Trust, Suzanne shall have the right to demand that the Trustee apply principal of the Suzanne Trust to provide for a principal place of residence for Suzanne's rent-free use, which principal place of residence shall be reasonably acceptable to Suzanne.  In the event of such a demand by Suzanne, the Trustee may elect to provide a principal place of residence for Suzanne's use by making principal distributions from the trust to Suzanne so that Suzanne may pay rent for, or make monthly payments on a mortgage on, a reasonable facility to use as Suzanne's principal place of residence, or the Trustee may use (no more than half of) the trust principal to acquire, as an asset of the Trust, residential property to be used rent free by Suzanne as her principal place of residence. If the Trustee acquires, as an asset of the Trust, property to be used rent

7

free by Suzanne as her principal place of residence, then the Trustee shall pay from the other assets of the Suzanne Trust (and to the extent of such other assets) all expenses related to such residential property.

(ix) Anything in this Subparagraph (a) to the contrary notwithstanding, if Suzanne survives the Grantor, but Suzanne remarries or co-habitates with adult male who is not a lineal descendant of Suzanne's parents, then upon Suzanne's remarriage or co-habitation, Suzanne shall immediately cease to be a beneficiary of the Suzanne Trust and all assets then remaining in the Suzanne Trust shall be immediately distributed as provided in Paragraph 9 of the Trust, without regard to any disclaimers that might have been previously filed by Matthew W. Moore or Kimberly M. Vann (prior to Suzanne's remarriage or co-habitation). For all purposes of this Subparagraph 7(a), Suzanne shall be considered to co-habitate with a person if Suzanne lives/stays with such person in the same residential property for more than two (2) consecutive days or for more than four (4) days in any period of six (6) consecutive months.

(b) If Suzanne does not survive the Grantor, then the Suzanne Trust shall not be funded and all assets that would have otherwise been allocated to the Suzanne Trust shall be distributed as provided in Paragraph 9 of the trust.

(c) If Suzanne survives the Grantor and does not remarry or co-habitate, then upon Suzanne's death, all assets, if any, then remaining in the Suzanne Trust at the time of Suzanne's death shall be distributed as provided in paragraph 9 of the Trust.

If the Suzanne Trust is funded, then such funding shall be considered as a nonresiduary interest/distribution for purposes of Section 733.817, Florida Statutes, and the apportionment of estate tax.

8

2. Paragraph 13 is hereby amended by adding at the end of such Paragraph the following new Subparagraphs (e) and (f).

(e) If the trust owns real property (either at the time of the Grantor's death or because the real property passes to the trust pursuant to the provisions of the Grantor's Last Will and Testament) where tangible personal property belonging to the Grantor's Spouse, NANCY SUZANNE LITTEL MOORE (hereinafter "Suzanne") is located or stored, then the Trustee shall allow Suzanne up to sixty (60) days to remove Suzanne's tangible personal property from such real property. The preceding sentence to the contrary notwithstanding, Suzanne shall be allowed to store any of her tangible personal property on the Lynnville Real Property so long as the Suzanne Trust owns the Lynnville Real Property and Suzanne is a beneficiary of the Suzanne Trust.

(f) The Co-Trustees or sole Trustee, as the case may be, shall fund the Suzanne Trust as soon as possible after the Grantor's death (if Suzanne survives the Grantor and is a beneficiary of the Suzanne Trust), and prior to the formal allocation of the Lynnville Real Property to the Suzanne Trust, the Lynnville Real Property shall be treated as (deemed to be) an asset of the Suzanne Trust immediately upon the Grantor's death.

3. Paragraph 15 is hereby amended and restated in its entirety to read as follows:

15. (a) Subject to Subparagraph (b) below, in the event of the removal, resignation, death or incapacity of the initial Trustee, then the Grantor's children, KIMBERLY MOORE VANN and MATTHEW W. MOORE, shall serve as successor Co-Trustees of this trust. If one of the appointed Co-Trustees cannot or will not serve as Co-Trustee, then, subject to Subparagraph (b) below, the Grantor's other child shall serve as sole Trustee of this trust. If neither of the Grantor's children can serve as Trustee of this

9

trust, then, subject to Subparagraph (b) below, the successor Trustee shall be SCOTT GASHOW. If SCOTT GASHOW is unable or unwilling to serve as successor Trustee of this trust, then the successor Trustee shall be the individual or institution designated under the other provisions of this Paragraph 15.

(b) Any provision of Subparagraph (a) to the contrary notwithstanding, upon the funding (in whole or in part) of the Suzanne Trust as described in Subparagraph 7(a), then David W. Garrett shall serve as the sole Trustee of the Suzanne Trust, and the Co-Trustees or sole Trustee appointed pursuant to Subparagraph (a) of this Paragraph 15 shall cease to serve as Co-Trustees of the Suzanne Trust but shall continue to serve as Co-Trustees or sole Trustee of any other subtrusts established by this trust. If DAVID W. GARRETT is unable or unwilling to serve as Trustee of the Suzanne Trust, then WILLIAM LOOMIS BURNS, IV, shall serve as successor Trustee of the Suzanne Trust.

(c) The last individual serving as Trustee of this trust or of any separate trust share or separate trust subshare established under this agreement shall have the power to designate a successor Trustee to replace such Trustee if such Trustee should cease to serve for any reason, and if such designation is made, such designated successor Trustee shall serve before any institutional successor Trustee named herein. The last individual serving as Trustee of the Suzanne Trust shall have authority to appoint a successor Trustee to succeed him as Trustee of the Suzanne Trust, but any successor Trustee appointed for the Suzanne Trust pursuant to this sentence must be an institutional Trustee. The designation of a successor Trustee pursuant to this Subparagraph (c) shall be made by written instrument signed by the person making the designation and delivered to the successor Trustee, and may be revoked by similar written instrument at any time before the Trustee

10

making the designation ceases to serve as Trustee. If the last individual serving as Trustee of the Suzanne Trust is unable or unwilling to serve as the successor Trustee of the Suzanne Trust and does not designate a successor Trustee to succeed him as Trustee of the Suzanne Trust, then the successor Trustee of the Suzanne Trust shall be the trustee designated under the other provisions of this Paragraph 15.

(d)  If at any time there is no Trustee in office and no designated successor Trustee for this trust or a separate trust share or separate trust subshare, then the successor Trustee of this trust or separate trust share or separate trust subshare shall be an institution chosen by a majority of the Grantor's competent adult descendants.

(e)  Any Trustee may resign at any time by giving prior written notice to the income beneficiaries of the trust or trust share or trust subshare.

(f)  If any institutional Trustee at any time acting hereunder is merged with or transfers substantially all of its assets to another institution, or is in any other manner reorganized or reincorporated, the resulting or transferee institution shall become Trustee in place of its institutional predecessor.

(g)  All fees, compensation and expenses, including fees and expenses of the Trustee, shall be charged and paid as provided by applicable law.

(h)  No successor Trustee shall be personally liable for any act or omission of any predecessor Trustee. Any successor Trustee may accept, without examination or review, the accounts rendered and the property delivered by or for a predecessor Trustee without incurring any liability or responsibility. Any successor Trustee shall have all the title, powers and

11

discretion of the Trustee succeeded, without the necessity of any conveyance or transfer.

II.    The Revocable Trust Agreement of ROBERT W. MOORE, dated November 4, 2014, is hereby ratified and confirmed as previously amended and as hereby amended.

IN WITNESS WHEREOF, this Second Amendment to Revocable Trust Agreement of ROBERT W. MOORE is executed on the date hereinafter set forth.

**GRANTOR/TRUSTEE:**

_____
ROBERT W. MOORE

DATE: _____, 2019

The foregoing instrument was on the 24 day of October, 2019, signed, sealed, published and declared by ROBERT W. MOORE, in our presence, as and for the Second Amendment to his Revocable Trust Agreement, and we and each of us, in his presence, and at his special request, and in the presence of each other, hereunto subscribe our names as witnesses to the same.

_____ of Brentwood, Tennessee
WITNESS

_____ of Nashville, TN.
WITNESS

12

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 75 of 144 PageID #: 80

STATE OF _Tennessee_ )
COUNTY OF _Williamson_ ) : ss.

I, ROBERT W. MOORE, declare to the officer taking my acknowledgement of this instrument and to the subscribing witnesses, that I signed this instrument as the Second Amendment to my Revocable Trust Agreement.

_Robert W Moore_
ROBERT W. MOORE

We, _Kathryn Brinton_ and _Alexa Regina_ ,

have been sworn by the officer signing below, and declare to that officer on our oaths that the Grantor declared the instrument to be the Second Amendment to the Grantor's Revocable Trust Agreement and signed it in our presence and that we each signed the instrument as a witness in the presence of the Grantor and of each other.

_Kathryn Brinton_
Witness

_____
Witness

Acknowledged and subscribed before me by the Grantor and initial Trustee, ROBERT W. MOORE, who is personally known to me or who has produced _Driver License_ as identification, and sworn to and subscribed before me by the witnesses, _Kathryn Brinton_ (first witness), who is personally known to me or who has produced _Driver License_ as identification, and by _Alexa Regina_ (second witness), who is

13

personally known to me or who has produced ___Driver License___ as identification, and subscribed by me in the presence of the Grantor and the subscribing witnesses, all on the 24 day of October , 2019.

_____
[Signature of Notary Public]

___Nancy K. Hagan___
[Print, Type, or Stamp Name of Notary Public]

Commission Number:_____
My Commission Expires: 10-17-2021

[NOTARIAL SEAL]
A3571778.DOC

NANCY K HAGAN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
WILLIAMSON COUNTY

14

**SECOND AMENDMENT TO
REVOCABLE TRUST AGREEMENT OF
ROBERT W. MOORE**

**Schedule 1**

**The Lynnville Real Property**

**See attached Quit claim Deeds,
Dated January 30, 2015, and March 8, 2019**

15

BK/PG:D380/23-25

19120940

TAMMY BELTON, REGISTER

This instrument prepared by and
after recording returned to:

Ray D. Gibbons, Esq.
Gibbons Law LLC
1200 Corporate Drive, Suite 150
Birmingham, Alabama 35242

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the __8__ day of __March__, 2019, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4th DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this __8__ day of __March__, 2019.

ROBERT W. MOORE

STATE OF ~~TENNESSEE~~ Alabama )
COUNTY OF __Jefferson__ )

I, the undersigned Notary Public in and for said County in said State, hereby certify that Robert W. Moore, whose name is signed to the foregoing Quitclaim Deed and who is personally known to me (or proved to me on the basis of satisfactory evidence), acknowledged before me on this day that, being informed of the contents of said instrument, he voluntarily executed the same for the purposes contained therein.

Given under my hand and seal this __8__ day of __March__, 2019.

Christine Manni
Notary Public
My Commission Expires: __12/11/21__

19120940

GIBBONS LAW LLC
1200 CORPORATE DR -KEV
STE 150
BIRMINGHAM, AL 35242-5429

Book D380 Page 23

16

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $_____0.00

*Robert W Moore*
_____
Affiant

STATE OF ~~TENNESSEE~~ Alabama )
COUNTY OF Jefferson )

Subscribed and sworn before me this the __8__ day of __march__, 20 __17__.

*Christine Marino*
_____
Notary Public
My Commission Expires: 12|11/21

The following information is not a part of this Deed:

Property Address: 1290 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name: Robert W. Moore
and Address: 311 Spencer Creek Road
Franklin, Tennessee 37069

Parcel ID Number: MAP 030, PARCEL 009.03

Mail Tax Bills to: Robert W. Moore, Trustee of the
Robert W. Moore Revocable Trust
5487 Academy Way
Bessemer, Alabama 35022

Book 0330 Page 24

17

## EXHIBIT "A"

### LEGAL DESCRIPTION

The following described tract is bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 23 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the northwest corner of this tract; thence with Stephen K. Heard (remaining portion of the tract) the following 2 calls: South 87° 42' 22" East, 825.09 feet to an iron rod set; South 00° 04' 51" East, 883.26 feet (passing an iron rod set at 813.26') to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10° 20' 42" West, 137.79 feet to a point; South 02° 36' 52" East, 59.31 feet to a point; South 10° 37' 14" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence, the following 2 calls: North 78° 19' 13" West, 526.19 feet (passing an existing iron pin at 16.78 feet) to a 16" buckberry; North 79° 01' 21" West, 275.41 feet to an existing iron rod (approximately 25 feet from the center of Blue Creek Road); thence with said margin, the following 2 calls: North 04° 56' 13" East, 104.30 feet to an existing iron rod; North 00° 06' 08" East, 895.71 feet to the beginning; containing 20.14 acres more or less.

Being the same property conveyed to Robert W Moore by Deed from Alex F. Wade and Mary Wade, recorded October 11, 2013 in Book D356, page 875, in the Register's Office for Giles County, Tennessee.

This conveyance is subject to the matters set forth below, if any, as well as: (1) all applicable zoning ordinances; (2) utility, sewer, drainage, and other easements of record; (3) all subdivision / condominium assessments, covenants, bylaws, restrictions, declarations and easements of record (as may be amended or supplemented); (4) building restrictions; and (5) all other matters of public record.

1. Giles County taxes for the year 2019 and thereafter, not yet due and payable;

2. Liability as to taxes resulting from supplemental, revised or correction assessments pursuant to provisions of Tennessee Code Ann 65-6-503, et seq ;

3. Covenants, conditions, restrictions, easements or servitudes, if any, appearing in the public records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, conditions or restrictions violate 42 USA 3604(c);

4. Easement for right of way recorded in Book D339, page 16, in the Register's Office of Giles County, Tennessee

1

18

BK: 0362/375-378   BII: 48681
#115101936 02/18/15 10:37 AM
MTG TAX                     0.00
TRI TAX                     0.00
REC FEE                    20.00
DP FEE                      2.00
REO FEE                     0.00
TOTAL                      22.00
RECORDED BY: KAY
KAY GIBSONS, REGISTER
GILES, TENNESSEE

*This Instrument Prepared by, and*
*After Recording to be Returned to:*
Ray D. Gibbons, Esq.
Gibbons Graham LLC
100 Corporate Parkway, Suite 123
Birmingham, Alabama 35242

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the _30th_ day of _January_ 2015, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4TH DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this _30th_ day of _January_, 2015.

_____
ROBERT W. MOORE

STATE OF TENNESSEE                    §
COUNTY OF _Giles_                     §

Before me, the undersigned Notary Public in and for the County and State, personally appeared Robert W. Moore, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged to be the person(s) within named and that he executed the foregoing instrument for the purpose therein contained.

Witness my hand and seal this _30th_ day of _January_, 20__.

_____
Notary Public
My Commission Expires: _9/21/2015_

19101936

GIBBONS GRAHAM LLC
ATTN JANIE DILLINGHAM -ENV
100 CORPORATE PKWY STE 125
BIRMINGHAM, AL 35242-8903

Book D362  Page 375

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 82 of 144 PageID #: 87

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $ 0

_____
Affiant

STATE OF TENNESSEE Alabama §
COUNTY OF Shelby §

Subscribed and sworn before me this the 5th day of February , 20 15.

Notary Public
My Commission Expires: 10/17/2018

L. JANE DILLINGHAM
My Commission Expires
October 17, 1915

The following information is not a part of this Deed:

Property Address: 1208 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name:    Robert W. Moore
and Address:     311 Spencer Creek Road
                 Franklin, Tennessee 37069

Parcel ID Number:    MAP 030, PARCEL 005.02

Mail Tax Bills to:    Robert W. Moore, Trustee of the
                      Robert W. Moore Revocable Trust
                      5487 Academy Way
                      Bessemer, Alabama 35022

2

Book D362 Page 378

20

# EXHIBIT "A"
## LEGAL DESCRIPTION

Located in the Sixteenth (16th) Civil District of Giles County, Tennessee, and being more particularly described as follows, to-wit: The following described tract is bounded on the South by Danny Hanson and Albert Menefee, on the East by Albert Menefee, on the West and North by Blue Creek Road. Beginning at an iron rod set in the southeast corner of the intersection of Blue Creek Road and Trade Branch Road, said point being 25 feet from the center of Blue Creek Road, said point being the northwest corner of this tract; THENCE with the south margin of Blue Creek Road the following 8 calls: South 83 degrees 58' 19" East, 464.66 feet to an iron pin set; South 77 degrees 13' 12" East, 133.52 feet to an iron pin set; South 67 degrees 35' 28" East, 335.11 feet to an iron pin set; South 75 degrees 58' 19" East, 126.72 feet to an iron pin set; South 87 degrees 30' 13" East, 394.63 feet to an iron pin set; North 77 degrees 34' 16" East, 294.72 feet to an iron pin set; North 84 degrees 51' 55" (erroneously referred to in a previous deed as minutes) East, 117.62 feet to an iron pin set; South 82 degrees 51' 31" East, 7.07 feet to an iron pin set; thence with Albert Menefee the following 2 calls: South 02 degrees 24' 58" East, 428.26 feet to an iron pin set; South 02 degrees 29' 36" East, 562.32 feet to an iron pin set; thence continuing with Menefee, South 02 degrees (erroneously referred to in a previous deed as feet) 25' 44" East, 612.07 feet (passing an iron pin at 382.05 feet) to a point in the center of Blue Creek; thence continuing with Menefee and generally along the center of the creek, South 62 degrees 42' 42" West, 135.78 feet to a point in the center of Blue Creek; thence with Danny Hanson and generally along the center of the creek the following 12 calls: South 59 degrees 15' 33" West, 295.33 feet to a point; South 79 degrees 01' 25" West, 58.49 feet to a point; North 88 degrees 53' 42" West, 36.75 feet to a point; North 59 degrees 32' 58" West, 83.17 feet to a point; South 41 degrees 34' 26" West, 77.29 feet to a point; South 26 degrees 57' 29" West, 78.58 feet to a point; South 68 degrees 31' 53" West, 272.73 feet to a point; South 50 degrees 21' 37" West, 190.76 feet to a point; South 38 degrees 47' 22" West, 61.04 feet to a point; South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence continuing with Hanson and leaving said creek, North 78 degrees 19' 15" West, 526.19 feet (passing an iron pin set at 36.78 feet) to a 36" Hackberry; thence continuing with Hanson, North 79 degrees 01' 21" West, 275.41 feet to an iron pin set in the east margin of Blue Creek Road (25 feet from the center); thence with said margin the following 4 calls: North 04 degrees 56' 12" East, 104.30 feet to an iron pin set; North 00 degrees 06' 08" East, 1187.96 feet to an iron pin set; North 00 degrees 39' 29" East, 551.96 feet to an iron pin set; North 00 degrees 54' 24" West, 400.38 feet to the point of beginning, containing 81.52 acres, more or less, as per survey of James H. Bingham, Jr., TN RLS No. 1251, dated July 21, 1997.

INCLUDED WITHIN THE BOUNDARIES OF THE ABOVE DESCRIBED REAL ESTATE BUT EXPRESSLY EXCLUDED FROM THIS CONVEYANCE IS THE FOLLOWING DESCRIBED TRACT OF LAND WHICH WAS PREVIOUSLY CONVEYED TO ALEX F. WADE:

Bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road

3

21

and Trade Branch Road, said point being the northwest corner of this tract; THENCE with Stephen K. Heard (remaining portion of the tract), the following 2 calls: South 87 degrees 42' 22" East, 825.09 feet to an iron rod set; South 00 degrees 04' 51" East 883.26 feet (passing an iron rod set at 813.26'), to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79 degrees 01' 21" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56' 12" East, 104.30 feet to an existing iron rod; North 00 degrees 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

The undersigned also conveys unto the grantee, its heirs and assigns, such water rights as were acquired by deed of record in Book D328, page 75, Register's Office of Giles County, Tennessee, described therein as follows:

"Also hereby intended to be conveyed is certain water rights reserved by the Grantor in Deed Book 283, Page 903, for the right to use of one-half of the water produced from a well located thereon for agricultural/residential purposes along with the right to enter the premises for the purpose of installing water and pumping equipment for the use and benefit of the Grantee herein. These water rights shall be perpetual and shall run with the land."

The property herein conveyed is the same property conveyed to Robert W. Moore by deed from James Barrow Brown, III, and wife, Carlana O. Brown, and Susan Brewer Brown McMillian (formerly known as Susan Brewer Brown) and James Barrow Brown, III, Co-Trustees of the Susan Brewer Brown Revocable Trust, said deed dated March 14, 2014 and recorded March 17, 2014 in Book D358, pages 460-463, Register's Office of Giles County, Tennessee.

The realty is conveyed subject to the following:

Any existing easement, whether recorded or unrecorded, for highway, road, or utility purposes which may affect the realty.

Subject to water rights as shown by the instruments of record in Book 283, page 903, and Book 327, page 700, Register's Office of Giles County, Tennessee.

Subject to a right of way easement granted to The Fairview Utility District of Giles County, Tennessee, as shown by the instrument of record in Book D339, page 14, Register's Office of Giles County, Tennessee.

The realty is currently assessed under the Greenbelt Law and may be subject to the assessment of rollback taxes if not re-certified.

All matters expressed or implied noted on the plat of survey prepared by James H. Bingham, Jr., TRLS 1251, dated July 21, 1997.

RWISHWADDOCX, II

4

22

# Exhibit 6

# THIRD AMENDMENT TO
## REVOCABLE TRUST AGREEMENT OF
## ROBERT W. MOORE

This Third Amendment to the Revocable Trust Agreement of ROBERT W. MOORE is executed on the date hereinafter set forth, by ROBERT W. MOORE, of Walton County, Florida, both as Grantor and as Trustee, for the following uses and purposes:

I.  The Revocable Trust Agreement established by ROBERT W. MOORE, as Grantor and as Trustee, on November 4, 2014, as modified and amended by the First Amendment, dated October 18, 2017, and the Second Amendment, dated October 24, 2019, is hereby further modified and amended as follows:

1.  Paragraph 7 is amended and restated in its entirety to read as follows:

7.  If the Grantor is survived by his spouse Nancy Suzanne Littel Moore (hereinafter "Suzanne"), then the Trustee shall allocate to a separate subtrust to be referred to herein as "the Suzanne Trust" (I) all of the interest of the trust and the Grantor in any and all real property and improvements located in Giles County, Tennessee, which property, as of the date of this amendment, includes the real property described on Schedule 1 to this Trust (hereinafter referred to as "the Lynnville Real Property"), together with all interest of the trust and the Grantor in the furniture, fixtures, appliances, electronics and other tangible personal property located in or on the Lynnville Real Property as of the date of the Grantor's death, other than the tangible personal property that is specifically identified on the list referred to in Item Two of the Grantor's Last Will and Testament (the tangible personal property to be allocated to the Suzanne Trust is hereinafter referred to as the "Lynnville Personal Property"), and (ii) one-third (1/3) of the interest of the trust and the Grantor in any and all real property and improvements located at 65 Jasmine Circle, Santa Rosa Beach, Florida 32459, which property, as of the date of this Amendment, includes the real property described on Schedule 2 to this Trust (hereinafter referred to as "the Jasmine Dunes Real Property"), together with one-third of all interest of the trust and the Grantor in the furniture, fixtures, appliances, electronics and other tangible personal property located in or on the Jasmine Dunes Real Property as of the date of the Grantor's death, other than the tangible personal property that is specifically identified on the list referred to in Item Two of the Grantor's Last Will and Testament (the tangible personal property to be allocated to the Suzanne Trust is hereinafter referred to as the "Jasmine Dunes Personal Property"), and (iii) cash in the amount of Six Hundred Thousand ($600,000.00) Dollars. The Lynnville Real Property consists of at least two separate parcels that are described on Schedule 1 and includes all improvements located on the Lynnville Real Property, including, but not limited to, the house/residence, barns and any other outbuildings, as well as the pastures and fields that are part of the Lynnville Real Property. If the Lynnville Real Property is subject to a mortgage or other lien or encumbrance, then the Lynnville Real Property shall be allocated to the Suzanne Trust, subject to such mortgage, lien or encumbrance. The Jasmine Dunes Real Property consists of the parcel as described on Schedule 2 and includes all improvements located on the Jasmine Dunes Real Property. If the Jasmine Dunes Real Property is

1

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 87 of 144   PageID #: 92

subject to a mortgage or other lien or encumbrance, then the one-third (1/3) interest in the Jasmine Dunes Real Property shall be allocated to the Suzanne Trust, without being subject to such mortgage, lien or encumbrance. The assets of the Suzanne Trust shall be held, administered and distributed as provided in the following subparagraphs of this Paragraph 7.

a) Subject to the other provisions of this Subparagraph (a), particularly Subparagraph (a)(xi), so long as Suzanne is living, the Trustee shall hold, manage and distribute the assets of the Suzanne Trust for the benefit of Suzanne in the manner provided in Subparagraphs (i) through (x) of this Subparagraph 7(a).

   i. Except as otherwise provided herein, so long as the Suzanne Trust owns the Lynnville Real Property, the Trustee shall allow Suzanne to use the entirety of the Lynnville Real Property rent free, as her principal place of residence and/or for any other purpose, including the operation of a business, such as the operation of a horse boarding business on a portion of the Lynnville Real Property. The Trustee shall also allow Suzanne rent-free use of all of the Lynnville Personal Property. However, a condition of Suzanne's rent-free use of the Lynnville Real Property and the Lynnville Personal Property is that Suzanne pay the recurring expenses related to the Lynnville Real Property, such as regularly scheduled principal and interest payments on debt, if any, secured by a mortgage on the Lynnville Real Property, ad valorem taxes, insurance (both hazard and liability), utilities and routine maintenance and upkeep, in the event, and only in the event, that the Suzanne Trust does not have assets, in addition to the Lynnville Real Property and the Lynnville Personal Property, including income earned by the Suzanne Trust, sufficient to pay such recurring expenses.

   ii. Since the Lynnville Real Property owned by the Suzanne Trust includes real property in addition to the real property immediately surrounding the home/residence located on the Lynnville Real Property, as well as tangible personal property in addition to the furniture, fixtures and appliances located in the home/residence located on the Lynnville Real Property, then unless Suzanne is using such other real property or other personal property (such as using such other real property or other personal property in a business operated by Suzanne), the Trustee shall make reasonable efforts to make such other Lynnville Real Property and other Lynnville Personal Property productive. By way of example, and not by way of limitation, to the extent consistent with Suzanne's use of the Lynnville Real Property, the Trustee may arrange for cultivation of portions of the Lynnville Real Property (other than the portion on which the home/residence is located) and sell the crops harvested to produce income for the Suzanne Trust that can be used to pay expenses of the Suzanne Trust, including the recurring expenses of the Lynnville Real Property, or to make distributions provided in this Subparagraph 7(a).

2

iii.     If the Suzanne Trust holds assets other than the Lynnville Real Property and Lynnville Personal Property (hereinafter "excess trust assets") sufficient to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property, then the Trustee shall pay such expenses related to the Lynnville Real Property and the Lynnville Personal Property from such excess trust assets, and the Trustee shall not look to Suzanne to pay all or any part of such expenses if excess trust assets are available to pay such expenses. If the Suzanne Trust does not have sufficient excess trust assets to pay all of the expenses related to the Lynnville Real Property and the Lynnville Personal Property, but the Trustee has determined that the Lynnville Real Property should not be sold as permitted by Subparagraph (viii) below, then the Trustee is authorized, but not required, to cause the Suzanne Trust to borrow funds to provide excess trust assets to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property. So long as the Suzanne Trust holds excess trust assets, the Trustee shall maintain those excess trust assets as liquid assets to be used to pay the expenses related to the Lynnville Real Property and the Lynnville Personal Property.

iv.     For so long as the Suzanne Trust owns any interest in the Jasmine Dunes Real Property, the Trustee shall allow Suzanne to use the entirety of the Jasmine Dunes Real Property rent free, as a vacation home, for not less than twelve (12) weeks per year. However, Suzanne may not use the Jasmine Dunes Real Property as a vacation home for more than two (2) consecutive weeks at one time. The Trustee of the Suzanne Trust shall coordinate times for Suzanne to use the Jasmine Dunes Real Property with Kimberly Moore Vann and Matthew W. Moore. The Trustee shall also allow Suzanne rent-free use of all of the Jasmine Dunes Personal Property. Suzanne shall not be obligated to pay any expenses related to the Jasmine Dunes Real Property, including, without limitation, ad valorem taxes, insurance, utilities and routine maintenance and upkeep.

v.     The Trustee of the Robert W. Moore Trust may sell or rent the Jasmine Dunes Real Property and Jasmine Dunes Personal Property at any time. If there are Co-Trustees serving as the Trustee of the Robert W. Moore Trust, then the unanimous consent of both Trustees shall be required to sell or rent the Jasmine Dunes Real Property and Jasmine Dunes Personal Property. However, if such sale or rental of the Jasmine Dunes Real Property or Jasmine Dunes Personal Property occurs while Suzanne is a beneficiary of this Suzanne Trust, then Suzanne shall be entitled to an outright distribution, free of trust, of one-third (1/3) of the net proceeds from said rental or sale of the Jasmine Dunes Real Property or Jasmine Dunes Personal Property.

vi.     During each of the first five (5) calendar years following the funding of the Suzanne Trust (hereinafter "the Five Year Distribution Period"), the Trustee shall distribute to Suzanne, from the assets of the Suzanne Trust, cash in an amount equal to

3

$100,000 less any amounts paid by the Trustee during such year (from the excess trust assets) for the expenses related to the Lynnville Real Property and the Lynnville Personal Property, including regularly scheduled principal and interest payments on debt, if any, secured by a mortgage on the Lynnville Real Property, ad valorem taxes, insurance (hazard and liability), utilities and routine maintenance and upkeep, and for legal and accounting expenses incurred by the Suzanne Trust during such year. The aggregate distributions to Suzanne pursuant to this Subparagraph (vi) of this Subparagraph 7(a) shall not exceed $500,000 less the amounts paid by the Suzanne Trust during the Five Year Distribution Period for expenses related to the Lynnville Real Property and the Lynnville Personal Property and the legal and accounting expenses Incurred by the Suzanne Trust during the Five Year Distribution Period.

vii. In addition to the distributions to Suzanne described in Subparagraph (vi) above, the Trustee shall have discretion to distribute the income (if the Suzanne Trust is not distributing income on a mandatory basis pursuant to Subparagraph (ix) below) or principal of the Suzanne Trust to pay for legitimate and significant medical and health care expenses for Suzanne, and such expenses may include premiums for reasonable amounts of health, medical and hospitalization insurance for Suzanne.

viii. Except as specifically provided herein, so long as Suzanne is a beneficiary of the Suzanne Trust, the Trustee shall not sell or otherwise dispose of the Lynnville Real Property or the Lynnville Personal Property without Suzanne's consent. However, the Trustee may sell all or part of the Lynnville Real Property and Lynnville Personal Property if Suzanne requests that the Trustee sell all or part of the Lynnville Real Property or Lynnville Personal Property and the Trustee determines that the sale of all or part of the Lynnville Real Property or Lynnville Personal Property is a prudent action considering all factors, such as the potential appreciation of the Lynnville Real Property. If a portion, but not all, of the Lynnville Real Property or the Lynnville Personal Property is sold as provided herein, then the proceeds from such sale shall be considered excess trust assets available to pay expenses of the remaining Lynnville Real Property and the remaining Lynnville Personal Property and to make distributions as described herein. Anything herein to the contrary notwithstanding, the Trustee shall sell the entire Lynnville Real Property and all Lynnville Personal Property if –

a. the Suzanne Trust (1) does not have sufficient excess trust assets to pay the expenses of the Lynnville Real Property and the Lynnville Personal Property, together with the legal and accounting expenses of the Suzanne Trust, (2) Suzanne is unwilling or unable to pay the remaining expenses of the Lynnville Real Property and the Lynnville Personal Property and the remaining legal and accounting expenses of the Suzanne Trust and (3)

4

the Trustee, in the Trustee's discretion, determines that it is not appropriate for the Suzanne Trust to borrow funds to pay such expenses or

b. Suzanne notifies the Trustee that she will no longer use the Lynnville Real Property as a place of residence and Suzanne demands that the Trustee sell the entire Lynnville Real Property and all of the Lynnville Personal Property.

In the case of any proposed sale of all or any portion of the Lynnville Real Property or the Lynnville Personal Property, upon receipt of a bona fide offer to purchase all or any portion of the Lynnville Real Property or Lynnville Personal Property that the Trustee intends to accept (hereinafter "a Third Party Offer"), the Trustee, before final acceptance of a Third Party Offer, shall give the Grantor's children the opportunity (a Right of First Refusal) to purchase the Lynnville Real Property or the Lynnville Personal Property that is the subject of such Third Party Offer upon the same terms and conditions as the Third Party Offer (if the Third Party Offer involves consideration from the buyer in a form other than cash, such as exchange property, then the Grantor's children may substitute cash of equivalent value for such exchange property). The Right of First Refusal shall be extended by the Trustee providing to the Grantor's children the price and all terms and conditions of the Third Party Offer and allowing the Grantor's children forty-five (45) days to notify the Trustee in writing that they will match the Third Party Offer (hereinafter "the ROFR Acceptance Notice"). The closing pursuant to a Right of First Refusal Acceptance Notice must occur within thirty (30) days after the timely delivery of the Right of First Refusal Acceptance Notice. The Right of First Refusal shall expire if (i) a Right of First Refusal Acceptance Notice is not delivered within the forty-five (45) day period, (ii) the closing pursuant to a timely Right of First Refusal Acceptance Notice does not occur within the applicable thirty (30) day period or (iii) the Grantor's children cannot agree between themselves regarding whether one or both of them will exercise the Right of First Refusal.

ix. After the sale of the entire Lynnville Real Property and so long as Suzanne is still a beneficiary of the Suzanne Trust, the net proceeds from the sale of the entire Lynnville Real Property and all of the Lynnville Personal Property (hereinafter "the Lynnville Sales Proceeds") shall continue to be held in trust and managed and distributed, along with any other assets of the Suzanne Trust, for Suzanne's benefit in accordance with the provisions of this Subparagraph 7(a). After the sale of the entire Lynnville Real Property and while Suzanne is still a beneficiary of the Suzanne Trust, in addition to the distributions to Suzanne described in Subparagraphs (vi) and (vii) above, the Trustee shall begin distributing to Suzanne all of the net income earned by all of the assets of the Suzanne Trust, and such mandatory income distributions shall be made to Suzanne or for Suzanne's benefit no less frequently than quarterly.

x. In addition to the distributions described in Subparagraphs (vi), (vii) and (ix) of this Subparagraph 7(a), after a sale of the home/residence located on the Lynnville Real Property and so long as Suzanne is still a beneficiary of the Suzanne Trust, Suzanne

5

shall have the right to demand that the Trustee apply principal of the Suzanne Trust to provide for a principal place of residence for Suzanne's rent-free use, which principal place of residence shall be reasonably acceptable to Suzanne. In the event of such a demand by Suzanne, the Trustee may elect to provide a principal place of residence for Suzanne's use by making principal distributions from the trust to Suzanne so that Suzanne may pay rent for, or make monthly payments on a mortgage on, a reasonable facility to use as Suzanne's principal place of residence, or the Trustee may use (no more than half of) the trust principal to acquire, as an asset of the Trust, residential property to be used rent free by Suzanne as her principal place of residence. If the Trustee acquires, as an asset of the Trust, property to be used rent free by Suzanne as her principal place of residence, then the Trustee shall pay from the other assets of the Suzanne Trust (and to the extent of such other assets) all expenses related to such residential property.

xi. Anything in this Subparagraph (a) to the contrary notwithstanding, if Suzanne survives the Grantor, but Suzanne remarries or co-habitates with adult male who is not a lineal descendant of Suzanne's parents, then upon Suzanne's remarriage or co-habitation, Suzanne shall immediately cease to be a beneficiary of the Suzanne Trust and all assets then remaining in the Suzanne Trust shall be immediately distributed as provided in Paragraph 9 of the Trust, without regard to any disclaimers that might have been previously filed by Matthew W. Moore or Kimberly M. Vann (prior to Suzanne's remarriage or co-habitation). For all purposes of this Subparagraph 7(a), Suzanne shall be considered to co-habitate with a person if Suzanne lives/stays with such person in the same residential property for more than two (2) consecutive days or for more than four (4) days in any period of six (6) consecutive months.

b) If Suzanne does not survive the Grantor, then the Suzanne Trust shall not be funded and all assets that would have otherwise been allocated to the Suzanne Trust shall be distributed as provided in Paragraph 9 of the trust.

c) If Suzanne survives the Grantor and does not remarry or co-habitate, then upon Suzanne's death, all assets, if any, then remaining in the Suzanne Trust at the time of Suzanne's death shall be distributed as provided in paragraph 9 of the Trust.

If the Suzanne Trust is funded, then such funding shall be considered as a nonresiduary interest/distribution for purposes of Section 733.817, Florida Statutes, and the apportionment of estate tax.

II. The Revocable Trust Agreement of ROBERT W. MOORE, dated November 4, 2014, is hereby ratified and confirmed as previously amended and as hereby amended.

6

IN WITNESS WHEREOF, this Third Amendment to Revocable Trust Agreement of ROBERT W. MOORE has been signed and sealed by the Grantor and the initial Trustee on this 28th day of April, 2022.

_____

ROBERT W. MOORE, *Grantor and Initial Trustee*

*Witnesses:*

I, _Christine S Laawir_, of Dunlap & Shipman, P.A., witness ROBERT W. MOORE, sign this document as the Third Amendment to Revocable Trust Agreement of ROBERT W. MOORE on April 28, 2022.

_____

Signature of Witness

I, _Maureen Paine_, of Dunlap & Shipman, P.A., witness ROBERT W. MOORE, sign this document as the Third Amendment to Revocable Trust Agreement of ROBERT W. MOORE on April 28, 2022.

_____

Signature of Witness

7

STATE OF FLORIDA

COUNTY OF WALTON

I, ROBERT W. MOORE, declare to the officer taking this acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as the Third Amendment to Revocable Trust Agreement of ROBERT W. MOORE.

_____
ROBERT W. MOORE

We, _Christine S Laawiy_ and _Maureen Paine_ , have been sworn by the officer signing below, and declare to that officer on our oaths that ROBERT W. MOORE declared this instrument to be the Third Amendment to Revocable Trust Agreement of ROBERT W. MOORE and signed it in our presence and that we each signed the instrument as a witness in the presence of the ROBERT W. MOORE and of each other.

_____
Witness Signature

_____
Witness Signature

_Christine S. Laawiy_
Printed Name of Witness

_Maureen Paine_
Printed Name of Witness

Date: April 28, 2022

Date: April 28, 2022

Acknowledged and subscribed before me by means of ☑ physical presence or ☐ online notarization by the Grantor, ROBERT W. MOORE, who is personally known to me or produced ____FL D.L.____ as identification, and sworn to and subscribed before me by means of ☑ physical presence or ☐ online notarization by the witnesses, _Christine S Laawiy_ , who is personally known to me and _Maureen Paine_ , who is personally known to me and subscribed by me in the presence of the Grantor and the subscribing witnesses, all on April 28, 2022.

Kerri Ramage
Notary Public, State of Florida
My Commission Expires 12/22/2023
Commission No. GG 941944

_____
Notary Public

_Kerri Ramage_
Name typed, printed or stamped

8

# THIRD AMENDMENT TO
# REVOCABLE TRUST AGREEMENT OF
# ROBERT W. MOORE

### Schedule 1

### The Lynnville Real Property

**See attached Quit Claim Deeds,
Dated January 30, 2015, and March 8, 2019**

This instrument prepared by and after recording return to:

Ray D. Gibbons, Esq.
Gibbons Law LLC
1200 Corporate Drive, Suite 150
Birmingham, Alabama 35242



EX/PG:D380/23-25
19120940

ROD R PG MAT/45501
03/15/2019   ORION   AY
VALUE          9.40
MIG TAX        9.00
REC TAX        9.40
RID REG       12.00
BY PMG         4.50
MAG PGR        0.40
TOTAL         19.00
INDEXING BY I KRIGGER
TAINEY BELTON, REGISTER
WILL COUNTY, ALABAMA

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the __8__ day of __March__, 2019, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4th DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this __8__ day of __March__, 2019.

_____
ROBERT W. MOORE

STATE OF Alabama
COUNTY OF Jefferson

I, the undersigned Notary Public in and for said County in said State, hereby certify that Robert W. Moore, whose name is signed to the foregoing Quitclaim Deed and who is personally known to me (or proved to me on the basis of satisfactory evidence), acknowledged before me on this day that, being informed of the contents of said instrument, he voluntarily executed the same for the purposes contained therein.

Given under my hand and seal this __8__ day of __March__, 2019.

_____
Notary Public
My Commission Expires ___12/11/21___

19120940
GIBBONS LAW LLC
1200 CORPORATE DR -EAY
STE 150
BIRMINGHAM, AL 35242-5429

Book D380 Page 23

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $ __0.00__

_____
Affiant

STATE OF ~~TENNESSEE~~ Alabama )
COUNTY OF Jefferson )

Subscribed and sworn before me this the __8__ day of __March__, 20 __19__.

_____
Notary Public
My Commission Expires __12 | 11 | 21__

The following information is not a part of this Deed:

Property Address: 1200 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name(s) and Address: Robert W. Moore
311 Spencer Creek Road
Franklin, Tennessee 37069

Parcel ID Number: MAP 030, PARCEL 005.03

Mail Tax Bills to: Robert W. Moore, Trustee of the
Robert W. Moore Revocable Trust
5457 Academy Way
Bessemer, Alabama 35022

# EXHIBIT "A"

## LEGAL DESCRIPTION

The following described tract is bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the west margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1261 feet South of the center of the intersection of Blue Creek Road and Trace Branch Road, said point being the northwest corner of this tract; thence with Stephen K. Heard (containing portion of the tract) the following 3 calls: South 87° 42' 22" East, 535.09 feet to an iron rod set; South 01° 04' 51" East, 883.26 feet (crossing an iron rod set at 813.24") to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10° 20' 42" West, 137.79 feet to a point; North 01° 34' 52" East, 50.31 feet to a point; South 30° 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence, the following 2 calls: North 78° 19' 13" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" Hackberry; North 79° 01' 21" West, 275.41 feet to an existing iron rod (approximately 25 feet from the center of Blue Creek Road); thence with said margin, the following 2 calls: North 04° 50' 13" East, 104.30 feet to an existing iron rod; North 00° 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

Being the same property conveyed to Robert W. Moore by Deed from Alex F. Wade and Mary Wade, recorded October 11, 2013 in Book D556, page 875, in the Register's Office for Giles County, Tennessee.

This conveyance is subject to the matters set forth below, if any, as well as: (1) all applicable zoning ordinances; (2) utility, sewer, drainage, and other easements of record; (3) all subdivision / condominium assessments, covenants, bylaws, restrictions, declarations and easements of record (as may be amended or supplemented); (4) building restrictions; and (5) all other matters of public record.

1. Giles County taxes for the year 2019 and thereafter, not yet due and payable;

2. Liability as to taxes resulting from supplemental, revised or corrected assessments pursuant to provisions of Tennessee Code Ann. 63-6-503, et seq.;

3. Covenants, conditions, restrictions, easements or servitudes, if any, appearing in the public records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, conditions or restrictions violate 42 USA 3604(c);

4. Easement for right of way recorded in Book D332, page 16, in the Register's Office of Giles County, Tennessee

*This Instrument Prepared By and*
*After Recording to be Returned to:*
Ray D. Gibbons, Esq.
Gibbons Graham LLC
100 Corporate Parkway, Suite 125
Birmingham, Alabama 35242

BK: 0362/375-378    BI1 46601
#115101036 02/18/15 10:37 AM
IOG TAX          0.00
TRI TAX          0.00
REC FEE         20.00
CP FEE           2.00
GOO FEE          0.00
TOTAL           22.00
RECORDED BY: KAY
KAY GIBBONS, REGISTER
GILES, TENNESSEE

**QUITCLAIM DEED**

KNOW ALL MEN BY THESE PRESENTS, that ROBERT W. MOORE, a married person, on this the _30th_ day of _January_ 2015, for and in consideration of the sum of One and 00/100 Dollars, does hereby bargain, sell, release, remise, quitclaim and convey unto ROBERT W. MOORE, AS TRUSTEE OF THE ROBERT W. MOORE REVOCABLE TRUST DATED THE 4TH DAY OF NOVEMBER 2014, all his right, title, and interest in and to the following described real estate, to wit:

(See Exhibit "A" Attached Hereto)

IN TESTIMONY WHEREOF I/we have hereunto set my hand this _30th_ day of _January_, 2015.

_____
ROBERT W. MOORE

STATE OF TENNESSEE
COUNTY OF _Giles_          §
                          §

Before me, the undersigned Notary Public in and for the County and State, personally appeared Robert W. Moore, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged to be the person(s) within, and that he executed the foregoing instrument for the purpose therein contained.

Witness my hand and seal this _30th_ day of _January_, 20___.

_____
Notary Public
My Commission Expires _9/21/2015_

15101036
GIBBONS GRAHAM LLC
ATTN JANIE DELLINGHAM -ESV
100 CORPORATE PKWY STE 125
BIRMINGHAM, AL 35242-8903

Book 0362, Page 375

I, or we, hereby swear or affirm that to the best of affiant's knowledge, information, and belief, the actual consideration for this transfer is $ 0.00

_____
Affiant

STATE OF ~~TENNESSEE~~ Alabama
COUNTY OF Shelby _____, §

Subscribed and sworn before me this the 5th day of February, 20 15.

_____
Notary Public
My Commission Expires 10/17/2018

L. JANE DILLINGHAM
My Commission Expires
October 17, 1918

The following information is not a part of this Deed:

Property Address: 120 Blue Creek Road
Lynnville, Tennessee 38472

Owner's Name
and Address:     Robert W. Moore
311 Spencer Creek Road
Franklin, Tennessee 37069

Parcel ID Number:  MAP 030, PARCEL 005.02

Mail Tax Bills to:  Robert W. Moore, Trustee of the
Robert W. Moore Revocable Trust
5407 Academy Way
Bessemer, Alabama 35022

2

# EXHIBIT "A"

## LEGAL DESCRIPTION

Located in the Sixteenth (16th) Civil District of Giles County, Tennessee, and being more particularly described as follows, to-wit: The following described tract is bounded on the South by Danny Hanson and Albert Menefee, on the East by Albert Menefee, on the West and North by Blue Creek Road. Beginning at an iron rod set in the southeast corner of the intersection of Blue Creek Road and Trade Branch Road, said point being 25 feet from the center of Blue Creek Road, said point being the northwest corner of this tract; THENCE with the south margin of Blue Creek Road the following 8 calls: South 83 degrees 58' 19" East, 454.66 feet to an iron pin set; South 77 degrees 13' 12" East, 133.52 feet to an iron pin set; South 67 degrees 33' 28" East, 335.11 feet to an iron pin set; South 73 degrees 58' 19" East, 126.72 feet to an iron pin set; South 87 degrees 30' 13" East, 394.65 feet to an iron pin set; North 77 degrees 34' 16" East, 294.72 feet to an iron pin set; North 54 degrees 51' 55" (erroneously referred to in a previous deed as minutes) East, 117.62 feet to an iron pin set; South 82 degrees 51' 31" East, 7.07 feet to an iron pin set; thence with Albert Menefee the following 2 calls: South 02 degrees 24' 58" East, 428.26 feet to an iron pin set; South 02 degrees 29' 36" East, 562.32 feet to an iron pin set; thence continuing with Menefee, South 02 degrees (erroneously referred to in a previous deed as feet) 25' 44" East, 492.07 feet (passing an iron pin at 362.05 feet) to a point in the center of Blue Creek; thence continuing with Menefee and generally along the center of the creek, South 62 degrees 42' 42" West, 135.78 feet to a point in the center of Blue Creek; thence with Danny Hanson and generally along the center of the creek the following 12 calls: South 39 degrees 13' 32" West, 295.33 feet to a point; South 79 degrees 01' 25" West, 98.49 feet to a point; North 88 degrees 33' 43" West, 36.75 feet to a point; North 59 degrees 32' 38" West, 83.17 feet to a point; South 41 degrees 34' 26" West, 77.29 feet to a point; South 26 degrees 57' 29" West, 78.58 feet to a point; South 68 degrees 31' 53" West, 272.73 feet to a point; South 30 degrees 21' 37" West, 190.76 feet to a point; South 38 degrees 47' 27" West, 61.04 feet to a point; South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence continuing with Hanson and leaving said creek, North 78 degrees 19' 15" West, 326.19 feet (passing an iron pin set at 36.78 feet) to a 16" Hackberry; thence continuing with Hanson, North 79 degrees 01' 21" West, 275.41 feet to an iron pin set in the east margin of Blue Creek Road (25 feet from the center); thence with said margin the following 4 calls: North 04 degrees 56' 12" East, 104.30 feet to an iron pin set; North 08 degrees 05' 08" East, 1187.96 feet to an iron pin set; North 00 degrees 39' 29" East, 551.96 feet to an iron pin set; North 00 degrees 54' 24" West, 400.38 feet to the point of beginning, containing 81.52 acres, more or less, as per survey of James H. Bingham, Jr., TN RLS No. 1231, dated July 21, 1997.

INCLUDED WITHIN THE BOUNDARIES OF THE ABOVE DESCRIBED REAL ESTATE BUT EXPRESSLY EXCLUDED FROM THIS CONVEYANCE IS THE FOLLOWING DESCRIBED TRACT OF LAND WHICH WAS PREVIOUSLY CONVEYED TO ALEX F. WADE:

Bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road

and Trace Branch Road, said point being the northwest corner of this tract; THENCE with Stephen K. Heard (remaining portion of the tract), the following 2 calls: South 87 degrees 42' 22" East, 525.09 feet to an iron rod set; South 00 degrees 04' 51" East 883.26 feet (passing an iron rod set at 813.26'), to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20' 42" West, 137.79 feet to a point, South 02 degrees 39' 52" West, 50.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19' 15" West, 525.19 feet (passing an existing iron pin at 36.78 feet) to a 36" huckleberry; North 79 degrees 01' 23" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56' 12" East, 104.30 feet to an existing iron rod; North 00 degrees 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

The undersigned also conveys unto the grantee, his heirs and assigns, such water rights as were acquired by deed of record in Book D328, page 75, Register's Office of Giles County, Tennessee, described therein as follows:

"Also hereby intended to be conveyed is certain water rights reserved by the Grantor in Deed Book 283, Page 903, for the right to use of one-half of the water produced from a well located thereon for agricultural/residential purposes along with the right to enter the premises for the purpose of installing water and pumping equipment for the use and benefit of the Grantee herein. These water rights shall be perpetual and shall run with the land."

The property herein conveyed is the same property conveyed to Robert W. Moore by deed from James Barrow Brown, III, and wife, Carlana O. Brown, and Susan Brewer Brown McMillian (formerly known as Susan Brewer Brown) and James Barrow Brown, III, Co-Trustees of the Susan Brewer Brown Revocable Trust, said deed dated March 14, 2014 and recorded March 17, 2014 in Book D358, pages 460-463, Register's Office of Giles County, Tennessee.

The realty is conveyed subject to the following:

Any existing easements, whether recorded or unrecorded, for highway, road, or utility purposes which may affect the realty.

Subject to water rights as shown by the instruments of record in Book 283, page 903, and Book 117, page 760, Register's Office of Giles County, Tennessee.

Subject to a right of way easement granted to The Fairview Utility District of Giles County, Tennessee, as shown by the instrument of record in Book D339, page 14, Register's Office of Giles County, Tennessee.

The realty is currently assessed under the Greenbelt Law and may be subject to the assessment of rollback taxes if not re-certified.

All matters expressed or implied noted on the plat of survey prepared by James H. Bingham, Jr., TRLS 1251, dated July 21, 1997.

PWTIPFIDFPA II

4

Case 1:26-cv-00039     Document 1-1     Filed 04/17/26     Page 102 of 144 PageID #: 107

# THIRD AMENDMENT TO
## REVOCABLE TRUST AGREEMENT OF
### ROBERT W. MOORE

Schedule 2

**The Jasmine Dunes Real Property**

**See attached Quit Claim Deed,**
**Dated January 30, 2015**

Inst. #2015661311730 Bk: 2971 Pg: 1297 Recorded: 2/17/2015 1:13 PM Alex Alford Clerk of Courts, Walton County, Florida
Rec Fees: $18.50   Deputy Clerk COBB

*This Instrument Prepared by and*
*After Recording to be Returned to:*

Ray D. Gibbons, Esq.
Gibbons Graham LLC
100 Corporate Parkway, Suite 125
Birmingham, Alabama 35242

## QUIT-CLAIM DEED

**THIS QUIT-CLAIM DEED** is executed this 30th day of January, 2015 by ROBERT W. MOORE, a married person, whose address is 311 Spencer Creek Road, Franklin, Tennessee 37069 (hereinafter referred to as the "Grantor"), to ROBERT W. MOORE, AS TRUSTEE OF THE REVOCABLE TRUST AGREEMENT OF ROBERT W. MOORE DATED THE 4TH DAY OF NOVEMBER 2014, whose address is 5487 Academy Way, Bessemer, Alabama 35022 (hereinafter referred to as the "Grantee");

## WITNESSETH:

**THAT** the Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) in hand paid by the Grantee, the receipt and sufficiency of which is hereby acknowledged, does hereby remise, release and quit-claim unto the Grantee forever, all the right, title, interest, claim and demand which the Grantor has in and to the following described lot, piece or parcel of land, situate, lying and being in the County of Walton State of Florida, to wit:

Parcel 1:
Lots 3 and 4, Block B, Jasmine Dune, a Resubdivision of a portion of Block 17, Gulf Shore Manor Subdivision, according to the Plat thereof, as recorded in Plat Book 8, Page 24, of the Public Records of Walton County, Florida.

Parcel 2:
Lot 5, Block B, Jasmine Dune, according to the Plat thereof, as recorded in Plat Book 8, Page 34, of the Public Records of Walton County, Florida.

(hereinafter referred to as the "Subject Property");

**TO HAVE AND TO HOLD** the Subject Property, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the Grantor, either in law or equity, to the only proper use, benefit and behalf of the Grantee forever.

{00055798.DOC; 1}

**IN WITNESS WHEREOF,** the Grantor has caused these presents to be executed in manner and form sufficient to bind it as of the day and year first above written.

Signed, sealed and delivered in the
presence of the following 2 witnesses:

Signature of Witness

Ginger Oliver
Printed Name of Witness

Robert W. Moore
311 Spencer Creek Road
Franklin, Tennessee, 37069

Signature of Witness

Valissa White
Printed Name of Witness

STATE OF _____ TN _____ )
COUNTY OF _____ Giles _____ )

The foregoing instrument was acknowledged before me this 30th day of January, 2015 by Robert W. Moore, who is personally known to me or who has produced FL DL (type of identification) as identification.

(NOTARY SEAL)

ALLISON C. CARDIN
STATE OF TENNESSEE
NOTARY PUBLIC
GILES COUNTY

Notary Public Signature

Allison C. Cardin
Printed Name
My Commission Expires: 9/21/2015

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 105 of 144 PageID #: 110

# Exhibit 7

Case 1:25-cv-02039   Document 1-1   Filed 04/17/25   Page 106 of 144 PageID #: 111

# Giles County - Parcel: 030  005.03



Date: March 5, 2026

County: GILES
Owner: MOORE ROBERT W, TRUSTEE OF ROBERT W MOORE REVOCABLE TRUST
Address: BLUE CREEK RD 1200
Parcel ID: 030  005.03
Deeded Acreage: 20.14
Calculated Acreage: 0

1:9,028

| 0 | 0.05 | 0.1 | | 0.2 ml |

| 0 | 0.2 | | 0.4 km |

State of Tennessee, Comptroller of the Treasury, Division of Property Assessments (DPA), Esri Community Maps Contributors, © OpenStreetMap, Microsoft, Esri, TomTom, Garmin, SafeGraph, GeoTechnologies, Inc, METI/ NASA, USGS, EPA, NPS, US Census Bureau, USDA, USFWS

EX. T (1 PAGE)

# Exhibit 8

LAST WILL AND TESTAMENT

OF

ROBERT W. MOORE


I, ROBERT W. MOORE, a resident of Walton County, Florida, do make, publish, and declare this to be my Last Will and Testament, hereby revoking any and all other Wills heretofore made by me:

## ITEM ONE

I direct that all of my just debts and funeral expenses, including the cost of any appropriate monument for my gravesite, shall be paid as soon as practicable after my death.

My Personal Representative may, to the extent my Personal Representative deems necessary or appropriate, request payment of all or a portion of my debts and funeral expenses, expenses of administration, and any estate and inheritance taxes (but not any generation-skipping transfer taxes), together with any interest or penalties thereon, payable by reason of my death to any state or the United States, or any foreign government, by written notice to the successor Trustee under the Revocable Trust Agreement dated the same date as the date of this my Last Will and Testament, under which I am the Grantor and initial Trustee, and my children, KIMBERLY M. VANN and MATTHEW W. MOORE, or the survivor of them, are designated as successor Co-Trustees, and ServisFirst Bank (or its corporate successor or assignee by merger, purchase, consolidation, or otherwise), is designated as the second alternate successor Trustee, and any later amendment to said Trust Agreement. However, my Personal Representative's ability to request payment of debts from the aforementioned Trust Agreement is not intended to waive any protection afforded by any statute pursuant to the laws of Florida that would cause any asset of such trust to be exempt from the payment of any of my obligations or the obligations of my estate.

## ITEM TWO

All of my tangible personal property, less and except those items designated to pass to those persons on a list signed by me and referring to this my Last Will and Testament, shall pass as a part of the residue of my estate. By this reference, I hereby incorporate the list described herein as part of this my Last Will and Testament; however, if any such list is not found within sixty (60) days from the date of appointment of my Personal Representative, then it shall be presumed that there is no such list, and any list subsequently discovered shall be ignored.

If tangible personal property of mine passes to a beneficiary who is under the age of twenty-one (21) years at the date of distribution, I direct that my Personal Representative, or, upon completion of administration of my estate, a custodian under the Florida Uniform Transfers to Minors Act, shall have discretion to withhold distribution of such tangible personal property to such beneficiary until such time or times as in the discretion of my Personal Representative or the custodian, the beneficiary may use and enjoy the tangible personal property; but, in any event, such distribution shall not be withheld later than the date on which the beneficiary attains the age of twenty-one (21) years.

For all purposes of this my Last Will and Testament, the term "tangible personal property" shall not include property used by me in a business or for production of income, such as inventory or depreciable property.

## ITEM THREE

I give and devise the rest and residue of my estate, real and personal, to the successor Trustee of the Revocable Trust Agreement dated the same date as the date of this my Last Will and Testament, under which I am the Grantor and initial Trustee, and my children, KIMBERLY M. VANN and MATTHEW W. MOORE, or the survivor of them, are designated as successor Co-Trustees, and ServisFirst Bank (or its corporate successor or assignee by merger, purchase, consolidation, or otherwise), is designated as the second

2

alternate successor Trustee, and any later amendment to said Trust Agreement, to be held, managed, and distributed under the terms and conditions thereof.

If for any reason the trust described above shall not be in existence at the time of my death, or if for any reason a court of competent jurisdiction shall declare this testamentary transfer to the Trustee of such trust to be invalid, then I direct that the rest and residue of my estate, real and personal, shall be held by MATTHEW W. MOORE and KIMBERLY M. VANN, or the survivor of them, as Co-Trustees or sole Trustee, as the case may be, and if neither of them is able or willing to serve, by ServisFirst Bank (or its corporate successor or assignee by merger, purchase, consolidation, or otherwise), as Trustee, to be held, managed, and administered in exactly the same manner described in said trust agreement, giving, if the court shall allow, full effect to all amendments of said trust agreement existing at the time of my death. For this purpose, I hereby incorporate by reference such trust agreement and any amendments thereto into this my Last Will and Testament.

## ITEM FOUR

I nominate and appoint my children, MATTHEW W. MOORE and KIMBERLY M. VANN, as Co-Personal Representatives of this my Last Will and Testament, to serve without bond. In the event either of the appointed Co-Personal Representatives is unable or unwilling to serve, then the remaining appointed Co-Personal Representative shall serve as my sole Personal Representative, also to serve without bond. If neither of the appointed Co-Personal Representatives can serve as my Personal Representative, then I appoint ServisFirst Bank (or its corporate successor or assignee by merger, purchase, consolidation, or otherwise), as Personal Representative of this my Last Will and Testament, to serve without bond.

I authorize and empower my Personal Representative to receive, take, recover, hold, manage, and control all of the property of my estate, and from time to time to invest and reinvest the same, and the proceeds and income therefrom, in such securities and property, and in such manner as my Personal Representative in my Personal Representative's

3

absolute discretion may think best or fit; to assign, transfer, lease, rent, exchange, mortgage, repair, rebuild, pledge, sell, and convey the property, real and personal, of my estate or any part thereof; to make, execute, acknowledge, and deliver any and all deeds, leases, notes, mortgages, and other instruments necessary, proper, or convenient in connection therewith; and to do and perform any and all other acts and things necessary which my Personal Representative may deem expedient to carry out any of the purposes herein stated, including the execution and performance of contracts to purchase assets.

Any property or portion thereof given to the Trustee of a trust created under or identified in this Will, which trust pursuant to its terms would be immediately subjected to final distribution and termination upon receipt of the property, may be distributed by my Personal Representative directly to the beneficiaries of the trust in order to avoid the needless transfer of property to the Trustee as a preliminary step to distribution to the ultimate (trust) beneficiaries.

I further authorize my Personal Representative to make any and all elections or allocations permitted by any tax law applicable to my estate. My Personal Representative shall not make any adjustments among the beneficiaries of my estate as to the income or principal of the estate as a result of the exercise of any such election or allocation. Property may be subject to elections and allocations under this paragraph whether or not it is included in my probate estate. All elections and allocations under this paragraph shall be in the discretion of my Personal Representative, who shall have the power to omit any property from any such election or allocation. Any decision made by my Personal Representative under this paragraph shall be binding on all persons.

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal on the ___4th___ day of ___Nov_____, 2014.

_____
ROBERT W. MOORE

4

The foregoing instrument was on the _4th_ day of _NOVEMBER_ 2014, signed, sealed, published, and declared by ROBERT W. MOORE, in our presence, as and for his Last Will and Testament, and we and each of us, in his presence, and at his special request, and in the presence of each other, hereunto subscribe our names as witnesses to the same.

_Suzanne C. Cooke_ of Pensacola, Florida.

_Mikele Nunnelee_ of Pensacola, Florida.

STATE OF FLORIDA      )
                         : ss.
COUNTY OF ESCAMBIA    )

I, ROBERT W. MOORE, declare to the officer taking my acknowledgement of this instrument and to the subscribing witnesses, that I signed this instrument as my will.

_Robert W Moore_
ROBERT W. MOORE

We, _Suzanne C. Cooke_ and _Mikele Nunnelee_ have been sworn by the officer signing below, and declare to that officer on our oaths that the testator declared the instrument to be the testator's will and signed it in our presence and that we each signed the instrument as a witness in the presence of the testator and of each other.

_Suzanne C. Cooke_
Witness

_Mikele Nunnelee_
Witness

5

Acknowledged and subscribed before me by the testator, ROBERT W. MOORE, who is personally known to me or who has produced _____ _____ as identification, and sworn to and subscribed before me by the witnesses, _SuzANNe C. Cooke____, who is personally known to me or who has produced _____ as identification, and by _Mikele Nunnelee____, who is personally known to me or who has produced _____ as identification, and subscribed by me in the presence of the testator and the subscribing witnesses, all on the 4th day of _Novembe_, 2014.

HARRY B. STACKHOUSE
COMMISSION # EE46640
EXPIRES: February 23, 2015

_____
[Signature of Notary Public]

_____
[Print, Type, or Stamp Name of Notary Public]
State of Florida at Large

Commission Number:_____
My Commission Expires:_____

[NOTARIAL SEAL]

A1628712.DOCX

6

This is the list referred to in Item Two of my Last Will and Testament, dated the _____ day of _____, 2014, disposing of certain items of tangible personal property.

**Item of Tangible Personal Property**          **Name & Address of Beneficiary**

_____
ROBERT W. MOORE

Date:_____ day of _____, 20_____

Case 1:26-cv-00039   Document 1-1   Filed 04/17/26   Page 115 of 144 PageID #: 120

## INSTRUCTIONS FOR DISPOSITION OF
## TANGIBLE PERSONAL PROPERTY BY LIST

As you know, your Will provides that you may dispose of items of tangible personal property informally by a signed statement or list without the formality and expense of a Codicil to your Will for such gifts. You are _not_ required to make such a list, but you may choose to do so. I am enclosing a suggested blank form for you to use in preparing your list, if you want to use a list. If you decide to prepare a list, please keep the following in mind:

1.      The list can be used _only for tangible personal property_ (such as furniture, jewelry, clothing, automobiles, etc.). The list _cannot_ be used for intangible personal property (stocks, bonds, cash, savings accounts, etc.) or real estate.

2.      You _cannot_ use the list to change gifts (if any) of items of tangible personal property that are specifically described in your Will or in a Codicil to your Will.

3.      Any item or items to be given by the list should be described with enough detail to assure that there is no confusion regarding the item or group of items to be distributed.

4.      The complete name (and, if it is readily available, the address) of the person who is to receive the gift should be shown directly to the right of the description of the item.

5.      If possible, please _type or print_ when completing the list (except for your signature). It is important for the entries on the list to be legible.

6.      The list must be signed and dated by you in order to be effective.

7.      If you use the list, place the completed, signed, and dated original list with your original Will or be sure that someone knows where you keep the signed original list.

8.      If you make a list and want to make substantial changes to it, destroy the old list and make a new one to avoid any confusion.

9.      If you make a list, you are free to destroy it and have no list.

10.     Keep these instructions with the unused form for ease of reference.

This Instrument Prepared By:
**Harry B. Stackhouse**
**Clark, Partington, Hart, Larry,**
 **Bond & Stackhouse**
Post Office Drawer 13010
Suite 800, 125 West Romana Street
Pensacola, Florida 32591-3010

STATE OF FLORIDA      )

                : ss.       **DURABLE POWER OF ATTORNEY**

COUNTY OF ESCAMBIA   )

     KNOW ALL MEN BY THESE PRESENTS, that I, **ROBERT W. MOORE**, of Walton County, Florida, as authorized by Chapter 709, Florida Statutes, hereby appoint my son, **MATTHEW W. MOORE**, as my true and lawful attorney-in-fact, to act for me and to manage and conduct my affairs, in any way which I myself could do if I were present, with respect to any and all matters described herein.   In the event Matthew W. Moore predeceases me or is otherwise unable or unwilling to act as my attorney-in-fact, then I hereby appoint my daughter, **KIMBERLY M. VANN**, as my true and lawful attorney-in-fact, to act for me and to manage and conduct my affairs, in any way which I myself could do if I were present, with respect to any and all matters described herein.

     This durable power of attorney will not be affected by my subsequent incapacity, except as provided in Chapter 709, Florida Statutes.  All acts done by my attorney hereunder pursuant to the power hereby conferred during any period of disability or incapacity shall have the same effect, and inure to the benefit of and bind me, my heirs, devisees, and personal representatives, as if I were not incapacitated or disabled.  This durable power of attorney shall be nondelegable except as specifically provided below, and shall be valid and effective from the date hereof until such time as I shall die, revoke the power, or be adjudged incapacitated.

     I expressly authorize my attorney acting hereunder to do and execute all or any of the acts, deeds, and things described herein, and grant to my attorney any authority reasonably necessary to give effect to the express grant of specific authority set forth herein:

     (1)    To redeem or cash any and all bonds issued by the United States Government or any of its agencies, any other bonds, and any certificates of deposit or other similar assets or securities belonging to me.     RW M  Initial

     (2)    To vote at all meetings of stockholders of any company or corporation, and otherwise to act as my attorney or proxy in respect of my shares of stock or other securities or investments which now or hereafter shall belong to me, and to appoint substitutes or proxies with respect to any such shares of stock; to sell any such shares of stock or other securities or investments, whether listed on a securities exchange or otherwise; to execute stock powers or similar documents on my behalf and delegate to a transfer agent or similar person the authority to register any stocks, bonds, or other securities either into or out of my name or a nominee's name.    RWM  Initial

     (3)    To sign and execute in my behalf any state or federal tax return relating to income, gift, generation-skipping transfer, ad valorem, intangible, or other taxes, and to act for me in any examinations, audits, hearings, conferences, or litigation relating to any such taxes, including the authority to file joint income tax returns with my spouse, elect to join in any gift made by my spouse

to effect gift-splitting, make any and all tax elections available to me, exercise my right to allocate my GST exemption, designate himself or herself as my attorney-in-fact under any tax power of attorney, file and prosecute refund claims, enter into and effect any settlements, and appoint qualified individuals to represent me in dealing with the Internal Revenue Service or other taxing authorities. _RWM_ Initial

(4) To sign and execute in my behalf any document affecting any interest I have in any real property. _RWM_ Initial

(5) To make decisions and select options concerning individual retirement account distributions and retirement plan benefits, and to execute any document pertaining to my individual retirement account assets and retirement plan benefits. _RWM_ Initial

(6) To transfer assets to a revocable trust established by me and of which I am a beneficiary for my lifetime, or to a trust created pursuant to the following paragraph. _RWM_ Initial

(7) To execute on my behalf a revocable trust which does not disturb my estate plan and which is held for the benefit of me or my spouse and me during my lifetime. _RWM_ Initial

(8) To carry out estate planning transactions, including but not limited to making irrevocable gifts, for the purpose of reducing or eliminating any state or federal estate or gift tax payable by me or my estate; provided, however, that my attorney hereunder shall have no power to appoint my property to his or her estate or to his or her creditors or creditors of his or her estate, and the amount which my attorney hereunder may appoint to himself or herself as a gift from me in any calendar year shall be limited to the greater of Five Thousand and No/100 ($5,000.00) Dollars or five (5%) percent in the aggregate of the value of all real and personal property owned by me individually on the last day of such year (not including my interest in any property held in joint tenancy, or any property over which I hold a power of appointment, or my interest in any property held in tenancy by the entirety, or my homestead if I have a spouse or minor child living at the time of the gift). _RWM_ Initial

(9) To make qualified disclaimers of any gift or any devise or legacy or any interest in any trust provided for my benefit or property passing by operation of law at any time within nine (9) months after the date of the event which created an interest in me. _RWM_ Initial

(10) To create joint tenancies with rights of survivorship between me and my attorney hereunder or any other person. _RWM_ Initial

(11) To provide for my care and custody and my physical well-being. _RWM_ Initial

(12) To hire attorneys to represent me in any dispute and to authorize settlement from my assets of any litigation against me. _RWM_ Initial

(13) To employ investment managers, attorneys, accountants, and other professionals as advisors in connection with my personal and financial affairs. _RWM_ Initial

(14) To make payments to those who normally depend on me in whole or in part for their support. _RWM_ Initial

(15) To complete any pledge to a charitable organization which I have made. _RWM_ Initial

(16)     To execute, acknowledge, and sign all forms, documents, claims, and affidavits which are necessary, desirable, or required in regard to Social Security or veterans' benefits. _RWM_ Initial

(17)     To conduct banking transactions as provided in Section 709.2208(1), Florida Statutes, including but not limited to making deposits or investments in, or withdrawals from, any account in any banking, trust, savings and loan, and similar institution, exercising any right or option pertaining thereto (including signing checks on my behalf), and opening accounts, or interests of whatever kind with any such institution, in my name or in my attorney's name, or in our names jointly either with or without right of survivorship. _RWM_ Initial

(18)     To exercise any statutory rights or elections, including, but not limited to, any rights or elections in any probate or similar proceeding to which I am or may become entitled; to renounce or disclaim any interest otherwise passing to me by testate or intestate succession or by inter vivos transfer. _RWM_ Initial

(19)     To attend to any matters regarding bills or payments for my medical care, including (a) obtaining from my healthcare providers (physicians, nurses, and their staffs) any information concerning me, the status of my health or medical services that may have been rendered for me or recommended for me; (b) providing any of the foregoing information to any third-party payor; and (c) arranging for payment of my medical bills directly or by insurance companies, Medicare, or other third-party payor. This Durable Power of Attorney shall constitute my direct authorization and consent under the Federal law known as the "Health Insurance Portability and Accountability Act of 1996, as amended," and the regulations thereunder ("HIPAA") for any medical record or information concerning me to be provided to my attorney-in-fact named herein. In addition, I hereby waive all rights to privacy under all Federal and State laws with respect to disclosures to my attorney-in-fact. Notwithstanding my ability to take part in decisions concerning my own medical care or treatment, my attorney-in-fact, is hereby designated as my personal representative within the meaning of HIPAA for purposes of requesting, receiving, using, disclosing, amending, and otherwise having access to my personal, individually-identifiable health information. _RWM_ Initial

(20)     To sell, transfer, mortgage, or convey any property owned by me, including but not limited to my interest in all real property, including homestead real property; all personal property, tangible or intangible; all property held in any type of joint tenancy, including a tenancy in common, joint tenancy with right of survivorship, or a tenancy by the entirety; all property over which I hold a power of appointment; choses in action; and all other contractual or statutory rights or elections, including but not limited to any rights or elections in any probate or similar proceeding to which I am or may become entitled. This durable power of attorney shall further include the authority to mortgage or convey my homestead property with the joinder of my spouse, if living, or her legal guardian or duly appointed attorney. _RWM_ Initial

(21)     To conduct investment transactions as provided in Section 709.2208(2), Florida Statutes. _RWM_ Initial

If any instrument signed by my attorney pursuant to this durable power of attorney is recorded in the public records before my written revocation hereof is recorded in the public records

3

of the same county, then such instrument shall be and remain fully effective for the purposes stated in the instrument.

Any third party may rely upon the authority granted in this durable power of attorney until the third party has received notice of revocation, partial or complete termination, suspension, my death, or otherwise as provided in Section 709.2101, Florida Statutes. Until a third party has received such notice, the third party may act in reliance upon the authority granted in this durable power of attorney.

My attorney-in-fact is not liable for any acts or decisions made by my attorney-in-fact in good faith and under the terms of this durable power of attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on this _4th_ day of _November_, 2014.

Signed, sealed, and delivered
in the presence of:

_Suzanne C. Cooke_
[Signature of Witness]
_Suzanne C. Cooke_
[Type/Print Name of Witness]

_Michele Nunnelee_
[Signature of Witness]
_Michele Nunnelee_
[Type/Print Name of Witness]

_Robert W. Moore_ _____(SEAL)
ROBERT W. MOORE


STATE OF FLORIDA        )
                        : ss.
COUNTY OF ESCAMBIA      )

The foregoing instrument was acknowledged before me this _4th_ day of _November_, 2014, by ROBERT W. MOORE, who (_X_) is personally known to me, **or** (__) has produced _____ as identification.

_____
[Signature of Notary Public]

HARRY B. STACKHOUSE
COMMISSION # EE46640
EXPIRES: February 23, 2015

_____
[Print, Type, or Stamp Name of Notary Public]
State of Florida at Large

Commission Number:_____
My Commission Expires:_____

[NOTARIAL SEAL]
A1486859.DOC

4

# Exhibit 9

## PRE-MARITAL AGREEMENT

THIS IS A PRE-MARITAL AGREEMENT executed by and between **SUZANNE MOORE (f/k/a LITTEL),** hereinafter **"SUZANNE,"** and **ROBERT W. MOORE,** hereinafter **"ROBERT"** for the following uses and purposes:

## R E C I T A L S

WHEREAS, a marriage is contemplated and anticipated between the parties;

WHEREAS, each of the parties hereto has fully discussed with the other the need for entering into an agreement of this nature in the interest of furthering their marriage and to eliminate any question about each party's rights to his or her property and assets and each party's right to dispose of such assets in any way he or she wants;

WHEREAS, as of the date of entry into this Pre-Marital Agreement, each Party is in good mental health and neither is suffering from any mental illness or disease;

WHEREAS, in connection with the provisions of this Pre-Marital Agreement, each party hereby acknowledges receipt of specific advice pertaining thereto by separate independent counsel of each party's own choice; and each party acknowledges that, as part of such advice, his or her counsel has advised and discussed fully the Florida law, as set forth in certain judicial decisions, and current Florida Statutes, concerning pre-marital agreements. Each party further acknowledges that he or she has sought meticulously to comply with Florida law concerning pre-marital agreements and that, among other things, each:

(i) Has fully and fairly advised the other, and been advised by the other, of their respective financial situation;

(ii) Has a fair understanding of the financial status of the other and specifically understands that each is possessed of certain assets (and that the assets of each party are not equal in value), identified or included in annexed Exhibits "A" (Personal Financial Disclosure Statement of Robert) and "B" which are made a part of this Pre-Marital Agreement;

(iii) Considers the provisions contained herein as fair under the current and probable future circumstances of each party;

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 122 of 144 PageID #: 127

(iv)    Considers and believes after full and fair examination of the other's finances and after the advice of independent counsel that each has made a full disclosure to the other, each has a reasonable approximation of the financial situation of the other, and each considers the provisions contained herein to be fair and reasonable and in accordance with their respective intentions;

(v)    That Suzanne believes that appraisals are not needed based on the above and acknowledges that her decision not to get appraisals is hers alone.

(vi)    That Suzanne has also had the opportunity to obtain accounting advice from an independent accountant of her choosing regarding the terms of this Pre-Marital Agreement.

WHEREAS, the parties intend that the assets and liabilities of each party as of the date of their wedding, including any assets currently held in trust and any expected inheritance, shall after the marriage of the parties remain solely the assets and liabilities of the respective party who owned such assets or owed such liabilities prior to the marriage of the parties;

. WHEREAS, the parties also intend that certain assets that may be acquired during the marriage shall remain the assets of one party or the other and shall not become the assets of both parties;

WHEREAS, the parties also intend to waive certain other rights to assets, alimony, death benefits, and other entitlements as described herein; and

WHEREAS, the parties hereto have discussed and reviewed between themselves the provisions of this Pre-Marital Agreement, and each party represents and acknowledges that he and she respectively has had the opportunity to counsel with his or her respective attorney or other advisor privately and in the absence of the other party concerning the provisions of this Pre-Marital Agreement. Further, Suzanne acknowledges that she consulted with a lawyer in 2004 regarding a 2004 Prenuptial Agreement that was signed by both parties, but that the parties wish to void pursuant to Section 21 of this Agreement. Each party by the execution of this Agreement acknowledges to the other that he or she has a full and complete understanding and comprehension of all of the provisions of this Agreement, and that each party has fully discussed and understands the obligations and duties that one would have to the other had

2

such an agreement not been entered into. The parties further, each by the execution of this Agreement, acknowledge that each has entered into this Agreement freely and voluntarily of their respective own free will and without suggestion, coercion, duress, or influence of any nature, and further acknowledge that this Agreement has not been entered into for any reason other than the desire of each party to clearly establish certain rights in anticipation of the marriage of the parties.

WHEREAS, the parties acknowledge that ROBERT owns property in Alabama and Tennessee and that the parties from time to time visit and stay at these properties; however, both parties agree that they do not have now, (nor have they had in the past), a common law marriage in Alabama or any other state. The parties have not had a prior mutual agreement to permanently enter a marriage relationship to the exclusion of all other relationships and have not publicly recognized a marriage relationship or assumed any marital duties that could constitute a common law marriage.

NOW, THEREFORE, the parties hereto agree as follows:

1.    Consideration. The parties acknowledge that the provisions of this Agreement, and the marriage of the parties are the consideration for this Agreement and are sufficient consideration to support this Agreement. SUZANNE and ROBERT together have voluntarily and independently negotiated and agreed upon the mutual promises and agreements herein set forth. The parties hereto understand that this Pre-Marital Agreement contains the entire understanding of the parties; there are no representations, warranties, covenants or undertakings, oral or otherwise, other than those expressly set forth herein. The parties agree that if for any reason the marriage is not consummated this Pre-Marital Agreement will be void and of no force or effect.

2.    ROBERT's Pre-Marriage Property. Except as specifically provided herein, all assets owned by ROBERT on the date of the parties' wedding and any appreciation, growth, or other enhancement in value in such assets after such wedding (regardless of whether such appreciation, growth, or other enhancement in value is passive in nature or results from the effort of either party during marriage or from the contributions to or expenditures thereon of marital or non-marital funds or other forms of marital or non-marital assets), and any asset

3

acquired by ROBERT after the wedding with the profits, avails, or proceeds from the disposition of such assets (hereinafter "ROBERT's Pre-Marriage Assets") shall remain ROBERT's sole and separate property throughout the marriage. ROBERT's Pre-Marriage Assets shall specifically include, but not be limited to, all real property, notes or accounts receivable, securities, accounts and joint venture interests owned by ROBERT on the date of the wedding, and all vested and non-vested benefits, rights, and funds that may be held for his benefit on the date of the wedding in any retirement account, pension plan, profit sharing plan, Section 401(k) plan, IRA(s) annuity, deferred compensation plans or programs, together with all earnings, appreciation, or growth in such property, benefits, rights, funds, or assets after the date of the wedding. SUZANNE shall not claim or acquire any interest in any of ROBERT's Pre-Marriage Assets or any earnings, appreciation, growth or other increase in value of such assets which accrues during the marriage. ROBERT reserves the right to make gifts to SUZANNE out of ROBERT's Pre-Marriage Assets during the marriage, but such gifts, if any, shall not constitute an amendment to or other change in this Agreement.

3.     SUZANNE's Pre-Marriage Property. Except as specifically provided herein, all assets owned by SUZANNE on the date of the parties' wedding and any appreciation, growth, or other enhancement in value in such assets after such wedding (regardless of whether such appreciation, growth, or other enhancement in value is passive in nature or results from the effort of either party during marriage or from the contributions to or expenditures thereon of marital or non-marital funds or other forms of marital or non-marital assets), and any asset acquired by SUZANNE after the wedding with the profits, avails, or proceeds from the disposition of such assets (hereinafter "SUZANNE's Pre-Marriage Assets") shall remain SUZANNE's sole and separate property throughout the marriage. SUZANNE's Pre-Marriage Assets shall specifically include, but not be limited to, all real property or accounts receivable, securities, accounts and joint venture interests owned by SUZANNE on the date of the wedding, and all vested and non-vested benefits, rights, and funds that may be held for her benefit on the date of the wedding in any retirement account, pension plan, profit sharing plan, Section 401(k) plan, annuity, deferred compensation plans or programs, together with all earnings, appreciation, or growth in such property, benefits, rights, funds, or assets after the date of the

4

wedding. ROBERT shall not claim or acquire any interest in any of SUZANNE's Pre-Marriage Assets or any earnings, appreciation, growth or other increase in value of such assets which accrues during the marriage. SUZANNE reserves the right to make gifts to ROBERT out of SUZANNE's Pre-Marriage Assets during the marriage, but such gifts, if any, shall not constitute an amendment to or other change in this Agreement.

4.      Property Acquired During the Marriage. Property acquired during the marriage, specifically including but not limited to (I) all vested and non-vested benefits, rights, and funds contributed to, or otherwise accruing, during the marriage in retirement accounts, pension plans, profit sharing plans, IRA(s), Section 401(k) plans, annuities, or deferred compensation plans or programs, (II) all income derived from marital and non-marital assets during marriage, whether or not such income is treated, used, or relied upon as a marital or non-marital asset, (III) any compensation, wages, gain or other income earned by a party whether or not such income is treated, used, or relied upon as a marital or non-marital asset, (Iv) any assets (including real property, securities, and interests in any partnership, corporation, joint venture, limited liability company, or other entity) acquired by purchase or exchange, (v) any assets received by a party by gift or inheritance, (vi) any earnings, appreciation, growth, or other enhancement in value from or in the assets, benefits, rights, funds, plans, income, gifts, or inheritances, described in items (I), (II), (III), (Iv), and (v) above, occurring after acquisition or receipt (regardless of whether such earnings, appreciation, growth, or other enhancement in value is passive in nature or results from the effort or labor of either party during marriage or from the contributions to or expenditures thereon of marital or non-marital funds or other forms of marital or non-marital assets) of such assets, benefits, rights, funds, plans, income, gifts or inheritances, and (vii) any asset acquired with the profits, avails, or proceeds from the disposition of any assets described in this Section 4, shall be owned and held by the party or parties as provided in the instrument conveying or evidencing the title to such asset or property. ROBERT and SUZANNE hereby agree that each may hold assets (including the vehicles that each own or drives) acquired during the marriage in his or her sole name, and such assets shall be the sole property of the spouse in whose name the asset is titled. Property or assets titled in SUZANNE's name alone shall be conclusively presumed to belong solely to

5

SUZANNE. Property or assets titled in ROBERT's name alone shall be conclusively presumed to belong solely to ROBERT. While ROBERT and SUZANNE are living, property or assets titled in the joint names of ROBERT and SUZANNE shall be presumed to belong to SUZANNE and ROBERT in equal undivided shares if held (i) as tenants in common, (ii) as tenants by the entirety (if conveyed to ROBERT and SUZANNE as tenants by the entirety or as husband and wife), or (iii) as joint tenants with rights of survivorship (if conveyed to ROBERT and SUZANNE as joint tenants with right of survivorship), unless otherwise specifically set forth in the instrument of conveyance or title instrument. Each party agrees that the manner in which each asset is titled in accordance with this Agreement during the marriage shall control its ownership and disposition in the event of dissolution of marriage, divorce, support unconnected with dissolution under Section 61.09 or 61.10, Florida Statutes, separation, annulment of the marriage, or death of either party. Except for items of personal use or adornment, if the instrument of title or evidence of ownership does not specify otherwise (such as reflecting title or ownership in the name of one party alone) or if there is no instrument of title and there is no indication that the particular asset is not intended to be owned jointly by SUZANNE and ROBERT, then the particular asset acquired during the marriage shall be deemed to be held as a tenancy by the entirety or a joint tenancy with right of survivorship. Items of personal use or adornment, including jewelry and sporting or recreation equipment, shall be presumed to belong solely to the party who usually uses or wears such item unless there is a contrary indication as to the ownership of such items.

5. <u>Homestead</u>. It is anticipated that any property that the parties use as their residence(s) (their primary residence will be in Florida) during their marriage, including property acquired or constructed during the marriage (such property now owned or hereafter acquired and all improvements constructed thereon are hereinafter referred to as the "Principal Residence(s)"), may be owned by a trust or entity in which SUZANNE has no interest or may be titled in ROBERT's name alone. Subject to the provisions of Section 8 of this Agreement, SUZANNE waives all homestead rights or interests with respect to the Principal Residence(s). Provided, however, the provisions of this Paragraph 5 shall not prohibit ROBERT from titling the Principal Residence(s) in the names of SUZANNE and ROBERT as tenants by the entirety nor

6

shall this Paragraph 5 limit ROBERT's right to provide in his will that upon ROBERT's death, SUZANNE shall receive an interest in the Principal Residence(s) which is greater than that provided in this Agreement. Provided, further, except as provided in Section 8 of this Agreement, ROBERT shall not be required to transfer to SUZANNE by gift, devise, or otherwise, any interest in the Principal Residence(s).

6. Household Account. The parties may establish a joint checking account which shall be identified as the "household account" for the purpose of paying normal recurring living expenses. However, the parties shall not be required to establish such an account, and neither party shall be required to contribute to such account after the parties are married. In the event of the death of either party during the marriage, all funds in the household account (if one has been established) shall belong to the surviving spouse. In the event the marriage is dissolved or annulled, or the parties separate, one-half (1/2) of the funds in the household account shall be distributed to ROBERT and one-half (1/2) of the funds in the household account shall be distributed to SUZANNE.

7. Disposition of Property. Each party retains the management and control of the property belonging to that party, as provided in this Agreement, and may encumber, sell or dispose of such property without the consent of the other party. Each party may designate a beneficiary (who may be someone other than the spouse) to receive benefits under any life insurance policy, retirement plan, retirement account, or annuity, and each party hereby agrees to execute (at anytime, including after the wedding) any waiver or consent document necessary to enable the other party to receive, during his or her lifetime, benefits from any retirement plan or account or to designate a primary beneficiary other than the spouse to receive benefits payable from any retirement plan or account upon the death of the spouse who owns such retirement plan or account. The parties understand that it may be necessary to execute, after the wedding, a waiver of spousal benefits with respect to retirement plan death benefits payable upon the death of the other spouse so that such spouse may designate a primary beneficiary, other than the surviving spouse, to receive any such retirement plan benefits. Such waiver may not be fully effective unless executed after the wedding. Each party shall, without delay, execute any instrument necessary to effectuate this paragraph on the request of the other

7

party. If either party does not join in or execute an instrument as required by this paragraph, the other party may sue for specific performance or for damages, regardless of the doctrine of spousal immunity, and the prevailing party in any such litigation shall be entitled to seek costs, expenses and attorneys' fees pursuant to Chapter 61, Florida Statutes, or other statutory basis.

8. <u>Claims Against the Estate of a Party in the Event of Death During Marriage</u>. The parties agree that the laws presently or in the future in effect as to the rights of widows or widowers to the contrary notwithstanding, both ROBERT and SUZANNE each waive any and all rights to any share, elective share, intestate share, pretermitted share, exempt property, dower, curtesy, homestead right, family allowance, widow's or widower's rights, or any other right that either might have in the estate or the property or assets of the other in the event of death during the coverture of marriage.

The parties fully agree that in the event of death of either party, each party has the unrestricted right in his or her sole discretion, by will, joint ownership, beneficiary designation, trust, or other instrument, to leave the other spouse anything or nothing from their respective estates or assets. Except to the extent that a party has affirmatively and specifically, in a document executed after ROBERT and SUZANNE are married, indicated that the other party is to receive assets or an interest in assets upon the death of a party, the estate and assets of a deceased party shall be free of any claim or demand of inheritance, dower, curtesy, elective share, homestead right, exempt property, intestate share, pretermitted share, family allowance or any spousal or other claims given by law, irrespective of the marriage and any law to the contrary.

9. <u>Claims for Property and Support in the Event of Dissolution of Marriage</u>. In the event that the marriage of the parties entered into after the execution of this Pre-Marital Agreement does not, for any reason, work out to the satisfaction of either of the parties to the marriage, then in the event of a dissolution of the marriage or a divorce proceeding, a proceeding for support unconnected with dissolution (under Sections 61.09 or 61.10, Florida Statutes), or separation proceeding being filed and being pursued in a court by either party, the parties agree that the terms and provisions of this Agreement shall govern all their rights as to property, any type of alimony (including, but not limited to, temporary alimony, rehabilitative

8

alimony, permanent periodic alimony or support, bridge the gap alimony or lump-sum alimony), property settlement, equitable distribution, rights of community property or costs against the other. If divorce or dissolution proceedings or any other proceedings described in the preceding sentence are filed by either of the parties to this Agreement, then in that event the parties agree that the party filing said proceeding shall ask and request that the court follow the provisions and terms of this Pre-Marital Agreement which the parties have freely, willingly, and voluntarily entered into this date, and the non-filing party shall also ask and request the court to follow the provisions and terms of this Pre-Marital Agreement.

(a)     The parties recognize and agree that each owns separately his or her Pre-Marriage Assets as described in Paragraphs 2 and 3 of this agreement. Each party's Pre-Marriage Assets that are held solely in the name of one party, and any other assets titled solely in the name of such party shall continue to be solely the property of the party in whose name the asset is titled. After the marriage is dissolved, the assets described in this Subparagraph (a) shall be the property of the party in whose name the assets were titled, and such assets shall not be subject to, or considered in, any form of equitable distribution, property settlement, or division of property or assets between the parties.

(b)     The parties recognize that during the marriage, assets, property, and funds may be acquired by them as described in Paragraph 4 of this agreement. Each party agrees that the manner in which each and any such thing of value is titled during the marriage shall control its ownership and disposition in the event of dissolution of marriage, support unconnected with dissolution under Section 61.09 or 61.10, Florida Statutes, divorce, or separation. For example, assets titled in SUZANNE's name alone (which shall include real property owned by SUZANNE before the marriage) shall be the sole property of SUZANNE free of any claims by ROBERT. Similarly, assets titled in ROBERT's name alone shall be the sole property of ROBERT free of any claims by SUZANNE. Assets titled in the joint names of ROBERT and SUZANNE shall be divided between ROBERT and SUZANNE in accordance with the instrument conveying or evidencing the title to such joint property or in accordance with provisions of this Agreement specifically providing for the division of such asset (such as the household account). Except for items of personal use or adornment, untitled tangible personal

9

property acquired during the marriage shall be divided equally in the event of divorce, dissolution of marriage, or separation unless there is a written agreement executed by both parties providing for some other division/distribution of such items of tangible personal property. Items of personal use or adornment (including jewelry and sports or recreation equipment) shall belong solely to the party who usually uses or wears such item unless there is a contrary indication as to the ownership of such items.

(c) In the event that the marriage is annulled, dissolved, a divorce decree or judgment is entered, or an action is filed for support unconnected with dissolution under Section 61.09 or 61.20, Florida Statutes, for whatever reason, the parties agree that the provisions of this Agreement shall be a complete settlement of all rights to claim or seek any division of the property or assets and any payment of alimony or support in any form (further set forth in Paragraph 14 herein).

10. Acknowledgment of Rights Waived. Each of the parties to this Agreement is fully aware and clearly understands that if the other were to die testate or intestate, the share of the decedent's estate and property to which he or she would be entitled, or could assert a right to, would, except for the terms of this Agreement, be greater than provided herein. Similarly, each of the parties is fully aware and clearly understands that in the event the marriage is dissolved, annulled or divorce occurs, this Agreement operates as a waiver of rights which the other may have with respect to certain property, assets, alimony or support.

11. Taxes. the parties may (but are under no obligation to) file joint income tax returns. Any such joint returns shall be prepared by a duly licensed Certified Public Accountant selected by ROBERT. If the parties do not agree to file joint income tax returns before or by March 1 of a calendar year in respect of the preceding calendar year, each party shall file a separate return for the preceding calendar year unless the parties make other mutually agreeable arrangements in respect thereto. If separate returns are filed, each party shall assume all responsibility and expense for the preparation of such party's separate return and the payment of all tax, interest, and penalties in connection with same, and shall indemnify and hold the other party harmless from any responsibility and respect thereof. If the parties file a joint return ROBERT shall be entitled to any refund and he shall assume all responsibility and

10

expense for the preparation of the joint return and be responsible for any money, interest or penalty owed to the IRS based on his assets or income.

12. Debts. Any and all debts contracted or incurred by either party, whether prior to or during their marriage, shall remain such party's separate and sole liability to be paid by such party alone out of such party's separate property. Neither party (hereinafter "first party" in this paragraph) shall become liable to the other party (hereinafter "second party" in this paragraph) or to any third person on account of the actions or separate property of second party unless the first party specifically incurs such liability in a written instrument.

13. Further Assurances. Each party shall, upon any request of the other party, execute, acknowledge, and deliver any additional instruments that may be reasonably required to carry the intention of this Agreement into effect, including such instruments as may be required by the laws of any state or jurisdiction, now in effect or hereafter enacted, that may affect the property rights of the parties as between themselves or with others, and including, without limitation, any deeds, mortgages, or leases in which the party upon whom such request is made shall not incur any liability or obligation by complying with such request.

14. Alimony or Support Waiver. Both parties hereby agree to waive any and all right to all forms of alimony (including but not limited to permanent periodic, lump sum, rehabilitative, or bridge-the-gap), separate maintenance, or spousal support of any kind, manner, or duration. Both parties agree that neither shall pay alimony of any kind to the other based on the filing of a petition for dissolution of marriage, divorce, support unconnected with dissolution under Section 61.09 or 61.10, Florida Statutes, separation, or annulment. The parties further agree to waive any right to modify this alimony waiver based upon a significant change of circumstances or for any other reason whatsoever during their marriage or after. Nothing in this Agreement shall be construed as alimony.

15. Horses. All horses titled in Suzanne's name are acknowledged by Suzanne to be the property of Robert in which she holds title solely for the benefit of riding in horse events. Notwithstanding the provisions of this Agreement, Suzanne agrees to transfer title to horses she holds in her name to Robert in the event the marriage is dissolved by Final Judgment for any reason.

11

16. Severability. If any provision of this Agreement is deemed to be wholly invalid or wholly unenforceable, it shall be deemed severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement. If any provision is deemed unenforceable due to its scope or breadth, then such provision shall be enforced to the extent of the scope or breadth permitted by law and the court having jurisdiction of the subject; and furthermore, each party hereby specifically affirms such party's intention that such unenforceable provision or portion, if any, of a provision shall be used as a guideline in any judicial proceeding involving such provision or portion of a provision, and the parties intend for the court having jurisdiction of the matter to resolve the matter of such provision in a manner consistent with the provision with the appropriate reformation of the provision so as to make it enforceable in a manner as close to the original provision as possible.

17. Modification and/or Termination. This Pre-Marital Agreement may only be modified, changed or terminated by a further written instrument executed by both parties hereto, but additional consideration is not necessary. Any oral or implied agreement which conflicts with any of the foregoing shall be void, unenforceable, and of no force and effect.

18. Fairness. ROBERT and SUZANNE acknowledge and agree that all terms of this Agreement, including the provisions regarding property settlement/division/distribution and alimony, are fair and reasonable in light of their overall circumstances and agreements herein provided for.

19. Enforceability. This Pre-Marital Agreement shall bind and be enforceable against the parties hereto and their respective heirs, legal representatives, assigns, and successors in interest. SUZANNE acknowledges that she is not aware of any reason that this Agreement is not enforceable and that her intent is that this Agreement will be, and is, enforceable by either party after their marriage.

20. Governing Law. This Agreement shall be governed and construed by and enforced in accordance with the laws of the State of Florida without regard to conflict of laws principles, and any action brought hereunder shall be brought in the courts of the State of Florida located in the County of Escambia. Each party irrevocably waives any objection on the grounds of venue, forum non conveins or similar grounds and irrevocably consents to the jurisdiction of

12

said courts and service of process from such courts by mail or any other means permitted by applicable law.

21. Integration Clause. This Agreement contains the entire agreement of the parties. No representations or promises have been made except those that are set out in this Agreement. This Agreement may not be modified, amended, superseded or revoked, in whole or in part, by the subsequent conduct or verbal statement of either party, but only by an instrument in writing executed by the parties against whom it is sought to be enforced. The parties agree that by executing this Agreement they hereby declare void, and of no legal effect, the Prenuptial Agreement executed by them in April of 2004.

IN WITNESS WHEREOF, this Agreement is executed in duplicate on the dates set forth below.

WITNESSES:

_____
John M. Kmetik
[Type/Print Name of Witness]

_____
William F. Band ESQ
[Type/Print Name of Witness]

WITNESSES:

_____
John M. Kmetik
[Type/Print Name of Witness]

_____
William F. Band ESQ
[Type/Print Name of Witness]

_____
SUZANNE MOORE (f/k/a LITTEL)

Date: __11/28/08__, 2008

_____
ROBERT W. MOORE

Date: __1/28/08__, 2008

13

STATE OF FLORIDA )
                             ;
COUNTY OF ESCAMBIA )

The foregoing instrument was acknowledged before me this _28ʰ__ day of __January___, 2008, by SUZANNE MORRE (f/k/a LITTEL), who (__) is personally known to me, or (✓) has produced _Alabama Driver License # 7453067_____, as identification.

_Perla O. Phillips_
[Signature of Notary Public]

PERLA O. PHILLIPS
Notary Public, State of Florida
My comm. expires January 8, 2009
Comm. No. DD 374216

_Perla O. Phillips_
(Print, Type, or Stamp Name of Notary Public)
State of Florida at Large

Commission Number: _DD 374216_
My Commission Expires: _1-3-2009_

[NOTARIAL SEAL]

STATE OF FLORIDA )
                             ;
COUNTY OF ESCAMBIA )

The foregoing instrument was acknowledged before me this _28ᵗʰ__ day of __January___, 2008 by ROBERT W. MOORE, who (__) is personally known to me, or (✓) has produced _Florida Driver License M600-779-39-376-0_____, as identification.

_Perla O. Phillips_
[Signature of Notary Public]

PERLA O. PHILLIPS
Notary Public, State of Florida
My comm. expires January 8, 2009
Comm. No. DD 374216

_Perla O. Phillips_
[Print, Type, or Stamp Name of Notary Public]
State of Florida at Large

Commission Number: _DD 374216_
My Commission Expires: _1-3-2009_

[NOTARIAL SEAL]

A0304267

14

## BIZZELL, NEFF & GALLOWAY, P.A.
### CERTIFIED PUBLIC ACCOUNTANTS
POST OFFICE BOX 12346
PENSACOLA, FLORIDA 32591

THOMAS M. BIZZELL, CPA
CHRIS CUNNINGHAM, CPA
SAMUEL B. GALLOWAY, JR., CPA
TIMOTHY C. MOYER, CPA
GEORGE M. NEFF, JR., CPA RET.

FELICITY H. VAN SLYKE, CPA
STRYKER M. JONES, CPA

3250 NAVY BOULEVARD
TELEPHONE (850) 434-5574
FAX (850) 438-9256
EMAIL bng@cpabizzness.com

MEMBERS
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
FLORIDA INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

January 17, 2008

Robert W. Moore
Santa Rosa Beach, Florida

We have compiled the Statement of Financial Condition of Robert W. Moore as of December 31, 2007 included in the accompanying prescribed form in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. We also have compiled the supplementary information presented in the prescribed form.

Our compilation was limited to presenting in the accompanying prescribed form information that is the representation of the individual whose financial statement is presented. We have not audited or reviewed the financial statement and supplementary information referred to above and, accordingly, do not express an opinion or any other form of assurance on them.

The financial statement and supplementary information are presented in accordance with the requirements of the prescribed form which differ from generally accepted accounting principles. Accordingly, this financial statement and supplementary information is not designed for those who are not informed about such differences.

BIZZELL, NEFF & GALLOWAY, P.A.

*Bizzell, Neff & Galloway, P.A.*

Certified Public Accountants

EXHIBIT
" A "

## STATEMENT OF FINANCIAL CONDITION
### PERSONAL FINANCIAL DISCLOSURE STATEMENT

Date: 12/31/2007

To: _____

### Individual Information

Name: Robert W. Moore
Address: 65 Jasmine Dunes Box 12
City: Santa Rosa Beach  State: FL  Zip: 32459
Occupation: Executive
Phone: (850) 231-1829

| Current Assets | | Current Liabilities | |
|---|---|---|---|
| Cash on Hand or in Banks | $75,000 | Notes Payable (Secured)(Schedule F) | |
| Other Cash: | | Notes Payable (Unsecured)(Schedule G) | |
| Real Estate (other than residence Schedule A) | 4,685,000 | Real Estate Mortgages Payable (Schedule H) | |
| Residences | 1,750,000 | Auto Loans (Schedule I) | |
| Motor Vehicles (Schedule B) | 45,000 | Unpaid Taxes and Interest | |
| US Government Securities (Schedule C) | | Due to Brokers | |
| Non-Marketable Securities (Schedule D) | | Open Accounts | |
| Stocks (Schedule E) | 1,236,374 | Credit Cards (List): | |
| Other Personal Property | 900,000 | SunTrust Mastercard | $6,000 |
| Life Insurance Cash Value | | | |
| Notes Receivable | 1,074,729 | | |
| Other Assets: | | | |
| IRA | 405,422 | Other: | |
| Business Interests: | | | |
| 24.6% Interest in Mountain View Chevrolet | 1,000,000 | | |
| 100% Interest in Shell Creek Plantation | 3,797,260 | | |
| Loans - Shell Creek Plantation(as of 12/31/06) | 10,602,760 | Total Liabilities | $6,000 |
| ($4,000,000 secured by Mtge.) | | | |
| | | TOTAL OF ALL ASSETS | $25,571,525 |
| | | LESS TOTAL OF ALL LIABILITIES | 6,000 |
| | | NET WORTH | $25,565,525 |
| Total Assets | $25,571,525 | | |

### Individual Income Information (Annual)

| | | | |
|---|---|---|---|
| Salary | | | |
| Bonus | | SEE 2006 AND 2005 U.S. INDIVIDUAL | |
| Commissions | | INCOME TAX RETURN | |
| Dividends | | | |
| Rental Income | | | |
| Other Income (List): | | | |
| Total Income | | | |

### Contingent Liabilities

| | | | |
|---|---|---|---|
| Guarantor, Co-maker | | NONE | |
| Lease or Contracts | | | |
| Legal Claims | | | |
| Other: | | | |

Initials: *RWM*

Financial Statement page - 1 -

## SCHEDULE "A" REAL ESTATE

| Description of Real Estate | Cost | Market Value | Date Acquired |
|---|---|---|---|
| Land - Cullman, AL | $20,865 | $85,000 | 7/1/1990 |
| Land - Jasmine Dunes, FL | 912,500 | 1,500,000 | 9/20/2004 |
| House - 311 Spencer Creek Road, Franklin, TN | 1,100,000 | 1,100,000 | 10/1/2007 |
| House - Shell Creek Plantation | 1,200,000 | 2,000,000 | |
| | | | |
| | | | |
| Total | $3,233,165 | $4,685,000 | |

## SCHEDULE "B" MOTOR VEHICLES

| Description of Motor Vehicles | Cost | Value |
|---|---|---|
| 1993 Mercedes G Wagon | | $45,000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total | | $45,000 |

## SCHEDULE "C" U.S. GOVERNMENT SECURITIES

| Description of Stock or Bond | Date Acquired | Par Value | Market Value |
|---|---|---|---|
| | | | |
| NONE | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

## SCHEDULE "D" NON MARKETABLE SECURITIES

| Description | Date Acquired | Par Value | Market Value |
|---|---|---|---|
| | | | |
| NONE | | | |
| | | | |
| | | | |
| | | | |
| Total | | | |

## SCHEDULE "E" STOCKS

| Company | Shares | Date Acquired | Par Value | Market Value |
|---|---|---|---|---|
| Held through Wachovia | | | | $1,137,000 |
| Held through Fidelity | | | | 99,374 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total | | | | $1,236,374 |

Financial Statement page - 2 -

## SCHEDULE "F" NOTES PAYABLE SECURED

| Description | Date | Balance | Payment (m/yr) |
|---|---|---|---|
| NONE | | | |
| | | | |
| | Total | | |

## SCHEDULE "G" NOTES PAYABLE UNSECURED

| Description | Date | Balance | Payment (m/yr) |
|---|---|---|---|
| NONE | | | |
| | | | |
| | | | |
| | | | |
| | Total | | |

## SCHEDULE "H" REAL ESTATE MORTGAGES

| Description | Date | Balance | Payment (m/yr) |
|---|---|---|---|
| NONE | | | |
| | | | |
| | | | |
| | | | |
| | Total | | |

## SCHEDULE "I" AUTO LOANS

| Description | Date | Balance | Payment (m/yr) |
|---|---|---|---|
| NONE | | | |
| | | | |
| | | | |
| | | | |
| | Total | | |

I certify this Statement to be true and correct as of the date indicated:

_Robert W Moore_
Signature

Financial Statement page  - 3 -

Case 1:26-cv-00039    Document 1-1    Filed 04/17/26    Page 139 of 144 PageID #: 144

# Exhibit 10

This instrument was prepared by:
DLO Title, LLC
101 SE Parkway Court, Suite 220
Franklin, TN 37064-3982

*No oath of value required pursuant to*
*Tenn. Code Ann. §67-4-409(a)(1)(C)(vi).*

BK/PG: D415/358-361
**26156283**
4 PGS:AL-QUITCLAIM DEED
MARYC BATCH: 91170
**01/06/2026 - 09:52 AM**

| | |
|---|---|
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 20.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 22.00 |

STATE OF TENNESSEE, GILES COUNTY
**TAMMY HELTON**
REGISTER OF DEEDS

This Instrument was prepared by information provided by the parties with no title examination being made, and the parties hereto hold DLO Title, LLC, its members, employees, attorneys, and assigns harmless from any and all liability in connection herewith. DLO Title, LLC is not the Settlement Agent for this transaction for I.R.S. reporting requirements or for any other purpose.

| Address New Owner: | Send Tax Bills: | Map-Parcel: |
|---|---|---|
| Nancy Suzanne Moore | **Same** | **Map 030, Parcel 005.02** |
| 1200 Blue Creek Road | | **Map 030, Parcel 005.03** |
| Lynnville, TN 38472 | | |

## QUITCLAIM DEED

FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) cash in hand paid by Grantee to Grantor, the receipt of which is hereby acknowledged, **Robert W. Moore, as Trustee, of the Robert W. Moore Revocable Trust Dated November 4, 2014, ("Grantor")** by these presents, does hereby quitclaim and convey unto **Nancy Suzanne Moore ("Grantee")**, her heirs, successors and assigns, all of Grantor's right, title and interest in and to the following described property in **GILES** County, Tennessee, described as follows, to-wit:

## TRACT 1

Located in the Sixteenth (16th) Civil District of Giles County, Tennessee, and being more particularly described as follows, to-wit: The following described tract is bounded on the South by Danny Hanson and Albert Menefee, on the East by Albert Menefee, on the West and North by Blue Creek Road. Beginning at an iron rod set in the southeast corner of the intersection of Blue Creek Road and Trade Branch Road, said point being 25 feet from the center of Blue Creek Road, said point being the northwest corner of this tract; THENCE with the south margin of Blue Creek Road the following 8 calls: South 83 degrees 58' 19" East, 464.66 feet to an iron pin set; South 77 degrees 13' 12" East, 133.52 feet to an iron pin set; South 67 degrees 35' 28" East, 335.11 feet to an iron pin set; South 75 degrees 58' 19" East, 126.72 feet to an iron pin set; South 87 degrees 30' 13" East, 394.63 feet to an iron pin set; North 77 degrees 34' 16" East, 294.72 feet to an iron pin set; North 84 degrees 51' 55" ( erroneously referred to in a previous deed as minutes) East, 117.62 feet to an iron pin set; South 82 degrees 51' 31" East, 7.07 feet to an iron pin set; thence with Albert Menefee the following 2 calls: South 02 degrees 24' 58" East, 428.26 feet to an iron pin set; South 02 degrees 29' 36" East, 562.32 feet to an iron pin set; thence continuing with Menefee, South 02 degrees ( erroneously referred to in a previous deed as feet) 25' 44" East, 412.07 feet (passing an iron pin at 382.05 feet) to a point in the center of Blue Creek; thence continuing with Menefee and

Page 1 of 4

26156283
NANCY SUZANNE MOORE
1200 BLUE CREEK ROAD
LYNNVILLE, TN 38472

*EX.10  (4 PAGES)*

generally along the center of the creek, South 62 degrees 42' 42" West, 135.78 feet to a point in the center of Blue Creek; thence with Danny Hanson and generally along the center of the creek the following 12 calls: South 59 degrees 15' 32" West, 295.33 feet to a point; South 79 degrees 01' 25" West, 58.49 feet to a point; North 88 degrees 53' 42" West, 36.75 feet to a point; North 59 degrees 32' 58" West, 83.17 feet to a point; South 41 degrees 34' 26" West, 77.29 feet to a point; South 26 degrees 52' 29" West, 78.58 feet to a point; South 68 degrees 31' 53" West, 272.73 feet to a point; South 50 degrees 21' 37" West 190.76 feet to a point; South 38 degrees 47' 22" West, 61.04 feet to a point; South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence continuing with Hanson and leaving said creek, North 78 degrees 19' 15" West, 526.19 feet (passing an iron pin set at 36.78 feet) to a 36" Hackberry; thence continuing with Hanson, North 79 degrees 01' 21" West, 275.41 feet to an iron pin set in the east margin of Blue Creek Road (25 feet from the center); thence with said margin the following 4 calls: North 04 degrees 56' 12" East, 104.30 feet to an iron pin set; North 00 degrees 06' 08" East, 1187.96 feet to an iron pin set; North 00 degrees 39' 29" East, 551.96 feet to an iron pin set; North 00 degrees 54' 24" West, 400.38 feet to the point of beginning, containing 81.52 acres, more or less, as per survey of James H. Bingham, Jr., TN RLS No. 1251, dated July 21, 1997.

INCLUDED WITHIN THE BOUNDARIES OF THE ABOVE-DESCRIBED REAL ESTATE BUT EXPRESSLY EXCLUDED FROM THIS CONVEYANCE IS THE FOLLOWING DESCRIBED TRACT OF LAND WHICH WAS PREVIOUSLY CONVEYED TO ALEX F. WADE:

Bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the northwest corner of this tract; THENCE with Stephen K. Heard (remaining portion of the tract), the following 2 calls: South 87 degrees 42' 22" East, 825.09 feet to an iron rod set; South 00 degrees 04' 51" East 883.26 feet (passing an iron rod set at 813 .26'), to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10 degrees 20' 42" West, 137.79 feet to a point; South 02 degrees 34' 52" East, 59.31 feet to a point; South 30 degrees 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence the following 2 calls: North 78 degrees 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79 degrees 01' 21" West, 275.41 feet to an existing iron rod (approximately 25' feet from the center of Blue Creek Road); thence with said margin the following 2 calls: North 04 degrees 56' 12" East, 104.30 feet to an existing iron rod; North 00 degrees 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

The undersigned also conveys unto the grantee, its heirs and assigns, such water rights as were acquired by deed of record in Book D328, page 75, Register's Office of Giles County, Tennessee, described therein as follows:

"Also hereby intended to be conveyed is certain water rights reserved by the Grantor in Deed Book 283, Page 903, for the right to use of one-half of the water produced from a well located thereon

Case 1:26-cv-00039    Document 1-1    Book D415 Page 369    Filed 04/17/26    Page 142 of 144 PageID #: 147

for agricultural/residential purposes along with the right to enter the premises for the purpose of installing water and pumping equipment for the use and benefit of the Grantee herein. These water rights shall be perpetual and shall run with the land."

Being the same property conveyed to Robert W. Moore, Trustee of the Robert W. Moore Revocable Trust dated November 4, 2014 by deed from Robert W. Moore, said deed dated January 30, 2015 and recorded February 18, 2015 in Book D362, pages 375-378, Register's Office of Giles County, Tennessee.

## TRACT 2

The following described tract is bounded on the South by Danny Hanson, on the West by Blue Creek Road, on the North by Stephen K. Heard and on the East by Stephen K. Heard and Danny Hanson. Beginning at an iron rod set in the east margin of Blue Creek Road (approximately 25 feet from the center), said point being approximately 1262 feet South of the center of the intersection of Blue Creek Road and Trade Branch Road, said point being the northwest corner of this tract; thence with Stephen K. Heard (remaining portion of the tract) the following 2 calls: South 87° 42' 22" East, 825.09 feet to an iron rod set; South 00° 04' 51" East, 883.26 feet (passing an iron rod set at 813.26') to a point in the center of Blue Creek; thence with Hanson and generally along the center of Blue Creek the following 3 calls: South 10° 20' 42" West, 137.79 feet to a point; South 02° 34' 52" East, 59.31 feet to a point; South 30° 57' 34" West, 55.40 feet to a point; thence leaving said creek and continuing with Hanson generally along a fence, the following 2 calls: North 78° 19' 15" West, 526.19 feet (passing an existing iron pin at 36.78 feet) to a 36" hackberry; North 79° 01' 21" West, 275.41 feet to an existing iron rod (approximately 25 feet from the center of Blue Creek Road); thence with said margin, the following 2 calls: North 04° 56' 12" East, 104.30 feet to an existing iron rod; North 00° 06' 08" East, 895.72 feet to the beginning; containing 20.14 acres more or less.

Being the same property conveyed to Robert W. Moore, Trustee of the Robert W. Moore Revocable Trust dated November 4, 2014 by deed from Robert W. Moore, said deed dated March 8, 2019 and recorded March 19, 2019 in Book D380, pages 23-25, Register's Office of Giles County, Tennessee.

Tracts 1 and 2 are subject to such limitations, restrictions and encumbrances as may affect the premises.

This is improved property known as **1200 Blue Creek Road, Lynnville, TN 38472.**

*Nancy Suzanne Moore is the spouse of Robert W. Moore. This conveyance is made as a transfer by a transferor of real estate to a revocable living trust created by the same transferor or by a spouse of the transferor, or as a transfer by the trustee of a revocable living trust back to the same transferor or to the transferor's spouse.*

WITNESS my/our hand(s) this 5th day of January, 2026.

_____

GRANTOR, Robert W. Moore, Trustee of
The Robert W. Moore Revocable Trust dated November 4, 2014

**STATE OF TENNESSEE**
**COUNTY OF** Williamson

Before me personally appeared **Robert W. Moore**, the within named bargainor, with whom I am personally acquainted, (or proved to me on the basis of satisfactory evidence) and who acknowledged that he executed the within instrument for the purposes therein contained, and who acknowledged the execution of the same to be his free act and deed.

Witness my hand this the 5th day of January, 2026.

_____
Notary Public
My Commission Expires:  09-27-2028

Page 4 of 4

Book 9419 Page 361